# EXHIBIT A

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0240p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

GRACE CHEN and DANIELLE VILLARREAL, individually and on behalf and all others similarly situated,
        *Plaintiffs-Appellants*,

v.

HILLSDALE COLLEGE,
        *Defendant-Appellee.*

No. 24-1788

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:23-cv-01129—Jane M. Beckering, District Judge.

Argued: May 1, 2025

Decided and Filed: August 28, 2025

Before: SUTTON, Chief Judge; SILER and WHITE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Mark P. Chalos, LIEFF CABRASER HEIMANN & BERNSTEIN, LLP, Nashville, Tennessee, for Appellants. Allyson N. Ho, GIBSON, DUNN & CRUTCHER LLP, Dallas, Texas, for Appellee. **ON BRIEF:** Mark P. Chalos, LIEFF CABRASER HEIMANN & BERNSTEIN, LLP, Nashville, Tennessee, Annika K. Martin, LIEFF CABRASER HEIMANN & BERNSTEIN, LLP, New York, New York, Michelle A. Lamy, Caitlin M. Woods, LIEFF CABRASER HEIMANN & BERNSTEIN, LLP, San Francisco, California, for Appellant. Allyson N. Ho, Elizabeth Kiernan, GIBSON, DUNN & CRUTCHER LLP, Dallas, Texas, Ryan J. Walsh, EIMER STAHL LLP, Madison, Wisconsin, for Appellee.

    SUTTON, C.J., delivered the opinion of the court in which SILER, J., concurred, and WHITE, J., concurred in part. WHITE, J. (pp. 15–19), delivered a separate opinion concurring in part and dissenting in part.

## OPINION

SUTTON, Chief Judge. Two Hillsdale College students filed separate complaints that individual classmates sexually assaulted them. At the end of an allegedly inadequate discipline and investigation process, they sued Hillsdale for negligence, intentional infliction of emotional distress, and discrimination. The district court dismissed their complaint for failing to state a claim. We affirm.

I.

Hillsdale College is a Christian school in western Michigan. Its sexual-misconduct policy prohibits behavior that shows "disrespect to another person based upon sex." R.19-1 at 2. That includes sexual assault, which the policy condemns as "not only a gross failure to govern oneself" but also a violation of "the rights and dignity of the victim, the standards of the Honor Code, and the basis of membership in the College." R.19-1 at 2. A violation, the policy warns, triggers "College discipline" "at a minimum" and may be "punishable by law." R.19-1 at 2.

The policy "encourages prompt reporting" of any relevant incident, provides details about how to report an assault, and explains the investigatory process. R.19-1 at 2–3. Hillsdale investigates "[a]ll reports of sexual misconduct . . . , as appropriate," and sometimes enlists "a neutral, third-party investigator" to lead the effort. R.19-1 at 3. Before completing an investigation, Hillsdale "offer[s] assistance" to the complainant and may take "interim measures" to address an incident, including housing and schedule changes as well as no-contact orders. R.19-1 at 3. After Hillsdale completes an investigation, it takes "appropriate disciplinary actions." R.19-1 at 3.

In November 2021, Grace Chen, then a freshman, alleges that a fellow Hillsdale track athlete sexually assaulted her in an on-campus dormitory. Chen reported the incident to the Dean of Women and Associate Dean of Women. The Dean of Women reviewed the report and arranged for Chen to meet with an outside lawyer whom Hillsdale hired to investigate the assault.

The lawyer told Chen that her assailant did not refute the allegations, removing any need to interview witnesses, and instead focused on guiding the disciplinary process. The lawyer told Chen that, as a result of "a prior drinking infraction," the assailant "was already doing community service" and attending "AA meetings," and he therefore would not be punished further. R.19 ¶ 83. While the lawyer mentioned the possibility of a no-contact order, Hillsdale did not impose one. Chen continued to see the assailant at school and at track practices.

Chen's mother became involved. When she asked the school administrators for a report, they sent her to the school's general counsel, who allegedly did not provide one. More back-and-forth ensued, and a few weeks later a Hillsdale administrator told Chen for the first time that there were discrepancies between her story and the accused's version. After more pressure from Chen and her mother for a written report, the Dean of Women told Chen that she could meet with one of the two lawyers involved if she wanted to continue to press her case. At that point, Chen declined to meet with the school's counsel and stopped communicating with the school. Her grades and athletic performance suffered, and about a year after the investigation she was diagnosed with anxiety and post-traumatic stress disorder. At the time she filed this complaint, Chen remained a student at Hillsdale.

In August 2021, Danielle Villarreal, then a sophomore, alleges that a member of the Hillsdale baseball team sexually assaulted her in an off-campus apartment. Villarreal reported the assault to local police and the Dean of Men, who hired an outside lawyer to investigate the incident. The lawyer interviewed the assailant a few weeks later, and reported to Villarreal that the assailant had violated the sexual misconduct policy. He was put on social probation, required to do community service, and suspended indefinitely from the baseball team. According to the lawyer, Hillsdale would not expel him because, during the incident, he eventually "stopped" when Villarreal "told him to." R.19 ¶ 114. Villarreal told the lawyer that she had never consented in the first place.

Villarreal alleges that Hillsdale did not enforce this punishment because she saw the accused at a party and later saw him on campus wearing baseball shoes. She also asked the baseball coaches whether her assailant was allowed to practice, and they refused to answer. The assailant rejoined the baseball team the next semester, just before the baseball season began.

Villareal adds that Hillsdale's general counsel warned of "consequences" for Villarreal if she continued to inquire about the investigation. R.19 ¶ 121. The incident took a toll on Villareal, prompting her to see a therapist, to take antidepressants, and eventually to withdraw from Hillsdale.

Frustrated by Hillsdale's handling of their complaints and its sexual-misconduct policy, Chen and Villarreal filed this lawsuit. They sued Hillsdale in federal district court, bringing several federal and state claims on behalf of themselves and a proposed class of Hillsdale female students. Hillsdale filed a motion to dismiss under Civil Rule 12(b)(6) and a motion to strike the class allegations. The court granted the motion to dismiss and treated the motion to strike the class allegations as moot.

II.

On appeal, Chen and Villareal challenge the district court's dismissal of three state-law claims: (1) negligence; (2) intentional infliction of emotional distress; and (3) discrimination under a Michigan civil rights statute. To survive a motion to dismiss, a plaintiff must allege sufficient facts to support a plausible theory of relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). They have not appealed the rejection of their federal claim under Title IX, presumably because Hillsdale does not accept any funding from the federal government. And they have not appealed their claim under the Michigan Consumer Protection Act. We give fresh review to the district court's decision. *BNA Assocs. LLC v. Goldman Sachs Specialty Lending Grp., L.P.*, 63 F.4th 1061, 1064 (6th Cir. 2023).

*Negligence.* To prevail on their negligence claim under Michigan law, Chen and Villareal must show that: (1) Hillsdale owed them a legal duty to prevent these sexual assaults; (2) Hillsdale breached that duty; (3) the two women suffered damages; and (4) the breach proximately caused their damages. *Case v. Consumers Power Co.*, 615 N.W.2d 17, 20 (Mich. 2000).

The key problem with their theory of liability turns on duty, more precisely the absence of a duty on Hillsdale's part to prevent these assaults by one student against another. Michigan does not impose a "duty to protect another from the criminal acts of a third party."

*Krass v. Tri-County Sec., Inc.*, 593 N.W.2d 578, 582 (Mich. Ct. App. 1999). "Under all ordinary and normal circumstances, in the absence of any reason to expect the contrary," an "actor may reasonably proceed on the assumption that others will obey the criminal law." Prosser & Keeton, § 33, at 201 (5th ed. 1984). "[T]he burden of taking continual precautions" against hypothetical crimes "almost always exceeds the apparent risk." *Id.*; *see In re Certified Question from Fourteenth Dist. Ct. of App. of Tex.*, 740 N.W.2d 206, 211 (Mich. 2007) (considering whether a legal duty should be imposed based on "the relationship of the parties, the foreseeability of the harm, the burden on the defendant, and the nature of the risk presented").

Some States, including Michigan, create an exception to this general rule when a dependent relationship exists between parties. *Williams v. Cunningham Drug Stores, Inc.*, 418 N.W.2d 381, 383 (Mich. 1988). Think of a landlord and a tenant. *E.g.*, *Trentacost v. Brussel*, 412 A.2d 436 (N.J. 1980). Or a carrier and a passenger. *E.g.*, *Werndli v. Greyhound Corp.*, 365 So. 2d 177 (Fla. Dist. Ct. App. 1978). Or an elementary school and its students. *E.g.*, *McLeod v. Grant Cnty. Sch. Dist. No. 128*, 255 P.2d 360 (Wash. 1953). In situations like these, one entity may have a "special responsibility" to the other, whether because one individual occupies a position of vulnerability or because the other individual/entity is in a "unique position to prevent the harm." Prosser & Keeton, *supra*, § 33, at 202–03.

Even in these settings, the duty to protect against third party crime extends only to foreseeable risks. "Where the events leading to injury are not foreseeable, there is no duty." *Johnson v. City of Detroit*, 579 N.W.2d 895, 902 (Mich. 1998); *see In re Doe*, No. 264679, 2006 WL 475285, at *2 (Mich. Ct. App. Feb. 28, 2006). The foreseeable risks must be "imminent" and apply to readily "identifiable" individuals. *MacDonald v. PKT, Inc.*, 628 N.W.2d 33, 38–39 (Mich. 2001); *see Graves v. Warner Bros.*, 656 N.W.2d 195, 201 (Mich. Ct. App. 2002) (explaining that "readily" identifiable victims are "promptly," "quickly," and "easily" identifiable victims) (quotation omitted).

Gauged by these standards, Hillsdale did not violate any duty to Chen and Villareal. Michigan law, to start, did not impose a general duty on the college to protect its students from third-party crimes. No such far-reaching duty exists under Michigan law. *Tame v. A L Damman Co.*, 442 N.W.2d 679, 680 (Mich. Ct. App. 1989) (where a store owner employed a security

guard that allegedly failed to sufficiently patrol a parking lot, the store owner "had no duty to take all possible precautions for the protection of invitees by turning its establishment into a fortress").

The modest exception to this rule for dependent relationships and foreseeable crimes arising from them also does not apply. Both assaults had no relation to a school-sponsored event or activity that might have provided Hillsdale with enough "control" over the circumstances to create a dependent relationship. *In re Doe*, 2006 WL 475285, at *2 (declining to impose a duty based on a school-student relationship where an assault of a high schooler occurred on school grounds but outside school hours and unrelated to school-sponsored activities); *cf. Davidson v. Univ. of N.C. at Chapel Hill*, 543 S.E.2d 920, 927–28 (N.C. Ct. App. 2001) (finding a dependent relationship between a college and its cheerleaders during a practice). Chen and Villarreal did not "entrust[]" themselves to Hillsdale's care when they went to dorm rooms or off-campus apartments. *In re Doe*, 2006 WL 475285, at *2. When it comes to these settings, Hillsdale never took on the kind of "unique position," marked by control and responsibility, that reflects a dependent relationship. Prosser & Keeton, *supra*, § 33, at 202–03.

But even if that were not the case, even if a special relationship existed based on these allegations, Chen and Villareal face a foreseeability obstacle that they cannot overcome. They do not plead any facts showing, or even suggesting, that Hillsdale had reason to know of an "imminent and foreseeable" attack against either of them. *Graves*, 656 N.W.2d at 202. So far as the complaint indicates, the assailants had no known history of assault against these women or any others. No alleged facts show suspicious behavior likely to lead to imminent crime. All of this returns Hillsdale to the customary position of a college and the customary rule applicable in that setting—that it could trust that its students would "obey the criminal law" and that it need not treat each student as a lurking rapist. *MacDonald*, 628 N.W.2d at 39.

Much as we lament the crimes Chen and Villarreal suffered, their arguments on appeal do not show that the college, as opposed to the men, should be liable for these assaults. The women claim that Hillsdale had a duty to provide a "safe educational environment." R.19 ¶¶ 137–38. But absent a special undertaking or school-sponsored activity, the "general rule" across all States is that "no special relationship exists between a college and its own students because a college is

not an insurer of the safety of its students." *Freeman v. Busch*, 349 F.3d 582, 587 (8th Cir. 2003) (emphasis omitted); *Guest v. Hansen*, 603 F.3d 15, 21 (2d Cir. 2010) (explaining that colleges "do not act *in loco parentis*"); *McCauley v. Univ. of the V.I.*, 618 F.3d 232, 245 (3d Cir. 2010) ("[T]he idea that public universities exercise strict control over students via an in loco parentis relationship has decayed to the point of irrelevance.").

The women claim in the alternative that the college in fact undertook a special relationship with them. But as the authority they invoke shows, these kinds of relationships arise only during school-related activities and involve only foreseeable risks to, and from, specific individuals. *See Avila v. Citrus Cmty. Coll. Dist.*, 131 P.3d 383, 390, 392 (Cal. 2006) (discussing the "special duties that schools and colleges owe their athletes" during games and practices based in part on coaches' "supervisorial authority over the conduct of the game"); *Regents of Univ. of Cal. v. Super. Ct.*, 413 P.3d 656, 660–62, 673 (Cal. 2018) (recognizing a duty to protect a student where she was stabbed by a peer during chemistry, and the school knew of the assailant's history of schizophrenia and violence against peers); *Barlow v. State*, 540 P.3d 783, 790 (Wash. 2024) (declining to impose a duty to prevent an off-campus, unforeseeable harm to a student).

It's not that easy, Chen and Villarreal respond. They point to segments of their complaint that include two anonymous Reddit posts (saying that Hillsdale does not take assault allegations seriously) and a student newspaper article (saying that Hillsdale would benefit from a more "accessible, straightforward procedure"). R.33-5 at 4. But the reality that anonymous students thought the college could have better policies in this area and the unfortunate reality that the college's existing policies did not prevent all assaults in the past does not suffice to create a cognizable claim. Michigan courts require a reason to know of a "specific" risk of "imminent harm" to an "identifiable" person before deeming a crime foreseeable. *MacDonald*, 628 N.W.2d at 39. A general record of past crime, with no reason to suspect any one student of a future crime, does not suffice. *See Williams*, 418 N.W.2d at 384. That is particularly so in the context of an article that acknowledges that Hillsdale, perhaps owing to a tradition of single-sex dormitories, has an unusually safe campus when it comes to sexual assault.

The claimants' cited cases reinforce this conclusion. In *O'Neal v. MCC Mecosta, LLC*, the Michigan Court of Appeals *rejected* the imposition of a duty on a resort owner when its

employee sexually assaulted a guest. No. 356766, 2023 WL 461844, at *5 (Mich. Ct. App. Jan. 26, 2023). Even though guests had complained to the owners about the employee's "inappropriate conduct that made guests uncomfortable," that did not suffice to create a foreseeable risk that he would sexually assault a guest. *Id.*

*Dawe v. Bar-Levav & Associates, PC*, is no more helpful. 808 N.W.2d 240 (Mich. Ct. App. 2010). The Michigan Court of Appeals concluded that a jury could find that a shooting at a psychiatrist's office by a former patient was foreseeable. *Id.* at 244. The facts show why. The shooter ominously told his psychiatrist that he "fantasized about murdering" people and showed that this was more than an improbable fantasy by bringing a handgun to the office. *Id.*

Unlike either case, Chen and Villarreal do not allege that Hillsdale had notice of any "specific situation" of peril, much less one that would lead it to "recognize" a specific risk "of imminent harm" to Chen or Villarreal. *Graves*, 656 N.W.2d at 202 (quotation omitted). These cases instead reflect Michigan's reluctance to "transform the test of foreseeability" into one of omniscience—and to make the college underwrite responsibility for every bad act by its students. *Brown v. Brown*, 739 N.W.2d 313, 318 (Mich. 2007).

The rest of Chen and Villarreal's response rests on federal cases decided under Title IX, a claim they no longer pursue (presumably because Hillsdale does not accept funding from the federal government) and a set of cases that says nothing about Hillsdale's liability under Michigan negligence law. Even if we drew parallels from those authorities, for what it is worth, they would not change things. The cases either reject the relevant negligence claim, involve foreseeable risks to identifiable individuals, or turn on unique obligations created by Title IX. *See Ware v. Univ. of Vt. & State Agric. Coll.*, 722 F. Supp. 3d 379, 412–13, 441 (D. Vt. 2024) (declining to dismiss Title IX claims about campus-wide prevention of sexual assault on foreseeability grounds yet dismissing corresponding negligence claims that lacked allegations of a "specific knowledge" of assailants' danger); *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1108 (9th Cir. 2020) (dismissing an individual's Title IX claim against a university that violated its own policies but investigated the complaint, met with the assailant, and "eventually imposed appropriate sanctions"); *Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1173, 1183–84 (10th Cir. 2007) (finding a triable issue on Title IX liability only after the local district

attorney told the university to supervise football team events where sexual assaults occurred in the past).

As a fallback, Chen and Villarreal urge us to certify this state-law question to the Michigan Supreme Court. But the plaintiffs could have sought the Michigan courts' view on the subject by filing in state court at the outset. They instead chose to file this lawsuit in federal court. We disfavor certification "where a plaintiff files in federal court and then, after an unfavorable judgment, seek[s] refuge in a state forum." *City of Columbus v. Hotels.com, L.P.*, 693 F.3d 642, 654 (6th Cir. 2012). The plaintiffs also failed to request certification below. Absent a good explanation, and the claimants offer none, "certification is disfavored when it is sought only after the district court has entered an adverse judgment." *State Auto Prop. & Cas. Ins. v. Hargis*, 785 F.3d 189, 194 (6th Cir. 2015).

*Intentional Infliction of Emotional Distress.* To establish this claim under Michigan law, the plaintiffs must show that (1) Hillsdale engaged in extreme and outrageous conduct that was (2) intentional or reckless, and that (3) caused (4) severe emotional distress. *Teadt v. Lutheran Church Mo. Synod*, 603 N.W.2d 816, 823 (Mich. Ct. App. 1999). To show "extreme and outrageous" conduct, a claimant must show that the conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Bernhardt v. Ingham Reg'l Med. Ctr.*, 641 N.W.2d 868, 870 (Mich. Ct. App. 2002). Merely offensive conduct does not suffice. *See, e.g., Meek v. Mich. Bell Tel. Co.*, 483 N.W.2d 407, 410 (Mich. Ct. App. 1991) (finding that a claim "clearly" misses the extreme and outrageous threshold where employees berated their colleague by calling her "chubby" and "ugly," asking "who she had slept with to get her job," and insulting her religion); *Duran v. Detroit News, Inc.*, 504 N.W.2d 715, 720 (Mich. Ct. App. 1993) (dismissing a claim for failure to plead outrageous conduct where a newspaper published individuals' location despite knowledge of death threats against them).

Chen and Villareal's allegations do not cross this daunting threshold. Start with the possibility of a claim premised on Hillsdale's response to Chen's and Villarreal's complaints. Recall that at least one dean told Chen that she believed her accusations, put her in touch with a lawyer, and, after some back and forth, the investigation ended when Chen stopped pursuing her

claim. Villarreal's claims triggered a similar investigatory process that resulted in (at least some) discipline against her assailant. That does not amount to beyond-the-bounds conduct that is extreme and outrageous.

Turn to the possibility that the claimants target Hillsdale's general approach to sexual assaults on campus. At worst, the complaint paints a picture of a disorganized disciplinary process that was not as victim friendly as it could have been. While Chen and Villarreal's complaint offers several criticisms about the investigatory process and their treatment, it does not show that Hillsdale's approach to sexual assault claims—and the due process to the alleged assailants that it simultaneously must provide—amounts to extreme and outrageous conduct. At one point in their complaint, the claimants cite a Hillsdale article that describes the school as "atypically safe and community-oriented" and committed to the "fight for its women" when it comes to sexual misconduct, an issue that school officials treat with "the utmost urgency and importance." R.33-5 at 3. That is not the kind of information that one associates with a cognizable claim of intentional infliction of emotional distress.

A similar conclusion applies to hurtful comments that Chen and Villarreal allege officials made along the way. Officials at one point, they allege, "downplay[ed] the severity of [Chen's] assault," R.19 ¶ 79, and suggested to her mother that Chen had provided an inaccurate account of the assault. The school's lawyer likewise allegedly asked Villarreal if, in reality, the assault was a consensual encounter and warned her to stop asking about the status of her assailant's punishment when she saw him at parties and surmised that he rejoined the baseball team after a semester-long punishment. Even if we accept the labels that the claimants apply to these aspects of the investigation—"insulting," "insensitive," and "cynical"—they are not so beyond scale as to create a cognizable claim. *Harris v. Citizens Ins.*, 366 N.W.2d 11, 13 (Mich. 1983).

No officials, for instance, incessantly "browbeat" Chen or Villarreal into forgoing their claims. *Rosenberg v. Rosenberg Bros. Special Acct.*, 351 N.W.2d 563, 568 (Mich. Ct. App. 1984) (holding that allegations of twenty-six attempts by a defendant to wear down a widow into selling him her portion of her late husband's business could suffice to state a claim). To the contrary, Chen did not seek further action when offered another chance to talk to the outside lawyer hired by the school, and Villarreal's investigation concluded with some degree of

discipline. No one called either of the two women offensive slurs or publicly embarrassed them. *Ledsinger v. Burmeister*, 318 N.W.2d 558, 562 (Mich. Ct. App. 1982) (finding a triable issue on the extreme and outrageous requirement where a store owner made racial epithets at a man while ejecting him from his public business). Hillsdale instead provided both women access to outside lawyers that it hired to investigate the incidents and to the relevant deans after the lawyers completed the investigations.

Chen and Villarreal claim that other (unidentified) students have had similar experiences with Hillsdale's sexual misconduct procedures. This pattern, they surmise, establishes something worse than disorganization and a victim-insensitive process. But Chen and Villarreal do not allege any specific facts showing other instances of such behavior. The only specific complaints they mention are their own. That leaves them only with a "conclusory" allegation of a pattern, which does not suffice. *Ashcroft*, 556 U.S. at 678.

The two women add that, in sizing up this claim, a court must consider the "aggregated" circumstances. *Conway v. Detroit Pub. Sch. Cmty. Dist.*, No. 360875, 2023 WL 2618500, at *2 (Mich. Ct. App. Mar. 23, 2023). We agree. But that does not suffice to save this claim. Yes, a court must acknowledge each of the alleged instances of misconduct by the college. Here, that would include: One of the school's lawyer's comments "downplay[ing] the severity of" Chen's assault and suggesting that she "put the sexual assault behind her" and "befriend her assailant in the future," R.19 ¶¶ 79, 84, that same lawyer's statement to Chen's mother that Chen's "account of the incident was not accurate," R.19 ¶ 91, the school's failure to implement a no-contact order or provide a written report for Chen, other lawyers' remarks to Villarreal "suggest[ing] that she was to blame" for the encounter, R.19 ¶ 109, or that she reported the incident "only after she came to regret" it, R.19 ¶ 122, and a warning from one of them that if Villarreal "continued to inquire about" her assailant's punishment, "there would be consequences for her," R.19 ¶ 121. But, at the same time, a court cannot ignore the undisputed instances of positive conduct, in which the college responsibly handled these allegations. That would include: Hillsdale's prompt efforts to connect both women with an outside lawyer to investigate their assaults upon their initial reports, a school dean's assurance that she "believed" Chen, R.19 ¶ 75, and Hillsdale's conclusion that misconduct occurred in Villarreal's case and its subsequent discipline of her

assailant. Nor may a court ignore the college's obligation to provide a fair process to the alleged assailants. It's only after looking at this aggregation of circumstances that a court can make a fair call about whether the claimants have a cognizable claim. All in all, these circumstances do not rise to the level of a cognizable claim of intentional infliction of emotional distress. The district court properly dismissed this claim.

The dissent invokes three out-of-state, out-of-circuit cases that purport to involve comparable behavior. *Brandon ex rel. Est. of Brandon v. Cnty. of Richardson*, 624 N.W.2d 604 (Neb. 2001); *Drejza v. Vaccaro*, 650 A.2d 1308 (D.C. 1994); *Snyder v. Smith*, 7 F. Supp. 3d 842 (S.D. Ind. 2014). Chen and Villarreal invoke none of these cases—and with legitimate reason. They all arise in the distinct context of law enforcement officials and their interactions with victims of assault. And they all involve far more extreme conduct. *See Brandon*, 624 N.W.2d at 622 (officer expressed "a prurient interest in the rapes"); *Drejza*, 650 A.2d at 1309 (officer "toss[ed] distraught rape victim's undergarments at her while telling her to take her 'little panties home'"); *Snyder*, 7 F. Supp. 3d at 872 (officer used expletives to refer to victim's parents in her presence). These opinions—applying other States' laws to incomparable facts—do not counsel a different result here.

*Sex Discrimination.* The Elliot Larsen Civil Rights Act forbids private and public schools from discriminating against individuals on the basis of sex. Mich. Comp. Laws §§ 37.2102(1), 37.2401. The Act permits two theories of discrimination: disparate treatment and disparate impact. *Lytle v. Malady*, 579 N.W.2d 906, 916 n.26 (Mich. 1998). A disparate-treatment claim requires intentional discrimination, while a disparate-impact claim involves a facially neutral policy with a discriminatory effect on a protected class. *Id.* The "essence" of both claims turns on whether "similarly situated" Hillsdale students were "treated differently because of their sex." *Betty v. Brooks & Perkins*, 521 N.W.2d 518, 523 (Mich. 1994). Chen and Villareal fail to state a claim under either option.

Take the disparate treatment claim. To establish a prima facie case of disparate-treatment sex discrimination, Chen and Villarreal must allege facts showing Hillsdale's differential treatment of men and women who engage in "the same or similar conduct." *Id.* But the amended complaint contains no allegations that Hillsdale treats female victims of sexual assault

worse than male victims. The policy prohibits "[a]ny sexual assault," no matter the sex of the assailant, no matter the sex of the victim. R.33-4 at 2. No allegations suggest that Hillsdale tailored the application of that policy differently based on sex. The only male students to whom the complaint refers are those "who perpetrate sexual violence," not those who suffer from it. R.19 ¶ 173. The allegations suffer from a "dearth" of facts indicating that "greater punishment," or other more favorable outcomes, would have resulted "had the assault victim been male." *Garvin v. Detroit Bd. of Ed.*, No. 298838, 2013 WL 951118, at *5 (Mich. Ct. App. Feb. 26, 2013). That reality directly undermines the claim.

Turn to disparate impact. To establish a cognizable claim of discrimination under this theory, the claimants must show that Hillsdale's "facially neutral" policy "disproportionately impacts or burdens" women more than men. *Alspaugh v. Comm'n on L. Enf't Standards*, 634 N.W.2d 161, 170 (Mich. 2001) (quotation omitted). Generalities about societal disparities "without more" do not trigger liability. *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 542 (2015). Else, schools would take on liability for "disparities they did not create." *Id.* Chen and Villarreal's complaint makes allegations premised only on that kind of disparity—between men's and women's sexual assault rates in America in general—and nothing more. They do not include any facts or statistics showing that Hillsdale's policy caused or worsened a disparity between the sexes at the school. The only specific experiences in the complaint are their own. And two examples of assault do not "adequately explain how" Hillsdale's policy disparately burdens its female students. *Burkhardt v. Flint Cmty. Sch.*, No. 347319, 2020 WL 1488659, at *5 (Mich. Ct. App. Mar. 24, 2020). Recall that the Hillsdale newspaper article cited in their complaint, moreover, indicates that Hillsdale does better in this area than most colleges—that it is an "atypically safe" community that's committed to the "fight for its women." R.33-5 at 3. That is not the kind of thing one sees in a cognizable disparate impact claim.

Chen and Villarreal's responses do not alter this conclusion. To show disparate treatment, they claim for the first time on appeal that male students are in fact treated more favorably than women when reporting sexual assault at Hillsdale. But it is too late to raise this

assertion, unadorned with supporting facts, that never appeared in the amended complaint. *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 613 (6th Cir. 2009).

To show disparate impact, the claimants point to alleged shortcomings of Hillsdale's misconduct policy. But they do not tether most of those allegations to a disparate impact on female students. There is one exception. They claim that Hillsdale, by expressing its religious view that "morally responsible sexual acts" occur within a marital relationship, "renders the rest of" its policy in this area "moot" and "chill[s]" student reporting of sexual misconduct, all to the detriment of female students. R.19 ¶¶ 23–24. But the allegation that Hillsdale—by featuring its faith commitments in the college's mission statement, by spelling out those principles with respect to its discouragement of pre-marital sex, and by acting on them by allowing only single-sex dormitories—somehow perpetuates a college culture with more sexual assaults than usual amounts to the epitome of a conclusory and unsupported allegation at best and runs the risk of disparaging people of faith at worst. Hillsdale's record, as this case shows, is not perfect. But neither, we suspect, is the record of any college in America, faith-based or otherwise. At a minimum, Hillsdale's promise to respond to misconduct reports "swiftly and with compassion and respect"—highlighted in the article cited in the students' complaint in this case—reflects an effort to do all it can to prevent and, if need be, respond to such assaults. R.33-5 at 4.

None of the claimants' other contentions fix the problems with this claim. Chen and Villarreal maintain that the policy should better describe prohibited behavior, specific consequences for offenders, and the meaning of consent. But they never allege facts suggesting that these provisions *cause* a disparate impact on Hillsdale women as opposed to merely *failing* to correct an imbalance that already exists across society. On the whole, their allegations include only facts showing (on a nationwide level) the relative sexual-assault rates of the sexes and their belief that Hillsdale's policy does not work well. That does not suffice to create a cognizable claim that Hillsdale's policy disparately impacts female students.

For these reasons, we affirm.

---

### CONCURRENCE / DISSENT

---

HELENE N. WHITE, Circuit Judge, concurring in part and dissenting in part.  I agree with the majority's disposition of Plaintiffs' negligence and sex-discrimination claims but write separately because I would reverse the dismissal of Plaintiffs' intentional infliction of emotional distress ("IIED") claim.

Although the majority acknowledges Plaintiffs' allegations that multiple Hillsdale officials made insulting or threatening remarks during the disciplinary process, it ultimately finds this "misconduct" counterbalanced by the college's efforts to investigate Plaintiffs' cases.  Maj. Op. 11–12.  Perhaps it is a close call, but I respectfully submit that the majority minimizes the egregious nature of the alleged remarks.

I take Plaintiffs' well-pleaded allegations as true.  Chen claims that the outside lawyer assigned to her case "downplay[ed] the severity of the assault" by telling Chen that she was "fortunate that her assailant did not rape her." R. 19, PageID 241.  At a later meeting, this lawyer went further and said that "Chen was not sexually assaulted because there was no obvious force." *Id.*  The lawyer suggested that Chen "take time off during the summer break and put the sexual assault behind her so she could be friends with her assailant in the future." *Id.*  Other administrators resisted or ignored Chen's and her mother's efforts to learn more about the investigation, its results, and the possibility of a no-contact order for Chen's assailant. *Id.* at 241–42.  Hillsdale's general counsel, for example, told Chen's mother, "in a hostile tone," that "Chen's account of the incident was not accurate." *Id.*  And Chen "stopped pursuing her claim," as the majority states, Maj. Op. 9–10, only because Hillsdale refused to engage with Chen and her mother and ultimately offered the choice of meeting with the same outside lawyer who downplayed her claims "or consider[ing] her case concluded," R. 19, PageID 243.

Villarreal alleges that the outside lawyer assigned to her case (1) "suggested that [Villarreal] was to blame"; (2) admitted that she had "taken too long to meet with Villarreal's rapist"; and (3) mischaracterized the events by claiming that Villarreal's assailant had stopped

sexual conduct once Villarreal withdrew consent (Villarreal asserts she never gave consent in the first place). *Id.* at 245. Villarreal also alleges that Hillsdale did not enforce punishment for her assailant and that the school's general counsel (1) "threatened [her] parents that if she continued to inquire about the investigation and punishment, there would be consequences for her," and (2) suggested that Villarreal "reported her rape only after she came to regret a consensual sexual encounter." *Id.* at 246.

These allegations suffice to establish the extreme-and-outrageous-conduct prong of an IIED claim. To begin, the Restatement explains that "[t]he extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests. . . . In particular police officers, *school authorities*, landlords, and collecting creditors have been held liable for extreme abuse of their position." Restatement (Second) of Torts § 46 cmt. e (emphasis added). Further, "[t]he extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress." *Id.* cmt. f.[1]

Based on some of these considerations, the Michigan Court of Appeals held that although using racial slurs "may not be extreme and outrageous" in all contexts, summary judgment for the defendant was precluded where a merchant used slurs "while in the process of throwing [the plaintiff] out of [the defendant's] place of business, ostensibly a public establishment." *Ledsinger v. Burmeister*, 318 N.W.2d 558, 562 (Mich. Ct. App. 1982). "Critical to this case and to defendant's ability to inflict distress is the relation between the parties, that of a public merchant to his customer." *Id.* In another case, a Michigan appeals court reversed summary judgment entered in favor of a defendant who drew a cartoon depicting himself and a married coworker engaging in extramarital sexual conduct. *Linebaugh v. Sheraton Mich. Corp.*, 497 N.W.2d 585, 588–89 (Mich. Ct. App. 1993). The court held that producing an "offensive" cartoon "imput[ing] a want of chastity" to the plaintiff "constitutes conduct so outrageous in

---

[1]"Although the Michigan Supreme Court has never recognized the tort of intentional infliction of emotional distress, the Michigan appellate courts that have addressed the tort have adopted the position of the Restatement (Second) of Torts." *Ringl v. Ameritech Corp.*, 107 F.3d 871, 1997 WL 63144, at *6 (6th Cir. Feb. 12, 1997) (unpublished table decision) (gathering cases); *see also Hayes v. Langford*, No. 280049, 2008 WL 5158896, at *6 (Mich. Ct. App. Dec. 9, 2008) (applying comments e and f).

character and so extreme in degree that it goes beyond all bounds of common decency in a civilized society." *Id.* at 587–88.

Persuasive authority also supports Plaintiffs' claims. The Supreme Court of Nebraska, applying principles identical to those applied in Michigan, found that a police officer's conduct was extreme and outrageous when the officer interviewed a victim who "was in a particularly vulnerable emotional state" from being "beaten and raped earlier that day" and engaged in the following conduct: denigrating the victim's "gender identity disorder"; using "crude and dehumanizing language" to describe the rape; "express[ing] disbelief" regarding the victim's account of the rape; suggesting that the victim "willingly participated in the sexual acts"; and asking invasive questions not relevant to the investigation. *Brandon ex rel. Est. of Brandon v. Cnty. of Richardson*, 624 N.W.2d 604, 621–22 (Neb. 2001). The court also repeatedly noted that as a police officer, the investigator "was in a position of authority." *Id.*

Similarly, a D.C. court of appeals reversed the grant of summary judgment where an officer was "contemptuous of [a victim's] claim of rape because the assailant was a former boyfriend who was alone with her in her apartment in the early hours of the morning"; "treated her with derision"; and "bullied her into initially declining to press charges." *Drejza v. Vaccaro*, 650 A.2d 1308, 1316 (D.C. 1994); *see also Snyder v. Smith*, 7 F. Supp. 3d 842, 874 (S.D. Ind. 2014) ("The IIED inquiry depends inescapably on 'cultural norms and values,' and it is our judgment that contemporary society has come to recognize the profound emotional scars left by sexual assault and to abhor the barbarity of a police officer's treating a victim with callousness and derision." (citation omitted)).

The majority characterizes Plaintiffs' allegations as depicting investigations that were "disorganized" and "not as victim friendly as [they] could have been." Maj. Op. 10. That may be true of investigations that, for example, involve undue delays or infrequent communication with victims, but such a benign characterization is inapt for school officials alleged to have blamed and threatened the victims while stonewalling any further investigation or punishment. And closer consideration of the "positive conduct" cited by the majority reveals its limited weight. That Hillsdale "connect[ed] both women with an outside lawyer" and "discipline[d]" Villarreal's assailant falls flat when considering that it was the same lawyers and insufficient

punishment that caused the alleged emotional distress. Maj. Op. 11. The bottom line is that although Hillsdale made some minimal effort to respond to Plaintiffs' claims, its response falls well short of cases in which courts dismissed IIED claims because of a sufficient investigation. *Cf. Bailey v. New York L. Sch.*, 2017 WL 6611582, at *12–13 (S.D.N.Y. Dec. 27, 2017) (IIED claim dismissed where the organization conducting an allegedly deficient investigation in fact "promptly" initiated the investigation, "credited Plaintiff's testimony," "punished" the individual accused of sexually assaulting the plaintiff, and implemented conditions "meant to ensure that he would not come into contact with Plaintiff"), *aff'd*, 2021 WL 5500078 (2d Cir. Nov. 24, 2021); *M.B. v. Chapel Hill-Carrboro City Sch. Bd. of Educ.*, 2021 WL 4412406, at *4 (M.D.N.C. Sept. 27, 2021) (failure to investigate allegations of sexual assault was not extreme or outrageous conduct in part because the plaintiff did not allege that the defendants "attempted to publicly discredit" the victim or "t[ook] the side of Plaintiff's abusers"; instead, the defendants "made some attempt to separate Plaintiff from at least one abuser").

The majority waives away several of the above cases as "out-of-circuit" and relating to the "distinct context of law enforcement." Maj. Op. 12. This position ignores that these cases apply materially similar IIED standards, as well as the same Restatement provisions that Michigan courts have adopted. *See Snyder*, 7 F. Supp. 3d at 873 (describing the law applied in *Drejza* and *Brandon* as "nearly identical"). And it creates a distinction between law enforcement and school officials where the Restatement sees none. Restatement (Second) of Torts § 46 cmt. e ("In particular *police officers*, *school authorities*, landlords, and collecting creditors have been held liable for extreme abuse of their position." (emphases added)). True, some of Plaintiffs' alleged facts may not be as egregious as in *Brandon* (ridiculing the victim's gender identity and crudely discussing the rape shortly after it happened) and *Drejza* (treating the victim with derision), but the three cases share fundamental similarities: an authority figure questioning a vulnerable individual; that authority figure disbelieving the victim or justifying her assailant's behavior; and an attempt to bully the victim into discontinuing the investigation. Plaintiffs also allege certain conduct absent in *Bailey* and *M.B.*, cases dismissing IIED claims. *Bailey* noted that investigators credited the plaintiff's testimony, punished the assailant, and took steps to prevent the victim from coming into contact with the assailant; here, however, Plaintiffs allege that Hillsdale officials discredited their accounts and failed to punish or enforce punishment for

the assailants. And *M.B.* noted that investigators did not take the side of the assailant and attempted to separate the assailant and victim; not so here. I conclude that with these cases in mind, and taking Plaintiffs' allegations as true, the complaint adequately pleads extreme and outrageous conduct.

Because I find this element sufficiently pleaded, I would turn to the remaining ones. Hillsdale does not challenge causation or that Plaintiffs suffered severe emotional distress, but the college does argue that Plaintiffs have not adequately pleaded that Hillsdale officials acted intentionally or recklessly. To satisfy this element, "[a] plaintiff can show that a defendant specifically intended to cause a plaintiff emotional distress or that a defendant's conduct was so reckless that 'any reasonable person would know emotional distress would result.'" *Lewis v. LeGrow*, 670 N.W.2d 675, 689 (Mich. Ct. App. 2003) (quoting *Haverbush v. Powelson*, 551 N.W.2d 206, 210 (Mich. Ct. App. 1996)); *see also* Restatement (Second) Torts § 46 cmt. i (section § 46 applies "where [the actor inflicting emotional distress] acts recklessly, . . . in deliberate disregard of a high degree of probability that the emotional distress will follow").

Plaintiffs allege that "Hillsdale's conduct was intentional or reckless." R. 19, PageID 256. They cite the hostile and threatening calls to their parents as instances of intentional conduct and describe the other aspects of Hillsdale's investigations as at least reckless conduct. *Id.* at 242, 246; Appellants' Br. 28. A reasonable person would expect distress to result from mischaracterizing, downplaying, and denying a victim's account of sexual violence; stonewalling a victim's efforts to learn more about the investigation; threatening the victim in an effort to cause her to discontinue those efforts; and failing to implement or enforce measures to reduce a victim's future contact with her assailant. *Cf. Hayes*, 2008 WL 5158896, at *1, *6 (reversing summary disposition and holding that jury should decide issue of recklessness where a 911 operator disbelieved plaintiff's claimed emergency and threatened her with legal action for making a false 911 call).

For these reasons, I respectfully dissent from the majority's disposition of Plaintiffs' IIED claim.