UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: KEFFER DEVELOPMENT SERVICES, LLC DATA SECURITY BREACH LITIGATION

**THIS DOCUMENT RELATES TO:**
Case No. 2:25-CV-10806

MDL No. 2:25-MD-03159-MAG

---

**PLAINTIFFS' SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT AND JURY DEMAND**

---

> ### RECORDS PRESERVATION NOTICE
>
> Defendants are hereby again notified to preserve all records and documents in all forms and formats relating to this case and to notify employees, agents, and contractors that each is required to take appropriate action to do so as well.

Plaintiffs, JANE DOE 1, JANE DOE 2, JANE DOE 3, JANE DOE 4, JANE DOE 5, JANE DOE 6, JANE DOE 7, JANE DOE 8, JANE DOE 9, JANE DOE 10, and JANE DOE 11 ("Plaintiffs"), through the interim co-lead and executive committee attorneys appointed by Orders dated May 23, 2025 (ECF No. 58) and June 23, 2025 (ECF No. 72), for their Second Consolidated Class Action Complaint against MATTHEW WEISS, the REGENTS OF THE UNIVERSITY OF

1

60453048.2

MICHIGAN, the UNIVERSITY OF MICHIGAN, KEFFER DEVELOPMENT SERVICES, LLC, DOMENICO GRASSO, SANTA J. ONO, MARK SCHLISSEL, WARDE J. MANUEL, DOUG GNODTKE, JAMES JOSEPH ("Jim") HARBAUGH, RAVI PENDSE, SOL BERMANN, SHERRONE MOORE, AND JOHN DOES 10–50, state:

## THE PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Jane Doe 1 was a student athlete at the University of Michigan between 2017 and 2023 and was a member of the Michigan Women's Soccer team.

2.      Plaintiff Jane Doe 1 is domiciled in Oakland County, Michigan, in the City of Northville.

3.      Plaintiff Jane Doe 2 was a student athlete at the University of Michigan between 2017 and 2021 and was a member of the Michigan Women's Softball team.

4.      Plaintiff Jane Doe 2 is domiciled in Barstow, California.

5.      Plaintiff Jane Doe 3 was a student athlete at Bemidji State University between 2016 and 2020 and was a student athlete at the University of Minnesota between 2020 and 2022, and she was a member of the Women's Hockey team at both schools.

6.      Plaintiff Jane Doe 3 is domiciled in Eagan, Minnesota.

2

60453048.2

7.    Plaintiff Jane Doe 4 was a student athlete at the University of Michigan between 2017 and 2021 and was a member of the Michigan Women's Track and Field team.

8.    Plaintiff Jane Doe 4 is domiciled in Indianapolis, Indiana.

9.    Plaintiff Jane Doe 5 was a student athlete at the University of Michigan between 2012 and 2016 and was a member of the Michigan Women's Field Hockey team.

10.    Plaintiff Jane Doe 5 is domiciled in Washington, D.C.

11.    Plaintiff Jane Doe 6 was a student athlete at Mount Royal University between 2018 and 2019, Barry University between 2019 and 2022, and George Washington University between 2022 and 2023, and was a member of the Women's Soccer team of each of those schools.

12.    Plaintiff Jane Doe 6 is domiciled in New York City, New York.

13.    Plaintiff Jane Doe 7 was a student athlete at Plymouth University between 2017 and 2021 and was a member of the Women's Volleyball team.

14.    Plaintiff Jane Doe 7 is domiciled in Boston, Massachusetts.

15.    Plaintiff Jane Doe 8 was a student athlete at Plymouth University between 2018 and 2022 and was a member of the Women's Volleyball team.

16.    Plaintiff Jane Doe 8 is domiciled in South Burlington, Vermont.

60453048.2

17.     Plaintiff Jane Doe 9 was a student athlete at Grambling State University between 2015 and 2019 and was a member of the Women's Basketball team.

18.     Plaintiff Jane Doe 9 is domiciled in Little Rock, Arkansas.

19.     Plaintiff Jane Doe 10 was a student athlete at Radford University between 2010 and 2014 and was a member of the Women's Basketball team.

20.     Plaintiff Jane Doe 10 is domiciled in Henrico, Virgina.

21.     Plaintiff Jane Doe 11 was not a student athlete but attended High Point University and has been contacted by the Department of Justice four times based on the same reasons as by other members of the class.

22.     Plaintiff Jane Doe 11 is domiciled in Chicago, Illinois.

23.     The above identified Plaintiffs are referred to as "Plaintiffs" and bring this case both on behalf of themselves and the class and or subclasses they seek to represent.

24.     The Regents of the University of Michigan (the "Regents") is a body corporate, with the right to be sued, vested with the government of the university. Mich. Comp. Laws § 390.3 and § 390.4.

25.     The University of Michigan (the "University") is a public university organized and existing under the laws of the State of Michigan. All allegations made against the "University" in this Complaint are also directed against the Regents for liability and all other applicable purposes.

4

60453048.2

26. The University received and receives state financial assistance and is therefore, among other reasons, subject to the laws of the State of Michigan, and the Michigan Constitution.

27. The University received and receives federal financial assistance and is therefore, among other reasons, subject to the laws of the United States and the Constitution.

28. Keffer Development Services, LLC ("Keffer") is a Pennsylvania limited liability company that has continuously and systematically done business in the State of Michigan through its direct providing of services to residents and entities within the State of Michigan for which it has been handsomely compensated and has therefore purposefully availed itself of protections of the laws of the State of Michigan.

29. Keffer's misconduct and legal failures as detailed in this Complaint occurred specifically with respect to several Plaintiffs who reside in Michigan and while they resided in Michigan.

30. Matthew Weiss is an individual who resides in Michigan.

31. Defendant Domenico Grasso is the current Interim President of the University.

32. On information and belief, Defendant Grasso was appointed in May of 2025 and continues in this capacity today. Defendant Grasso is an employee of the

5

60453048.2

University, and his conduct was and is under color of law and is considered state action under 42 U.S.C. § 1983. A substantial part of the events or omissions giving rise to this lawsuit, including Defendant Grasso's actions and/or inactions, occurred and continue to occur in Michigan, which is within the jurisdiction of this Court.

33.   Defendant Santa J. Ono was at times relevant to this lawsuit the President of the University.

34.   On information and belief, Defendant Ono served as President of the University from October 2022 to May 2025. Defendant Ono was at relevant times an employee of the University and his conduct was under color of law and is considered state action under 42 U.S.C. § 1983. A substantial part of the events or omissions giving rise to this lawsuit, including Defendant Ono's actions and/or inactions, occurred and continue to occur in Michigan, which is within the jurisdiction of this Court.

35.   Defendant Mark Schlissel was at times relevant to this lawsuit the President of the University.

36.   On information and belief, Defendant Schlissel served as President of the University from July 2014 to January 2022. Defendant Schlissel was at relevant times an employee of the University and his conduct was under color of law and is considered state action under 42 U.S.C. § 1983. A substantial part of the events or omissions giving rise to this lawsuit, including Defendant Schlissel's actions and/or

6

60453048.2

inactions, occurred and continue to occur in Michigan, which is within the jurisdiction of this Court.

37. Defendant Warde J. Manuel is the Athletic Director at the University.

38. On information and belief, Defendant Manuel has served as Athletic Director at the University since January 2016 and had supervisory authority over Weiss and Defendants Jim Harbaugh, Doug Gnodtke, and Sherrone Moore. Defendant Manuel is an employee of the University, and his conduct was and is under color of law and is considered state action under 42 U.S.C. § 1983. A substantial part of the events or omissions giving rise to this lawsuit, including Defendant Manuel's actions and/or inactions, occurred in Michigan, which is within the jurisdiction of this Court.

39. Defendant Doug Gnodtke was at times relevant to this lawsuit including from 2016 through today the Executive Associate Athletic Director and Chief of Staff for University athletics.

40. On information and belief, Defendant Gnodtke had supervisory authority over Defendants Weiss and Moore, and he wrote the letter terminating Defendant Weiss's contract with the University. Defendant Gnodtke was at relevant times an employee of the University and his conduct was under color of law and is considered state action under 42 U.S.C. § 1983. A substantial part of the events or

7

60453048.2

omissions giving rise to this lawsuit, including Defendant Gnodtke's actions and/or inactions, occurred in Michigan, which is within the jurisdiction of this Court.

41. Defendant James Joseph ("Jim") Harbaugh was the head football coach at the University during the time period relevant to this action, including but not limited to the years 2015 to 2023.

42. On information and belief, Defendant Weiss worked directly for Defendant Harbaugh, who had direct supervisory authority over Weiss.

43. On information and belief, Defendant Moore worked directly for Defendant Harbaugh, who had direct supervisory authority over Weiss.

44. Defendant Moore was at relevant times an employee of the University and his conduct was under color of law and is considered state action under 42 U.S.C. § 1983. A substantial part of the events or omissions giving rise to this lawsuit, including Defendant Moore's actions and/or inactions, occurred in Michigan, which is within the jurisdiction of this Court.

45. Defendant Harbaugh was at relevant times an employee of the University and his conduct was under color of law and is considered state action under 42 U.S.C. § 1983. A substantial part of the events or omissions giving rise to this lawsuit, including Defendant Harbaugh's actions and/or inactions, occurred in Michigan, which is within the jurisdiction of this Court.

8

60453048.2

46. Defendant Ravi Pendse is the Vice President for Information Technology ("IT") and Chief Information Officer at the University.

47. On information and belief, Defendant Pendse has served in this role since 2018 and continues in this capacity today. Defendant Pendse is an employee of the University, and his conduct is under color of law and is considered state action under 42 U.S.C. § 1983. A substantial part of the events or omissions giving rise to this lawsuit, including Defendant Pendse's actions and/or inactions, occurred and continue to occur in Michigan, which is within the jurisdiction of this Court.

48. Defendant Sol Bermann is the Executive Director of Privacy & Faculty Affairs in the office of the Vice President for Information Technology and Chief Information Officer at the University.

49. He has worked in that capacity since 2014.

50. On information and belief, Defendant Bermann served as Vice President for Information Technology and Chief Information Officer at the University at all times relevant to this lawsuit. Defendant Bermann is an employee of the University, and his conduct is under color of law and is considered state action under 42 U.S.C. § 1983. A substantial part of the events or omissions giving rise to this lawsuit, including Defendant Bermann's actions and/or inactions, occurred and continue to occur in Michigan, which is within the jurisdiction of this Court.

9

60453048.2

51.    At all relevant times Weiss, while employed by the University and using University facilities, hardware, networks, and credentials, acted under color of state law.

52.    The Individual University Employees (defined below) likewise acted under color of law in their supervisory and administrative capacities when they knowingly acquiesced in or were deliberately indifferent to the ongoing violations alleged.

53.    The Plaintiffs and Class Members are ignorant of the true names and capacities of the Defendant Does 10-50, but believe them to be employees of the University, members of the Board of Regents, or otherwise involved in the events leading up to this action and/or are and/or have been part of the athletic program for which Weiss worked.

54.    On information and belief, Defendant Does 10-50 ignored, aided, or otherwise assisted, enabled, and/or allowed Weiss to carry out his actions, including the individual captured on surveillance entering the quarterback meeting room at approximately 3:42 PM on December 21, 2022 and exiting moments later carrying a box, during active password reset activity from that same room, as set forth below in greater detail.

55.    On December 25, 2025, one or more Doe Defendants acted in concert with Weiss to remove, transfer, or deploy removable media and to attempt to

10

60453048.2

compromise electronic devices from the University which actions included accessing the student athlete databases and taking and then selling Plaintiffs' private and personal identifying information and health information, including from the University's databases and systems.

56.     Plaintiffs will seek to amend this Consolidated Complaint to set forth the true names of Defendant Does 1–50 and capacities when they are ascertained. Plaintiffs are informed and believe, and on that basis allege, that each of these fictitiously named Defendants are responsible in some manner for the illegal, intentional, improper and/or discriminatory actions alleged herein, which were committed in Michigan, and which subject the fictitiously named defendants to the jurisdiction of this Court.

57.     Jurisdiction is proper in this Court under 28 U.S.C. §§ 1331 and 1367 because this matter involves various federal causes of action including but not limited to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1981 *et seq.* ("Title IX") and the court has supplemental jurisdiction of the other causes of action under 28 U.S.C. §1367(a).

58.     Venue is appropriate in this district under 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to these claims occurred in this district and Defendants are subject to personal jurisdiction in this district.

11

## COMMON ALLEGATIONS

**A.    Weiss accessed Plaintiffs' private information, and the University Defendants had notice.**

59.    The University, the Regents, and the individual University employees Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Moore, and Bermann (the "Individual University Employees" or the "Individual University Defendants"), and together with the University and the Regents, the "University Parties" or the "University Defendants") were well aware of Weiss's activities, including but not limited to, hacking into female student athletes' accounts to retrieve and sell Plaintiffs' intimate and personal media.

60.    The Individual University Defendants actively covered up Weiss's activities.

61.    Led by Harbaugh, the Individual University Defendants agreed to keep Weiss's activities private and to "handle" the matter "internally" in order to advance men's sports, specifically the football team.

62.    The University, Ono, Manuel, and Harbaugh permitted Weiss to coach in the December 31, 2022 Fiesta Bowl despite actual knowledge of actions by Weiss specified in this pleading, including after contemporaneous criminal reports, University and electronic logs, and surveillance placed Weiss at Schembechler Hall

12

60453048.2

repeatedly accessing and exfiltrating primarily female students' private data using University computers and credentials.

63. Between receipt of actual knowledge by the Regents, the University, Manuel, Harbuagh, Gnodtke, Bermann, and Pendse, and in the time leading to and following the Fiesta Bowl, Weiss continued to access and sell Plaintiffs' private and personal identifying information and health information.

64. When Harbaugh learned that Weiss's activities had been reported to the campus police department, he was furious and lashed out at his codefendants for failing to keep Weiss's activities "internal."

65. There has been unrelenting pressure from the Individual University Defendants to keep Weiss's activities, and the activities of his accomplices, private.

66. The Individual University Defendants have clamped down on employee communications, searched through the content of communications, and attempted to stamp out any potential leaks within the University about the known wrongful conduct within the Athletics Department including, but not limited to, Weiss's conduct.

67. The Individual University Defendants have been largely successful in their attempts to prevent the dissemination of information about the full extent Weiss's activities and who his conspirators are and were, and how many individuals

13

60453048.2

beyond the Individual Defendants (defined below) knew exactly what Weiss was doing and how long he had been doing it.

68. Despite the best efforts of the Individual University Defendants (and together with Weiss, the "Individual Defendants"), information has been slowly leaking about the internal communications inside and outside the Athletics Department between and among the Individual Defendants and their attempts to cover up Weiss's hacking of student accounts, stealing their personal information, and selling it on the dark web.

69. Additionally, many of the facts in this case are undisputed and now well documented.

70. Weiss was employed by the University from February 2021 through January 2023.

71. Between December 21 and 23, 2022, Weiss, during multiple credentialed sessions on Athletics Department desktops, reset at least 46 alumni account passwords and logged into at least 29 female student accounts.

72. During these times, an individual (identity currently unknown) staff member of the Athletics department saw Weiss viewing Plaintiffs' private information at Schembechler Hall using University computers, University computer equipment, and electronic credentials supplied to him by the University.

14

60453048.2

73.    The access activity has already been confirmed to tie to specific Athletics Department desktops in Weiss's office (M-2UA4371F39) and the quarterback meeting room (A-2UA4431ZFS). *See* Gov't Resp. to Weiss Mot. to Suppress Evid., Case No. 25-cr-20165 (ECF No. 32) at PageID.166 and (ECF No. 32–7) and PageID.213–14, 216.

74.    The information Weiss was seen viewing and downloading included Plaintiffs' personal identifying information and images ("PII") and private health information ("PHI").

75.    University of Michigan Information Technology Services ("UM ITS") logs further recorded folders (named for victims) that were written to removable media from Weiss's office desktop on December 21, 2022 (8:03 PM) and from the quarterback room desktop on December 23, 2022 (7:27 PM). *Id*. at PageID.228–229.

76.    The individual who saw Weiss knew Weiss was not supposed to access, or be able to access and download, the PII and PHI he was seen accessing, downloading, and selling.

77.    The individual who saw Weiss reported the events between December 21 and 23, 2022, to the person within the University designated to receive complaints including those complaints based on Title IX violations and related to Title IX protections (the "December 21–23, 2022 Reporting").

15

60453048.2

78.     Surveillance corroborates Weiss's presence in the quarterback room during the bulk of the resets (2:37 PM entrance; 5:10 PM exit; 6:07 PM reentry; 8:01 PM exit). *Id*. at PageID.222-23.

79.     Critically, at approximately 3:42 PM on December 21, 2022—during the quarterback room reset session—a second individual entered the quarterback meeting room and exited seconds later carrying a box. *Id*. at PageID.222.

80.     This sequence, contemporaneous with activity of active account compromises from that room, is proof that there was an accomplice or aiding/abetting participant who was with Weiss and knows of the movement of removable media used to export and sell victims' data.

81.     After the December 21–23, 2022 Reporting, each of the Individual University Employees was told of the December 21–23 Reporting, and each of the Individual University Employees could have, but failed, to secure the physical areas and devices that were available to and used by Weiss to take and sell Plaintiffs' PHI and PII.

82.     The Individual University Employees thus easily foresaw the likelihood of Weiss's continued downloading and sale of Plaintiffs' PII and PHI after each received actual notice of it, and failed to take sufficient action for at least one month.

16

60453048.2

83. On December 25, 2022, Weiss after further attempted logins was at least partially successful at accessing Plaintiffs' PII and PHI and selling it, despite the University claiming to have "randomized victim passwords," which they knew was an insufficient measure to address the Flaw in the system—because they had not fixed the Flaw.

84. The December 25, 2022, access has been confirmed based on video evidence to have been Weiss and another actor inside of Schembechler Hall, using University devices, this time the tight end coach laptop A-5H1GFB3 and tight end room desktop M-2UA4511VP2.

85. Surveillance captured Weiss moving toward and returning from those locations—further evidencing coordinated activity and Ono's, Manuel's, Harbaugh's, and the University's failure to restrict access and further harm to Plaintiffs and victims after actual notice. *Id*. at PageID.226-28.

86. The University and the Regents and each of the individuals named as Defendants know the identity of the individual who saw Weiss viewing and downloading Plaintiffs' PII and PHI.

87. Each such Defendant is concealing that information.

88. The person who was designated to receive complaints including those complaints based on Title IX violations and related to Title IX protections relayed

17

60453048.2

the details of the December 21–23, 2022 Reporting to Ono, Manuel, Gnodtke, Harbaugh, Pendse, and Bermann by the end of the day on December 22, 2022.

89.     Ono, Manuel, Gnodtke, Harbaugh, Pendse, and Bermann each had the ability to instantly suspend Weiss's employment or to remove his electronic credentials supplied by the University.

90.     But Ono, Manuel, Gnodtke, Harbaugh, Pendse, and Bermann each failed to intervene to stop Weiss from continuing to download, access and sell Plaintiffs' PII and PHI on or after December 22, 2022, for, among other reasons, the football team was playing in the Fiesta Bowl on December 31, 2022.

91.     Between December 23, 2022, and January 19, 2023, Weiss continued to access, download, and sell Plaintiffs' PII and PHI using University computers, University computer equipment, and electronic credentials supplied to him by the University, despite actual knowledge of Weiss's actions by Ono, Manuel, Gnodtke, Harbaugh, Pendse, and Bermann.

92.     Thus, the University Defendants are liable to Plaintiffs as alleged in this complaint because they failed to discipline Weiss.

93.     Similarly, the University Defendants are liable to Plaintiffs as alleged in this complaint because they ratified Weiss's invasions and sales of Plaintiffs' PII and PHI.

18

60453048.2

94. Relatedly, the University and the Regents are liable to Plaintiffs as alleged in this complaint because they failed to train and supervise the other Individual University Employees who ignored Weiss's invasions and sales of Plaintiffs' PII and PHI even after actual notice.

95. It was a highly predictable consequence of University and the Regents' failure to train, supervise, and equip with specific tools the Individual University Employees (who ignored Weiss's ongoing invasions and sales of Plaintiffs' PII and PHI even after actual notice) so that the recurring harms could be stopped.

96. Each of the University Defendants also received actual notice, from at least March 2021 and on, based on Keffer electronic reports that were delivered to each of the University Defendants, that Weiss was downloading Plaintiffs' PII and PHI (which had nothing to do with men's football), and likewise were deliberately indifferent to such downloading, and therefore it was highly predictable that Plaintiffs' PII and PHI would be taken.

97. The University, the Regents, and the individual University employees Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Moore, and Bermann (the "Individual University Employees", and together with the University and the Regents, the "University Parties" or the "University Defendants") know the identity of the individual who witnessed Weiss's actions on or about December 21, 22, and 23, 2022, but each has withheld that information from Plaintiffs.

19

60453048.2

98.    Weiss's access to, and downloading, use, and sale of, Plaintiffs' PII and PHI between December 21 and 23, 2022, was also reported within the University including to each of the other Individual Defendants no later than December 23, 2022.

99.    The Police Department investigated Weiss's conduct.

100.   Weiss was ultimately fired on or about January 20, 2023.

101.   But the University Football Team first played in the Fiesta Bowl on December 31, 2022.

102.   It did so with Weiss coaching.

103.   Weiss's access to, and downloading and selling of, Plaintiffs' PII and PHI predates and postdates the December 21–23, 2022 Reporting.

104.   Between March 1, 2021, and December 23, 2022, Weiss used computers, computer equipment, and credentials supplied to him by the University and the Regents, with specific authorization from Schlissel, Ono, Manuel, Gnodtke, Harbaugh, Pendse, and Bermann, to access, download, and sell Plaintiffs' PII and PHI, including but not limited to the entire contents of Plaintiffs' email, cloud storage, and social media accounts.

105.   Each of Ono, Manuel, Gnodtke, Harbaugh, Pendse, and Bermann knowingly permitted and required Weiss to coach in the Fiesta Bowl on December 31, 2022, despite knowing that he had been seen accessing and downloading

20

60453048.2

Plaintiffs' PII and PHI between December 21 and 23, 2022 at Schembechler Hall, and despite that his doing so was reported to the University prior to December 31, 2022.

106. Each of the Defendants' actions and inactions and the taking and selling of Plaintiffs' PII and PHI has materially enhanced Plaintiffs' exposure to dangerous sexual predators and put them at a significantly higher risk of sexual assault.

107. The University, the Regents, and each of Ono, Manuel, Gnodtke, Harbaugh, Pendse, and Bermann knowingly permitted Weiss to continue to use computers, computer equipment, and electronic credentials supplied by the University and the Regents, from and after the Fiesta Bowl on December 31, 2022, despite notice that Weiss had been seen accessing and downloading Plaintiffs' PII and PHI at the latest between December 21 and 23, 2022 at Schembechler Hall, and despite that his doing so was reported to the University prior to December 31, 2022.

108. Between December 23, 2022 and January 20, 2023, each of Ono, Manuel, Gnodtke, Harbaugh, Pendse, and Bermann could have stopped Weiss's unlimited ongoing use of computers, computer equipment, and electronic credentials each supplied by the University and the Regents, to access, download, and sell Plaintiffs' PII and PHI through January 19, 2023.

109. Because each of Ono, Manuel, Gnodtke, Harbaugh, Pendse, and Bermann refused and failed to intervene and stop Weiss's unlimited ongoing use of

21

computers, computer equipment, and electronic credentials supplied by them and the University and the Regents, from or after December 21, 2023, Weiss then continued to access, download, and sell Plaintiffs' PII and PHI from and after December 21, 2022 through the day he was terminated, on or about January 20, 2023.

110. In this way, the University Defendants knowingly approved of Weiss's action and placed profits before people, specifically women and female student athletes. The University Defendants' actions, and inaction, constitute a Title IX violation.

111. Those actions and inactions are also violations of other statutes and law, and indicative of the factual basis for the various claims in this case.

112. Weiss's access to Plaintiffs' PII and PHI was in furtherance of his job duties.

113. On January 5, 2023, the University publicly but vaguely reported about Weiss's actions, see: https://www.dpss.umich.edu/content/crime-safety-data/daily-crime-fire-log/ and even then the reporting included scant details.

114. The University crime log reads: "1/05/2023 12:44 pm FRAUDULENT ACTIVITY CAD# 2300001507 SCHEMBECHLER GLENN E HALL1200 S STATE ST An employee reported fraudulent activity involving someone accessing university emails accounts without authorization. Upon further investigation, It was found that a crime may have been committed."

60453048.2

115. None of the actual known details have been provided by the University Defendants.

116. On January 10, 2023, federal, state, and local law enforcement officers executed search warrants at the University football facilities including the quarterbacks' meeting room and tight ends' meeting room, among other places.

117. The search warrants suggest Weiss did not act alone given that he was the quarterbacks coach, not the tight end coach, and three desktop computers, three laptops, and two iPads, among other devices, were seized including from Schembechler Hall.

118. Some but not all of these devices are believed to be currently located in the Digital Forensics Lab at the University of Michigan Police Department, 1239 Kipke Drive, Ann Arbor, Michigan 48109, where additional information obtained through the University of Michigan's Information Technology Services is contained on Officer Thomas Cargill's forensic computer, device ID D3BF44C5-1570-4773-8524-EFEF8182F4FB.

119. These devices also hold information about the crimes and the failure to address them by the University Defendants.

120. On January 17, 2023, the University placed Weiss on paid leave without public explanation.

23

60453048.2

121. By letter dated January 20, 2023, signed by Gnodtke, the University fired Weiss.

122. The January 20, 2023 termination letter indicated the reason Weiss was being fired was because Weiss failed to attend a meeting to discuss whether he had "inappropriately accessed" computer accounts belonging to other people.

123. When asked, Manuel has said only that Weiss's termination was related to a "review of university policies."

124. Manuel has refused to provide more information calling it a "personnel matter."

125. At no time did the University issue a Clery Act notification related to Weiss's conduct to protect and help the victims, even after the University Defendants were on notice of Weiss's actions and refused to intervene and permitted him to have continued unlimited access to and use of University computers, computer equipment, and credentials that were used to continue to access, download, and sell Plaintiffs' PII and PHI through January 19, 2023.

126. Manuel has concealed the details about how private and intimate information of student athletes, overwhelmingly female student athletes, was accessed between March 2021 and January 2023 by a highly paid University Athletic Department employee.

60453048.2

127.   None of Ono, Manuel, Gnotdke, Pense, or Bermann wanted to interfere with the Fiesta Bowl game, if it meant playing without Weiss coaching, despite being on notice that he had used and would continue to use University computers, computer equipment, and credentials to continue to access, download, and sell Plaintiffs' PII and PHI.

128.   Each of these Defendants' actions show athletic success in the football program and avoiding bad publicity are more important than protection of, and full transparency to, female students and athletes, none of whom play or played football.

**B.     The Defendants concealed Weiss's identity from students.**

129.   By letter sent in March 2023, the University Defendants obscured Weiss's actions from students.

130.   Bermann, with approval from each of the University Defendants, delivered notice to Plaintiffs and many in the class, stating that a "flaw" (the "Flaw") in their computer network had led to the compromising of private data. Exhibit A.

131.   The letter describes itself as a "follow-up" to an "investigation" by the "University of Michigan Police Department." *Id.* at 1.

132.   In the preamble, the letter offers to provide students "some additional information, as well as offer you identity theft protection coverage." *Id.*

133.   In the first section, titled "What happened," the University explains to select students that it "identified" "in late December 2022, potentially unauthorized

25

60453048.2

activity in your U-M Google account." *Id.* As part of its "investigation," the University "discovered that a 'threat actor' manipulated a *flaw* in [the U-M Google account] self-service password-recovery to change your password and gain unauthorized access to your U-M Google account." *Id.* (emphasis added). The letter defines the self-service recovery function as "Forgot password." *Id.*

134.   Plaintiffs did not know at that time that the "threat actor" was Weiss, then a high paid employee of the University, or that he continued to act despite notice to Ono, Manuel Gnodtke, Harbaugh, Pense, and Bermann.

135.   The letter covered up the identity of the "threat actor."

136.   The letter failed to state that Ono, Manuel, Gnodtke, Harbaugh, Pendse, and Bermann each had the ability to suspend Weiss's employment or to remove his electronic credentials supplied by the University, but that each knowingly refused to intervene and stop Weiss's unlimited ongoing use of computers, computer equipment, and electronic credentials supplied by them, even after actual notice that was given no later than December 23, 2022, and that after December 23, 2022, Weiss continued to access, download, and sell Plaintiffs' PII and PHI through the day he was terminated, on or about January 20, 2023.

137.   The letter instead tells the reader that the "University police" "subsequently launched a criminal investigation." *Id.*

60453048.2

138.   Based on its investigation, the letter next states, the Flaw in Forgot password permitted the "threat actor" to "gain[] unauthorized access to some of your accounts and/or data." *Id.*

139.   While the University did not further identify or describe the Flaw, it explained that, because of its Flaw, the "threat actor" "also logged into your U-M account management settings, where 'they' may have viewed and/or changed your password recovery phone number and password recovery email address." *Id.*

140.   The letter conceals the material details about what Weiss did, (even though Defendants know those details), when Weiss acted, (even though they know those details), the  methods and computer actions taken, (even though they know those details), and what the police investigation revealed as to Weiss's motive, (even though they each know those details as well), along with who was affected, which is also known.

141.   Each of the University Defendants have concealed details that the letter could have easily stated to identify a University employee as the "threat actor," but those Defendants did not make that disclosure because it would impugn them, including because it would show Ono, Manuel, Gnodtke, Harbaugh, Pendse, and Bermann each authorized Weiss having unlimited computer access, computer equipment, and computer credentials, and knew Weiss had accessed and downloaded Plaintiffs' PII and PHI no later than December 23, 2022, and permitted Weiss to

27

continue to have full computer access and credentials supplied and authorized by each of the University Defendants, even after actual notice, until he was terminated.

142. No real information about the "investigation" is relayed in the letter.

143. The University Parties also have concealed through the letter that female student athletes are the victims. Although some male victims have been identified, it is only by virtue of their association with female athletes that their PII and images were also taken and sold.

144. Rather than identify Weiss, the letter states that "[a]dditionally, 'they' logged into your M+ Google email and/or Google Drive." *Id.*

145. The letter also confirms that PII *was* accessed. The letter states, "law enforcement investigations have determined 'they' [referring to the 'threat actor'] were able to use information in your account to access additional personal information, which may include access details for accounts linked to your U-M email address (online banking, social media, password management, etc.)" *Id.*

146. In sum, while written in past tense and defensive in tone (and despite concealing prior notice), the letter discloses without qualification that it was the University's technology *Flaw* that permitted access without authorization to Plaintiffs' personal online banking, social media, and password management data.

28

60453048.2

147.   The letter concluded by acknowledging "how important your personal information is" and that the University "deeply regret[s] that this situation occurred." *Id.*

148.   The University Parties did not regret the events deeply enough to disclose that they had prior notice of Weiss's actions and did not limit or remove his credentials supplied by the University and the Regents, all of which were authorized by each of the University Parties.

149.   They also did not regret the events deeply enough to provide the student athletes with the critical detail of *who* committed the acts, or tell Plaintiffs, who are predominantly female student athletes, the entire truth, including that the "threat actor" was University employee Weiss, and that Weiss took these actions on a University computer, most of the time while at Schembechler Hall, that women were the targets, and that the University Defendants had prior notice of what Weiss was doing.

150.   Nor did the University Defendants tell female student athletes that their personal and intimate photos and videos had been taken and sold by Weiss, all of which the University Defendants knew and had known for months.

151.   Yet, the University also stated it "is committed to maintaining a secure computing environment, preserving the confidentiality of the information we maintain, and constantly reviewing and improving our security practice." *Id.*

29

60453048.2

152. The University apologized "for any inconvenience this incident has caused you" and offered the email address privacy@umich.edu and a local phone number, with the phrase "Data Incident Notification Letter from Feb. 2023," as a resource to "talk to someone about this situation." *Id.*

153. The letter was signed by Sol Bermann, the Chief Information Security Officer, Executive Director of Information Assurance for the University. *Id.*

154. The University, along with Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, and Bermann continue to conceal from Plaintiffs and the class the basic details about what they know, and previously, knew, even though those details are preventing Plaintiffs and the class from learning the entire nature of their harm, the causes, and the likely means to prevent further harm.

155. Among other missing details that Plaintiffs have learned is that Weiss's University issued computer was equipped with non-University encryption software that had to be disabled by an external vendor to fully investigate the depth of the invasions committed.

**C. The Mega Victim Case Assistance Program ("MCAP") confirms Plaintiffs are victims of the Defendants.**

156. The Department of Justice ("DOJ") has corroborated that Plaintiffs and the class and potential subclasses are "victims."

157. The DOJ said the victimization extends to aggravated identify theft, and includes "thousands of candid, intimate photographs and videos" with "many" including "victims engaged in explicit sexual acts."

158. Some of the specific details of methods taken to victimize Plaintiffs, including when, through what medium, by who (all such actors), and what was taken, lost, and what can or will happen, however, are never provided.

159. The University Defendants are concealing that information despite that each of them knows such details.

160. By emails dated on or about March 27, 2025, the DOJ contacted thousands of class members stating that each is a victim of the "incident" described in Exhibit A. *See* Exhibit B—name redacted. The emails state that the Plaintiffs and the members of the class are each "a victim of unauthorized access and aggravated identity theft."

161. The email states that "the defendant" (referring to Weiss as a highly paid University employee and while inside Schembechler Hall) "gained unauthorized access to the email, social media, and cloud storage accounts of 2000+ victims between 2015 and 2023." *Id.*

162. The email states that "[t]housands of candid, intimate photographs and videos have been seized from the [criminal] defendant's electronic storage devices and his cloud storage accounts." *Id.* The email specifies that "[m]any" of the

31

60453048.2

photographs and images "show victims naked" and that "[s]ome show victims engaged in explicit sexual acts." *Id.*

163. The email indicates that there is an active FBI investigation ongoing.

164. The email recommends resetting passwords across online accounts, especially those containing "sensitive information," including, but not limited to, financial accounts, email accounts, file storage accounts, and social media accounts. *Id.* The email strongly advises against reusing passwords and endorses "additional" levels of electronic authentication. Finally, the email offers resources regarding identify theft and information about safe practices. *Id.*

165. Thus, through March 2025, students and alumni from colleges and universities across the United States, including many connected to the University, have suffered a breach of their privacy and other injuries because of the actions of Weiss, a former University football coach, and the actions and inactions of Keffer, Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, and Bermann.

### D. Sexual misconduct at the University is longstanding and widespread.

166. The sexual misconduct of, and by, officials at the University, and the University Defendants' historical deliberate indifference to it, runs the gamut. The University has a long, sad history of subverting the interests of its students and student-athletes to its own institutional and bureaucratic concerns. The culture of

32

60453048.2

allowing and enabling sexual misconduct at the University is severe, pervasive, and objectively offensive. This culture of harassment constitutes a sexually hostile education environment. The University has long been on notice of these violations of Title IX and the pattern and culture of sexual harassment at the University. Some examples are outlined in the following paragraphs.

167. For nearly thirty years, until the late-1990s, the University's athletic department employed Dr. Robert Anderson as its head medical doctor, who was alleged to have sexually assaulted and raped thousands of student victims, leading to a massive $490 million settlement that the University reached with the victims in 2022. According to the subsequent investigation, more than two dozen University officials knew about Anderson's behavior at the time it was occurring, including the University's former athletic director and head football coach.

168. Overlapping with Anderson are extensive, publicly-confirmed occasions of sexual harassment and abuse by the University's second highest administrator, Provost Martin Philbert, who was an employee at the University since 1995, and which further demonstrates the University's pervasive culture of misconduct and systemic indifference to the safety and well-being of the University community.

33

60453048.2

169. According to the report of an independent investigation commissioned by the University, Philbert "made comments about women's bodies," exactly as Weiss did in his dossiers of the women he harassed.

170. Both Philbert and Weiss accessed and stored the images of students (including in sexualized states) on their computers and on computer equipment issued by the University and the Regents. With respect to Philbert, his conduct also included physical assault. *See* Report of Independent Investigation: Allegations of Sexual Misconduct by Martin A. Philbert, dated July 31, 2020, by the Wilmer-Hale Law Firm p. 1.[1]

171. Also, according to the Report, Philbert stored explicit photos of his victims on other University-owned devices, exactly as Weiss did with his victims' photos. *Id*. at 2, 3. The sexual harassment Philbert perpetrated while he was at the University spanned a period of at least 15 years. *Id*. at 76.

172. Philbert's sexual harassment and assault took place in at least 2003, 2005, 2006, 2007, 2008, 2010, and 2013 and could have included several other years.

173. In 2017, ironically, former President Mark Schlissel recommended, and Philbert was, promoted. *Id*.

---

[1] https://regents.umich.edu/files/meetings/01-01/Report_of_Independent_Investigation_WilmerHale.pdf (last visited on June 19, 2025).

174. In his August 3, 2020 email to the University "community," in respect of the WilmerHale report, former President Schlissel wrote "[t]he behaviors uncovered by this investigation are both awful and unacceptable, and our institution failed to properly and effectively address *earlier reports* of Philbert's misconduct.

175. Schlissel added, "I apologize . . . for our institution's failings" and that "[t]he university *has fallen far short of creating a culture that rejects harassment and misconduct*."

176. He also conceded he was on notice of Philbert's long assault on women students but that he failed to act, despite notice, stating "[a]s part of the WilmerHale investigation, I provided access to all of my documents for their review. It was in those materials where *they discovered something I had missed in 2019* – an anonymous allegation of misconduct by Philbert."

177. In addition to this notice to him personally that was ignored, Schlissel conceded, "the findings of this report are deeply distressing, both as to the harms to members of our community *and to our institutional failings. The safeguards, policies and procedures we had in place were inadequate*."

178. Provost Philbert was the highest ranking official to be accused of this type of misconduct – until the University then learned Schlissel himself *also* committed inappropriate sexual misconduct by virtue of his relationships with subordinates.

60453048.2

179.  The behavior was disturbing enough that the Board of Regents voted unanimously to fire Defendant Schlissel.

180.  In their firing letter, the Board of Regents acknowledged their actual notice of the culture of sexual harassment plaguing the University.

181.  Their letter declared that Defendant Schlissel's conduct was "particularly egregious" when "considering your knowledge of and involvement in addressing incidents of harassment by University of Michigan personnel, and your declared commitment to work to 'free' the University community of sexual harassment or other improper conduct." Letter to Dr. Schlissel, p.2., available at: https://regents.umich.edu/files/meetings/01-01/Letter_to_Dr._Schlissel.pdf   (last visited June 13, 2025).

182.  The letter refers to an email Schlissel sent to "the entire University of Michigan community" after the "actions of Martin Philbert," which email stated: "The highest priority for our regents and leadership team is to make our community safe for all. The regents have been stressing with campus leadership the importance of *diminishing* sexual harassment and misconduct for many years." *Id.* (emphasis added). And, as the Board of Regents further noted, Schlissel had "declared to the community that [his] leadership would 'determine what we need to do to address the fear of retaliation in our community and build a culture that does not accept misconduct or harassment at any level.'" *Id.* The letter was individually signed by

36

all eight members of the Board of Regents serving on the Board at the time, seven of whom still serve on the Board to this day.

183. Incredibly, at the very time it was settling the Anderson lawsuit and paying the Anderson victims, while also trying to recover from the decades of Provost Philbert's violations, and then was *also* terminating Schlissel for misconduct of a sexually inappropriate nature, the University learned of the latest facts of sexual harassment, stalking, and worse by a high-ranking athletic official – this time Defendant Weiss, then the University's offensive coordinator of its football team – yet in response the University Defendants did nothing to protect the affected students, either because they are indifferent, or because it was too much bad news and publicity all at once, or both.

184. Despite specific notice by at least December 21, 2022, Ono, Manuel Gnodtke, Harbaugh, Pendse, and Bermann did not terminate Weiss's otherwise unlimited computer access, which Weiss then continued (predictably) to use to access, download, and sell Plaintiffs' PII and PHI, both through the date of his termination, and even after, during which time Weiss continued to sell Plaintiffs' PII and PHI.

185. This conduct displays deliberate indifference, whereby the University put the interests of the University's public image and the University football team

37

60453048.2

ahead of those of the victimized female students, further discriminating against the Plaintiffs and class members.

186.  The University Defendants could have, and should have, particularly when considering the long history of "sexual harassment and improper conduct" at the University, *id.*, removed the perpetrator of these outrageous acts when they first became aware of Weiss's actions in 2021, and at the latest on the day the University received the December 21–23, 2022 Reporting.

187.  Instead, even though the University Defendants knew Weiss was behind the breach of female student-athletes' personal, private and intimate images and information, they allowed Weiss to coach in the 2023 national championship semifinal at the Fiesta Bowl.

188.  Only after the game, on January 5, 2023, over two weeks after it received notice of Weiss's conduct, did the University even put the incident on its police blotter.

189.  Weiss has continued to use and sell Plaintiffs' PII and PHI from the day he was terminated from the University on or around January 20, 2023 through the day he was indicted, on or around March 20, 2025.

190.  Plaintiffs did not know and could not have known the University Defendants caused most or all of the 2021 and 2022 breaches until March 20, 2025, when the Government charged Defendant Weiss with a 24-count indictment. Even

38

when the University eventually notified some of the affected female students of the 2022 breach, it minimized it and covered up that the University Defendants personally played the most crucial role in causing the invasions, vaguely blaming an anonymous "threat actor" who exploited a euphemistic "flaw" in the University's software system to obtain the students' personal information.

191. The Defendants have never disclosed the full extent of the breaches, never identified Weiss as the perpetrator, and never disclosed that it was their own failures to adopt basic measures to protect student privacy (and not some "flaw" in the system) that enabled the breach.

192. Between December 2022 and March 2025, the University failed to contact most Plaintiffs and class members, depriving Plaintiffs and class members of the ability to begin to address the aftermath of this next, nefarious chapter in the sordid history of sexual harassment at the University and prevent further harm.

193. Due to the University's actions and inactions, Plaintiffs and class members were unable even to take remedial actions to mitigate the enormous damage done to them. Instead, the University allowed them to continue to be harmed. Plaintiffs and class members now know some details only because of the March 2025 indictment that revealed to the victims for the first time, crucial but scant details of what had been done to them. To this day, the University has failed and refused to disclose the details of Plaintiffs' and class members' victimization.

39

60453048.2

These details are essential to Plaintiffs' and class members' ability to protect themselves, including from sexual predators to whom Weiss disseminated Plaintiffs' images.

194. The women—to this day—continue to be victimized and put in danger.

195. In contrast, as noted above, the University Defendants provided the men on the football team the benefit of Weiss's football prowess as an elite offensive coordinator at their playoff game, 10 days after his most recent victimization of women was reported to the University.

196. At least two Plaintiffs notified the University, by contacting the University's IT Service Center – after receiving a notice from the IT department itself – that their email passwords were changed. On information and belief, other members of the class similarly contacted the University's IT Service Center. The University Defendants concealed from these Plaintiffs the fact that University Defendants knew the exact reasons the passwords were changed and that they were on notice of Weiss's actions.

197. A review of the timeline reveals, not only that a culture of sexual harassment has thrived at the University for many years, but also that the University has explicitly admitted knowledge of that incredibly dangerous culture as well.

198. In addition to what is set forth above, in 2020, there was another claim against University leadership for sexual assault in the case of *Lipian v. University of*

60453048.2

*Michigan*, 453 F.Supp.3d 937 (E.D. Mich. 2020)[2] where the claimant-student alleged that he was drugged and assaulted by music professor, David Daniels, who was placed on paid leave and had previously been the subject of claims of sexual misconduct.

199. Weiss's sexual harassment of his victims occurred in a context of control by the University. A substantial portion or all of Weiss's actions occurred on and with University property and were made possible by his access to University computers and/or data, including his indefensible and inexcusable access to Plaintiffs' and class members' private, sensitive and intimate information and images, from and after the December 21–23, 2022 Reporting, through the date of termination, and then sales of that PII and PHI even beyond termination and up until the Indictment was filed.

200. Systemic, widespread harassment like that detailed above gives rise to Title IX liability.

201. In *Davis v. Monroe County Bd. of Ed.*, 526 U.S. 629, 639 (citing the lower court in that case, citation omitted), the Supreme Court suggested near unanimity on this point, observing that "even the dissent suggests that Title IX

---

[2] https://www.detroitnews.com/story/news/local/michigan/2018/10/24/student-sues-university-michigan-and-professor-alleges-sex-assault/1752751002/ (last visited on March 2, 2026).

60453048.2

liability may arise when a funding recipient remains indifferent to severe gender-based mistreatment played out on a "widespread level. . ." *Davis*, 526 U.S. at 653.

202. In the context of student-on-student sexual harassment, which might be similar but not exactly the same, the Sixth Circuit has adopted a four-part test for determining whether a school's deliberate indifference before the victim was harassed, caused the harassment: (1) A school maintained a policy of deliberate indifference to reports of sexual misconduct, (2) which created a heightened risk of sexual harassment that was known or obvious (3) in a context subject to the school's control, and (4) as a result, the plaintiff suffered harassment that was "so severe, pervasive, and objectively offensive that it can be said to [have] deprive[d] the [plaintiff] of access to the educational opportunities or benefits provided by the school. *Doe v. Government of Nashville & Davidson County*, 35 F.4th 459, 465 (6th Cir. 2022).

203. As detailed above and throughout this Consolidated Complaint, each of these four factors is met in this case.

204. Plaintiffs bring this action to force the University Defendants to account for their illegal, intentional, inexpiable, and discriminatory treatment of their female student-athletes despite notice of the actions Weiss, whom the University enabled and protected until the Government's prosecution in March 2025 forced its hand.

60453048.2

205. Defendants (including Does 10–50) acted in concert and as co-conspirators to deprive Plaintiffs of constitutional rights and Title IX protections, through their overt acts, which include credential-based account resets, recovery number substitutions to VOIP services, and the physical transfer of a box consistent with removable media during the 3:42 PM quarterback room incident.

206. Simply stated, the University has long known of a culture of sexual harassment that the Regents and President Schlissel himself acknowledged, and, despite actual notice, Weiss continued to obtain female student-athletes' intimate data, and the University Defendants did nothing to protect female students. This conduct violates Title IX, which requires equivalent and fair treatment of female student-athletes and gives rise to additional claims based on the United States Constitution, the Michigan Constitution, common law, tort law, and federal privacy protection laws, all as outlined in this Consolidated Complaint. The longstanding notice and culture of actual sexualized harassment of women and student athletes is ongoing as shown by the flagrant misconduct of the Sherrone Moore coaching staff, where the University admits to having "investigated" Moore's repeated violation of University policies, but failed to detect those violations, and then terminated Moore, only after he assaulted female employee who was working under his control, and with whom he was carrying on an affair.

43

60453048.2

207. Only following the public fallout of that latest controversy and that the University Defendants had "investigated" Moore but failed to learn of his inappropriate actions did the University engage the Jenner and Block law firm to, assertedly, independently evaluate the "culture, conduct and procedures" of the "athletics department" as part of the University's alleged "commitment" "to strengthening the functional capacity of our university-wide Ethics, Integrity, and Compliance Office within the Department of Intercollegiate Athletics."[3]

208. New reports on Moore's failings in the Athletics department, including failing to report an alleged rape by one of the athletic staff, continue to come to light.[4]

**E.      The University's deliberate carelessness of protecting student PII is also longstanding and widespread.**

209. The University had cybersecurity breaches before Weiss.

210. In this case, it is undisputed that the University has known since at least December 2022 that there had been a significant data breach of student athlete PII, including candid and intimate images. Since that time, there have been other, repeat data security breaches at the University.

---

[3] https://president.umich.edu/news-communications/messages-to-the-community/update-on-michigan-football-and-intercollegiate-athletics/ (last visited on March 2, 2026).
[4] https://www.msn.com/en-us/sports/nfl/sherrone-moores-attorney-denies-claims-in-new-report-involving-former-michigan-staffer-latroy-lewis/ar-AA1XeR8a?ocid=BingNewsVerp (last visited on March 2, 2026).

44

211.   In August 2023, hackers gained access to up to 230,000 individuals including the PII of University students and applicants, alumni and donors, employees and contractors, University Health Service and School of Dentistry patients, and research study participants.

212.   The University later informed these individuals about this breach and those whose information was stolen and offered free credit monitoring services.[5]

213.   In September 2024, Michigan Medicine had a *second* cyberattack in four months targeting employee email accounts and compromising protected health information, such as the names, medical record numbers and diagnostic and/or treatment information of nearly 58,000 people.[6]

214.   When these latter two major cybersecurity attacks occurred, the University Parties knew of the prior major security breach at issue here and knew so by at least December 2022.

215.   But for reasons that remain unknown, Plaintiff-victims were never told their student athlete information had been compromised by a University employee. *Id.*

---

[5]*See* https://www.detroitnews.com/story/news/local/michigan/2023/10/23/um-3rd-party-accessed-school-systems-personal-information-for-5-days/71292044007/ (last visited on April 13, 2025).

[6] *See* https://www.freep.com/story/news/health/2024/09/26/cybersecurity-breach-university-of-michigan-medicine-email-attack/75392949007/ (last visited on April 13, 2025).

45

216.   Yet, between January 10 and February 2, 2023, the 15th District Court in Ann Arbor signed at least 14 search warrants, giving investigators permission to seize items from the home and office of Weiss, as well as the quarterback and tight end meeting rooms at Schembechler Hall and the campus Administrative Services Building.[7]

217.   The full extent of that data breach has never come to light and the extent that has, did not come to light publicly until March 2025 when the Government indicted Weiss.

218.   Again, in all this time, harm to Plaintiffs and the class members could have been avoided.

219.   This is also evident because the University has confirmed it identified, on December 23, 2022, that Weiss's crimes were being committed in Schembechler Hall and that the devices were known to be from the athletics department, yet the University Defendants declined to terminate Weiss at that time, or remove his electronic credentials including username and password, and he went on to continue to steal and sell Plaintiffs' PII and PHI. See ECF No. 32–3 of Case 2:25-cr-20165, PageID.189 at subparagraph 3.F.

---

[7]*See* https://www.detroitnews.com/story/news/local/michigan/2025/03/26/warrants-reveal-what-was-seized-from-ex-um-coach-weiss-home-office/82678503007/ (last visited on April 13, 2025).

60453048.2

220. On December 24, 2022, the University Defendants even removed some, but astonishingly not all, of Weiss's devices from Weiss's office, and the University Defendants also declined to terminate Weiss at that time, or remove his electronic credentials including username and password, and he went on to continue to steal and sell Plaintiffs' PII and PHI. *See* ECF No. 32–7 of Case 2:25-cr-20165, PageID.226 at paragraph 25.

221. Among the devices Weiss retained were his University assigned laptop, iPhone, and external removable drives.

222. Weiss also continued to use the Tight end meeting room desktop (2UA4511VP2) and laptop (A-5H1GFB3) to take and steal Plaintiffs' PII and PHI, despite and after actual notice to the University Defendants.

**F.     The University's use of Keffer without insisting on more protection shows more carelessness for student health, safety, and privacy; and Keffer's inadequate data security breached duties owed to student athletes.**

223. Keffer is a software company.

224. Its flagship product, called the Athletic Trainer System ("ATS"), provides cloud-based electronic medical record software that Keffer sells to athletic programs as a service, charging schools and teams an annual fee for each user.

225. Over 6,500 schools, clinics, and organizations throughout the United States use Keffer's ATS software platform.

47

60453048.2

226.   Keffer designed ATS to allow both coaches and team medical staff—often athletic trainers, hence the system's name—access to real-time data about student-athletes' health and readiness to compete.

227.   Keffer also designed ATS to spot health risks and cue coaches and medical staff to engage in preemptive mitigation.

228.   Coaches and athletic programs input, or direct athletes to input, athletes' data into the ATS system. These data include PII and PHI such as athletes' contact information, medical details like height, weight, blood type, and medical history.

229.   ATS also attempts to track athletes' mental health by providing online forms for athletes to input highly sensitive PII and PHI relating to anxiety, alcohol and drug use, insomnia, disordered eating, and depressive characteristics or feelings.

230.   These data points are then transmitted to and stored by Keffer and made available to users for whom contracting universities, and other contracting entities, authorize access.

231.   ATS is an online platform accessible via web browser or an app that a coach can download to his or her smartphone or tablet. Users (i.e., coaches, athletic trainers, and student athletes) sign in to Keffer's ATS using a password set by the user.

48

60453048.2

232. Keffer stores ATS data about student athletes on servers that the company advertises as being compliant with several leading data-security standards.

233. On information and belief, ATS data are stored in servers located in multiple states.

234. ATS users, including coaches, athletic trainers, doctors, and student-athletes, access that data by using an internet connection on their computer or smartphone, which transmit data across the network of interstate wires.

235. Keffer keeps records of all operations and user transactions on ATS, called "transaction logs" and "user transaction logs."

236. The former track operations related to athlete records such as who viewed or modified a profile; the latter capture modifications to user accounts such as password changes and administrative profile updates.

237. Those logs are maintained as part of ATS and are accessible to and monitored by Keffer.

238. The University executed a contract with Keffer to give its Athletic Department employees, including coaches, access to student-athletes' medical information via ATS in or about 2008.

239. Plaintiffs and class members entrusted that the University and the University Parties' authorization and entrustment to Keffer would keep them safe and their private information private.

60453048.2

240. Because ATS's functionality included facilitating communications between student-athletes and their trainers and coaches, each student-athlete in the system had an individual account the athlete could use to log into ATS's system. Each athlete's account had its own user ID and password, and the athletes had the ability to specify their preferred passwords.

241. Likewise, university coaches, trainers, and athletic directors had their own individual accounts. Keffer referred to such non-athlete accounts as "staff" accounts.

242. Keffer configured the ATS system so that athlete accounts only permitted access to the athlete's own data, while staff accounts permitted access to the data of multiple athletes – even multiple athletes across multiple schools.

243. Keffer advertises the customizability of ATS in determining which staff members had access to which athletes' data. In Keffer's words, "[w]ith ATS you have the ability to set up users with a wide variety of security and usage options."

244. Keffer hosts extraordinarily personal and sensitive PII and PHI of over two million athletes around the country. In addition, Keffer boasts numerous prestigious clients such as the University as clients.

245. Yet, Keffer itself is a relatively small operation. Its customer-facing promotional and instructional materials are dated in design and content.

50

60453048.2

246. For example, Keffer's website has a page devoted to information "About ATS," which on the Company History page includes a picture of a single-story home described as the basement where the company started:





247. The same page invites users to "Meet the Team," and provides photographs and titles reflecting a staff of only five people, the majority of which are described as having a role at least partially involved in "sales":

51

60453048.2





**Ashley, ATC**
Sales & Support

**Joe, ATC**
Sales & Support

**Gail**
Research & Sales




**Dana**
Office Manager

**Rhett**
Founder/CEO

248.   Keffer's website also includes an "online help" section containing links to dozens of individual PDFs describing the operation of its system.[8]  Some of the links are broken and lead nowhere.[9]  Screen shots of the ATS system in the materials reveal outdated user-interface designs. For example:[10]

---

[8] https://www.athletictrainersystem.com/onlinehelp.aspx. (last visited on April 13, 2025).
[9] *E.g.*, https://www.athletictrainersystem.com/pdf_files/Covid_temp_po_symp_ Screen.pdf; https://www.athletictrainersystem.com/pdf_files/Covid_Test_ Result_Import.zip (last visited on April 13, 2025).
[10] https://www.athletictrainersystem.com/pdf_files/Configuring_UserAccount_ ATS.pdf (last visited on April 13, 2025).

60453048.2



249.   Keffer's own "help materials" reveal that its outdated appearance and relative lack of sophistication extended into the security of the student-athlete data hosted in its system.

250.   In particular, Keffer's system design included at least three flaws which made athletes' data and passwords susceptible to mass compromise.

251.   First, Keffer over-emphasized a focus on flexibility and customization of staff account permissions at the expense of reasonable and common-sense security. The result was that staff users could be granted access not just to athlete data of every member of a single team, or even all of the athletes at a particular school – but all of the athletes at multiple schools.  Indeed, Keffer's own instructional materials provide this "all athletes at multiple schools" staff member permission for

53

a "Head Athletic Trainer" as an example of a way to set up permissions, even including a visual diagram of what such permissions look like:[11]



252.    Second, Keffer's system access provided mass access to, and export of, student-athletes' passwords and related personal data (including birthdays) associated with the athletes' own ATS accounts.

---

[11] https://www.athletictrainersystem.com/pdf_files/ATS_Security_Overview.pdf (last visited on April 13, 2025).

60453048.2

253. Keffer's user guide– described in a link as a guide to "Passwords and Athlete Security" that any member of the public can access on Keffer's website, illustrates that a staff member granted administrative permissions has access to built-in functionality to easily display the passwords of every athlete within that staff member's permission sphere:[12]



254. Worse, that same "guide" tells everyone with access to the internet how to easily mass export all the names, birthdates, and passwords of athletes across multiple institutions in one file with a few clicks:

---

[12] https://www.athletictrainersystem.com/pdf_files/Athlete_Security.pdf (last visited on April 13, 2025).



255.   Third, despite Keffer designing its system to empower individual staff members to mass view and easily export highly-sensitive passwords and PII of student athletes across multiple institutions, Keffer's security measures surrounding the accounts of staff members with such extraordinary access were lax.

256.   Specifically, Keffer did not, prior to the incident at issue in this case, require multi-factor authentication for staff members to log in.[13]

---

[13] Keffer's user guides updated in April and May 2025 describe multifactor authentication as turned on by default for staff accounts, while guides describing the operation of the system prior to the Weiss incident say that multi-factor authentication was turned off by default and had to be enabled. *Compare* https://www.athletictrainersystem.com/pdf_files/Account_Authentication.pdf (revised April 2025 and describing MFA as turned on by default for staff accounts), *and* https://www.athletictrainersystem.com/pdf_Files/ATS%20Current%20Security%20Settings.pdf (updated May 2025, and stating MFA is required for staff and may not be disabled, *with* https://www.athletictrainersystem.com/pdf_files/2FactorAuthentication.pdf (to use MFA an administrator "must first turn this feature on in the Site Info area") *and* https://www.athletictrainersystem.com/pdf_files/Admin_FAQ.pdf.(describing MFA as an "option"), *and* https://www.athletictrainersystem.com/pdf_Files/ATS_FAQ.pdf (stating that "we have our own 2-factor authentication that *can be* enabled for staff and/or athletes/ Guardians (emphasis added)) (last visited on April 13, 2025).

60453048.2

257.   Multi-factor authentication ("MFA") is a security enhancement that requires users to provide two or more verification methods to gain access to an account or system. MFA adds an extra layer of security beyond a username and password, making it significantly harder for unauthorized users to access accounts, even if one factor is compromised.

258.   Thus, prior to the Weiss incident described here, anyone who obtained access to the password of a staff member with permission to view hundreds of thousands of passwords could log-in as that staff member.

259.   Acting as a vendor for the University, Keffer agreed to safely maintain and store data concerning Plaintiffs and the class in a secure manner, free from improper access from employees of the University such as Weiss or third parties.

260.   Keffer knowingly and intentionally took on the obligation to safeguard and protect the PII entrusted to Keffer by Plaintiffs and class members.

261.   Nevertheless, and it was also obvious to the University Defendants that the system design decisions by Keffer were each unreasonable, unusual, and inadequate for a system hosting the volume and nature of sensitive personal information in Keffer's system.

262.   Individually and collectively, these security designs recklessly and negligently exposed the data of millions of student-athletes to being compromised by a single bad actor with a password.

60453048.2

263.    Keffer failed to consider, enact, or implement appropriate policies, procedures, and security measures to safeguard and protect the personal and private information entrusted to Keffer by Plaintiffs and class members.

264.    This was also obvious to the University Defendants from looking at and using the ATS program.

265.    The University student-athletes' data was stored in ATS (i.e., on Keffer's servers). The University and Keffer issued Weiss login credentials to access those data.

266.    As a senior member of the University's coaching staff, Weiss had privileged access to the ATS databases.

267.    The University is classified as an "umbrella organization" in ATS such that senior personnel at the University and athletic department can view data belonging to student-athletes across all of the University athletic programs. Weiss was granted this university-level privileged access on ATS by virtue of his senior role in the Athletic Department, with no review by the University Defendants, even after the December 21–23, 2022 Reporting.

268.    At direction of each of the University Defendants, Keffer continually supplied Weiss with unlimited access to the ATS system that he would not have otherwise had, even after all of the December 2022 notices specified above. At direction of the University Defendants, Keffer granted Weiss further-elevated

58

60453048.2

administrative access that allowed Weiss to view and download data pertaining to student athletes not attending the University, as well as the passwords of both University and non-University student athletes used to log in to ATS.

269. Keffer was aware Weiss had been assigned an unusually high level of administrative access, which allowed him to access data and passwords for student-athletes from the University and other schools.

270. Based on the foregoing, Keffer knowingly and intentionally took on and breached the obligation to safeguard and protect the personal, private, and intimate images and information entrusted to by Plaintiffs and class members.

271. Keffer also breached those obligations by failing to consider, enact, or implement any policy, procedure, or security measure to safeguard and protect the personal, private information entrusted to Keffer by Plaintiffs and class members.

272. Weiss accessed the personal, private information entrusted to Keffer by Plaintiffs and class members as a result of both Keffer's failures to consider, enact, or implement any measure of security or protection, in addition to each of the University Defendants' failures to suspend Weiss's employment or to remove his electronic credentials supplied by the University even from and after actual notice on December 21, 2022, if not sooner, and until termination.

59

60453048.2

273. Weiss's access and activities on the system were recorded in Keffer's logs, including his downloading of student athletes' passwords, all of which logs were routinely and regularly shared with each of the University Defendants.

274. The University Defendants, however, failed to terminate Weiss's unlimited computer access despite actual notice through the logs that Weiss was accessing, downloading, and selling Plaintiffs' PII and PHI, specifically predominantly female student athletes' passwords.

**G.     The University's Google Workspace systems also show deliberate indifference.**

275. Google Workplace is a suite of cloud-based software made available to educational institutions, including the University, as a service by Google LLC (now a subsidiary of Alphabet Inc.).

276. Google Workplace at the University includes email (i.e., access to students' and employees' University email addresses), calendar, and "drive" software services. All these services are cloud-based and operate using Google servers located in multiple states throughout the United States connected via the network of interstate wires.

277. University students (including student athletes), faculty, and staff access Google Workspace and the data stored on Google servers via internet connection using their web browser or a mobile app.

60453048.2

278. Google Drive and Google Photo (together, "Google Drive") are services available to University students, staff, and faculty. Both are cloud-based storage systems, which allow users to save documents, pictures, videos, and other content in a personal file accessible only to the user (and those they specifically authorize to access individual files or folders within Drive).

279. At all relevant times, University students, staff, and faculty members were required to sign in to the University's Google Workplace system, including Google Drive, using the University's "single sign-on" system.

280. At all relevant times, the University's single sign-on system allowed a student, staff member, or faculty member to access virtually any University online system, including Google Workspace services, using a single unique username and password.

281. Upon trying to access any Google Workplace service or page, a user would be redirected to a sign-on page hosted by the University. There, the user would be asked to submit his or her unique University username and password (i.e., his or her University single sign-on credentials). This data would be transmitted to University servers over an encrypted connection via interstate wires. If the username and password were correct, University servers would send a message back (again via interstate wires) to the service provider, Google, telling the service provider to grant the user access.

61

60453048.2

282. At all relevant times, all University users' unique usernames matched the part of their email address before the "@" symbol. For instance, if a student had the email jdoe@umich.edu, her unique username was jdoe.

283. The University's single sign-on system has a "forgot password" feature.

284. Using that feature, a user clicks a link on the single sign-on page to initiate the password reset. Upon clicking the link, the person is prompted to enter his or her unique username. If he or she enters it correctly, the system redirects the user to a "verify identity" page. There, the person must enter either his or her birth date or eight-digit University identification number. If he or she enters either piece of information correctly, the system will take the user to a new page where he or she can obtain a code to unlock the account and change the user's single sign-on password.

285. At all relevant times, the University did not require students, staff, or faculty to use MFA to access Google Workspace.

286. This also made it obvious that Plaintiffs were at risk, particularly given the broad and loose authorizations for Weiss with respect to ATS.

287. Two-factor authentication or MFA adds a step to the sign-on process: after a user correctly enters his or her username and password, the sign-on system sends the user a one-time unique code via text (or a secure "authenticator" app) to his or her mobile phone. The user must then enter the code into the sign-on system

62

60453048.2

within a limited time window before the system will grant the user access. MFA significantly increases security by requiring users to confirm attempted access via the users' mobile phones, a device likely to be in the user's possession and protected by additional passwords and/or biometric access protocols.

288. The University's Google Workplace system, including Google Drive, remains accessible to and useable by students after they leave the University.[14]

289. The University logs access and password-reset events related to the University's single sign-on system and the University's Google Workplace services, including Google Drive.

290. The University requires organizational units that handle sensitive data to forward their security logs to the University's central information assurance office every 5 minutes. All other units must forward logs every 30 minutes for monitoring.

291. These logs also revealed to the University Defendants the ongoing invasions by Weiss of Plaintiffs' PII and PHI, including before and after the December 21–23, 2022 Reporting.

292. But despite that notice, the University Defendants each permitted Weiss to continue without limitation of his computer credentials after receipt of these logs,

---

[14] Beginning in 2024, some former students' accounts may have been closed by the University if they had a very large amount of data 90 days after graduation and the former students took no action to reduce the amount of data stored. But most remain open and accessible in perpetuity.

including both before and after the December 21–23, 2022 Reporting, during which times Weiss continued to access, download, and sell Plaintiffs' PII and PHI.

293. The University Defendants also did not treat either the Athletic Department or the IT unit that oversaw single sign-on and Google Workplace as offices that handled sensitive information.

294. The University officer responsible for information assurance is the Vice President of Information Technology and Chief Technology Officer.

295. Weiss was granted access to the University's single sign-on system Google Workplace when he began his employment at the University.

296. He used the University's Google Workplace programs in the course of his employment by the Athletic Department, including to communicate with players and University personnel and to save documents related to the football program and his coaching activities.

297. If Weiss did not work at the University, he would not have had access to the University's Google Workplace system or the University's single sign-on system.

298. The University Parties allowed Weiss to have unfettered Keffer data and unlimited Google Workplace system access for the University, all without enhanced verification such as MFA, and that conduct was extremely unreasonable,

60453048.2

dangerous, enabled Weiss to access Plaintiffs' private PII, PHI, and intimate information, including after actual notice was provided to the University Defendants.

H.     **Unauthorized Access of Keffer's ATS and the University's Google Workspace.**

299.    While working at the University, and despite notice to each of the University Parties and Keffer, Weiss obtained the private, protected data of roughly 150,000 unsuspecting students from across the United States.

300.    Weiss began by exploiting his elevated access to Keffer's ATS to obtain highly confidential information about students across the Athletic Department's many teams and across multiple universities. These data included PII and PHI like birthdates and parents' names; student athletes' height, weight, and race; and the passwords student athletes used to access ATS.

301.    Weiss used these data to target certain student athletes, mostly female student athletes, for further cyber harassment.

302.    Weiss used the data he obtained through his access to ATS to enter student-athletes' passwords (using in part information in the students' ATS data or their ATS password) needed to access Google Workplace or to successfully reset those passwords using students' usernames (which he knew from their email addresses) and birthdates or other PII (which he obtained from his ATS access), all

60453048.2

of which was possible only because of the lack of enhanced protection such as MFA, and despite notice to the University Defendants.

303.   Once he had obtained or changed a student athlete's University single sign-on password, Weiss would log into and download data from the student's Google Drive. Weiss took documents and emails, including photographs and videos.

304.   On information and belief, Weiss viewed and took at least some of these emails, documents, photographs and videos before they had been opened by their intended recipient.

305.   For at least the duration of his employment by the University, Weiss sought out and obtained, among other things, the most intimate, private, personal photographs and information of student athletes—in particular, female student athletes—from their University Google Drive. These included nude and semi-nude photographs and videos.

306.   Weiss would view exceptionally private videos and photographs on his University computer via an internet connection and download such videos and photos to his University computer or other physical storage medium. He would continue to access and view these images after obtaining them and then sell them.

307.   This action continued from not only March 2021 through January 20, 2023, but through March 20, 2025.

60453048.2

308.   Weiss has continued to sell Plaintiffs' PII and PHI since his employment with the University ended.

309.   Keffer and the University Defendants were aware that Weiss had an inappropriately high level of administrative access to ATS and ATS's databases. Weiss's access level was logged by Keffer's ATS when it was awarded and each time Weiss accessed ATS, and the University Defendants received each of those reports, along with the information showing Google passwords were reset.

310.   Neither Keffer nor the University Defendants took any action to correct or otherwise inhibit Weiss's access to the most sensitive student-athlete data that ATS and the University possessed, despite receipt of these logs and reports.

311.   On information and belief, Keffer and the University Defendants were also aware that Weiss had used his inappropriately high level of administrative access to download data concerning both the University and non-University students such as their birthdates and parents' names, height, weight, race, and passwords, some of which were used to access ATS. Weiss's actions to obtain this data were logged by Keffer's ATS, and reports of those logs were received by the University Defendants as well.

312.   Here too, neither Keffer nor the University Defendants took action to stop Weiss from obtaining these data and did not alert any student-athletes that their PII and PHI was or may have been compromised.

67

60453048.2

313. The University, including but not limited to the Individual University Employees, were aware that Weiss had reset students' passwords, accessed students' Google Workplace accounts, and downloaded data from those accounts. Indeed, the University's own system logged these activities and was provided to data assurance University personnel including but not limited to the University Individual Defendants with sufficient information to stop Weiss's activities.

314. The University Defendants still took no action to stop Weiss from continuing in obtaining this data and did not alert any student-athletes that their data was or may have been compromised.

315. The University began investigating Weiss only in 2023 despite that Weiss was reported in late 2022 for inappropriate and unauthorized access to computer systems.

316. Despite notice in 2022, the University and separately each of the Individual University Employees permitted if not required Weiss to coach in the December 31, 2022 Fiesta Bowl, and Weiss, despite notice to the University Defendants, was able to and did continue to access, download, and sell Plaintiffs' PII and PHI through January 20, 2023.

**I.     Each of the Named Plaintiffs have experienced specific harm from and as a result of conduct of each of the Individual Defendants.**

317. Plaintiff Jane Doe 1 is a professional soccer player.

68

60453048.2

318. Plaintiff Jane Doe 1 has been deprived of the use of her name, image, and likeness ("NIL") because of the actions and inactions of the Defendants as alleged in this Complaint.

319. Plaintiff Jane Doe 1 has and continues to receive constant updates that her PII, PHI, and NIL have been compromised and sold, since and after Weiss improperly accessed her PII, PHI, and NIL and from and after the other Defendants failed to take any reasonable action to safeguard her PII, PHI, and NIL, despite notice.

320. Plaintiff Jane Doe 2 has confirmed that she repeatedly had her PII, PHI, and NIL accessed and misappropriated because of the actions and inactions of the Defendants as alleged in this Complaint, from and after Weiss was a University employee.

321. Plaintiff Jane Doe 2 has and continues to receive constant updates that her PII, PHI, and NIL have been compromised and sold, since and after Weiss improperly accessed her PII, PHI, and NIL and from and after the other Defendants failed to take any reasonable action to safeguard her PII, PHI, and NIL, despite notice.

322. Plaintiff Jane Doe 3 has received at least four communications from the DOJ that her PII, PHI, NIL, and other personal information have been accessed and compromised in connection with Weiss's actions and from and after the other

69

60453048.2

Defendants failed to take any reasonable action to safeguard her PII, PHI, NIL and other personal information.

323. Plaintiff Jane Doe 4 has and continues to receive constant updates that her email, social media, and cloud storage accounts were compromised, and the contents of those accounts sold, since and after Weiss improperly accessed them and from and after the other Defendants failed to take any reasonable action to safeguard her PII, PHI, and NIL, despite notice.

324. Plaintiff Jane Doe 5 had her email accessed by Weiss without authorization, and received notice of a suspicious log in, and immediately in late December 2022 contacted the University IT department and spoke with an individual with the last name Wright to ask about any information relating to the suspicious log in.

325. Wright told Plaintiff Jane Doe 5 that there was nothing to worry about and that it was one of Doe 5's own software application that must have caused that log in attempt. Wright was wrong and Doe 5 continues to receive constant updates that her PII, PHI, NIL, and email, social media, and cloud storage accounts have been compromised, and the contents of those accounts sold, since and after Weiss improperly accessed them and from and after the other Defendants failed to take any reasonable action to safeguard her PII, PHI, NIL, and her email, social media, and cloud storage accounts, despite notice.

70

60453048.2

326.   Plaintiff Jane Doe 6 has received at least four communications from the DOJ that her PII, PHI, NIL, and other personal information have been accessed and compromised in connection with Weiss's actions and from and after the other Defendants failed to take any reasonable action to safeguard her PII, PHI, NIL, and other personal information.

327.   Doe 6 has had her email, social media, and cloud storage accounts compromised by Weiss, and that data sold, and thereby damaged from the other Defendants' failure to take any reasonable action to safeguard her PII, PHI, NIL, and her email, social media, and cloud storage accounts, despite notice.

328.   Plaintiff Jane Doe 7 has received detailed information from the DOJ that Weiss accessed, stole, and sold her and her partner's intimate information.

329.   Plaintiff Doe 7 has been damaged because of each of the Defendants' actions and inactions and failures to take any reasonable action to safeguard her PII, PHI, NIL, and other personal information, despite notice.

330.   Plaintiff Jane Doe 8 has received multiple DOJ communications that her PII, PHI, NIL, and other personal information was compromised, accessed and sold by Weiss.

331.   In late 2022 and into 2023, Plaintiff Jane Doe 8 was contacted by University employees who instructed her to reset her email password.

71

60453048.2

332. Doe 8 has had her email, social media, and cloud storage accounts compromised and sold by Weiss, and thereby damaged by each of the Defendants' failure to take any reasonable action to safeguard her PII, PHI, NIL, and email, social media, and cloud storage accounts, despite notice.

333. Plaintiff Jane Doe 9, a non-University of Michigan athlete, has received at least four communications from the DOJ that her PII, PHI, NIL, and other personal information has been accessed, compromised, and sold in connection with Weiss's actions and from and after the other Defendants failed to take any reasonable action to safeguard her PII, PHI, NIL, and other personal information, despite notice.

334. Plaintiff Doe 9 has had her email, social media, and cloud storage accounts compromised by Weiss, and thereby damaged by the other Defendants' failure to take any reasonable action to safeguard her PII, PHI, NIL, and email, social media, and cloud storage accounts.

335. Plaintiff Jane Doe 10 has received at least four communications from the DOJ that her PII, PHI, NIL, and other personal information have been accessed and compromised in connection with Weiss's actions and from and after the other Defendants failed to take any reasonable action to safeguard her PII, PHI, NIL, and other personal information.

336. Plaintiff Doe 10 has also received information from the University that her PII, PHI, and NIL was compromised and sold.

72

60453048.2

337. Plaintiff Doe 10 has received repeated information from Capital One and other credit card companies that her PII has been compromised and received those communications from and after December 2022.

338. Plaintiff Doe 10 was thereby damaged by each of the Defendants' actions and inactions to reasonably safeguard her PII, PHI, and email, social media, and cloud storage accounts, despite notice.

339. Plaintiff Jane Doe 11 was never a collegiate student athlete but nevertheless has received at least four communications from the DOJ that her PII, PHI, and other personal information has been accessed, compromised, and sold in connection with Weiss's actions and from and after the other Defendants failed to take any reasonable action to safeguard her PII, PHI, and other personal information, despite notice.

340. Plaintiff Doe 11 has also received multiple DOJ communications that her other personal information was compromised, accessed, and sold by Weiss, including but not necessarily limited to her email, social media, and cloud storage accounts, and thereby she has been damaged by the other Defendants' failure to take any reasonable action to prevent harm to her including but not limited to because of actions by Weiss, and to otherwise safeguard her PII, PHI, and email, social media, and cloud storage accounts, despite notice.

73

60453048.2

341. Other non-named class members have reported up to five instances of identity theft after Weiss accessed, downloaded, and sold her PII, PHI, and email, social mediation, and cloud storage accounts. Many other class members have also had identity theft instances of this frequency after Weiss accessed their PII, PHI, and email, social media, and cloud storage accounts.

342. Grasso has failed and refused to require the turnover of Plaintiffs' NIL taken by Weiss but recovered by the University or to deliver to Plaintiffs the details of the University Police Department's investigation into Weiss's access to Plaintiffs' PII, PHI, and use of their NIL.

343. Grasso thereby continues to perpetuate the harm to Plaintiffs and the class and is thereby inhibiting the Plaintiffs' ability to mitigate their damages.

344. Under Schlissel's leadership from July 2014 to January 2022, as the WilmerHale firm, and Schlissel himself, conceded, the "behaviors" within the University "community" were "awful," "unacceptable," "failed to properly and effectively address *earlier reports* of [sexual] misconduct," "failed" to "create" a "culture that rejects harassment and misconduct," and caused "harms to members of our community" because of "institutional failings," with "*safeguards, policies and procedures [that] were inadequate*."[15] *Id.*

---

[15]https://president.umich.edu/news-communications/messages-to-the-community/a-message-from-president-mark-s-schlissel-on-the-philbert-investigation-report/(last visited on April 12, 2025).

345. Schlissel personally was notified of Philbert's widespread sexual misconduct on women and failed to respond.

346. Schlissel authorized the providing of University computers, computer equipment, and electronic credentials to Weiss despite receiving logs and reports including from ATS that Weiss was accessing PII and PHI of Plaintiffs.

347. Schlissel also authorized the providing of University computers, computer equipment, and electronic credentials to Weiss despite obvious risks that the entire University community was marked by a culture of sexual harassment, repeated data breaches, a wholly unsecured Keffer ATS program, and the Google workspace that lacked any MFA.

348. As a result of Schlissel's direct actions that, through his own sexual misconduct of subordinates perpetuated the culture and institutional failures, Weiss was able to and did, before and after the December 21–23, 2022 Reporting, access, download, and sell Plaintiffs' PII and PHI.

349. Ono was told of Weiss's actions of accessing, downloading, and selling Plaintiffs' PII and PHI through use of University computers, computer equipment, and credentials no later than December 21, 2022, and he failed to take any action to stop Weiss from continuing to download, access and sell Plaintiffs' PII and PHI for, among other reasons, the football team was playing in the Fiesta Bowl on December 31, 2022.

75

60453048.2

350. As a result, Weiss continued to access, download, and sell Plaintiffs' PII and PHI from and after December 23, 2022, and through January 19, 2023.

351. Beyond the President's office, Manuel, Gnodtke, Harbaugh, Pendse, and Bermann also could have, but failed to intervene to stop Weiss from continuing to download, access and sell Plaintiffs' PII and PHI, despite prior notice, for, among other reasons, the football team was playing in the Fiesta Bowl on December 31, 2022.

352. Weiss continued to access, download, and sell Plaintiffs' PII and PHI through January 19, 2023, and then continued to sell Plaintiffs' PII and PHI that he obtained because of these Defendants actions and inactions through March 20, 2025.

353. Harbaugh and Manuel deleted electronic communications including text messages that detail his various communications pertaining to and with Weiss.

354. Harbaugh has publicly admitted in connection with NCAA reporting that he failed to monitor and supervise his staff, which includes but is not limited to Weiss.

355. Manuel, Gnodtke, Pendse, and Bermann each also failed and refused to require the turnover of Plaintiffs' NIL taken by Weiss or deliver to Plaintiffs the details of the University Police Department's investigation into Weiss's access to Plaintiffs' PII, PHI, and use of their NIL.

76

60453048.2

356. Manuel, Gnodtke, Pendse, and Bermann each thereby continues in this refusal and thus perpetuates the harm to Plaintiffs and the class and thereby is inhibiting the Plaintiffs' ability to mitigate their damages.

357. Grasso, Ono, Schlissel, Manuel, Gnodtke, Pendse, and Bermann each failed and refused undertake basic security measures as to Weiss and the football program that are and were applicable to other portions of the University's athletic department, including the female teams, despite prior notice as stated in this Complaint. The refusal and failure by each of them separately to do so not only resulted in Weiss being able to equip his University computer with encryption, but in Weiss having the ability to access and benefit from Plaintiffs' PII, PHI, and NIL, despite prior notice of Weiss's actions.

358. Harbaugh failed and refused to require the turnover of Plaintiffs' NIL taken by Weiss or deliver to Plaintiffs the details of the University Police Department's investigation into Weiss's access to Plaintiffs' PII, PHI, and use of their NIL.

359. Harbaugh led and encouraged a culture within the football program that resulted in a complete lack of oversight or protection for non-football student athletes.

60453048.2

360.   As the head football coach, Harbaugh was Weiss's direct supervisor. Harbaugh reported to the Director of the Athletic Department, who in turn reported to the President of the University, who in turn reports to the Regents.

361.   Harbaugh failed and refused to implement basic security measures as to Weiss and the football program that resulted in Weiss and others accessing Plaintiffs' PII, PHI, and NIL, despite prior notice.

362.   Had Harbaugh implemented basic oversight of his staff, Plaintiffs and the class would have been protected against predators such as Weiss. Instead, Weiss was a highly compensated asset that was promoted by and within the football program, from which position he was able to, and did, target female student athletes, access and take their PII, PHI, and NIL, and cause years and years of fear, loss of the same educational opportunities as male student athletes, identity theft, loss of trust, and distrust in collegiate and professional athletics.

363.   Harbaugh has admitted that he failed to reasonably monitor and supervise his staff.

364.   Those failures damaged Plaintiffs.

365.   Weiss violated Plaintiffs' and the class members' rights including, but not limited to, their rights to privacy, and he was able to do so because of the other Defendants' gross institutional and systematic security failures.

60453048.2

366.   During his time at the University, Weiss served as quarterbacks coach and co-offensive coordinator for the football team. Immediately prior to the University, the Baltimore Ravens ("Ravens") of the National Football League employed Weiss—starting in 2009—in various coaching roles, during which time Weiss worked for Harbaugh's brother, John Harbaugh, who is the head coach of the Ravens.

367.   Weiss worked for John Harbaugh from 2009-2021 as an assistant coach, including two years as John Harbaugh's personal assistant, until Jim Harbaugh hired Weiss in February 2021 as the University's quarterbacks coach. Jim Harbaugh knew Weiss well, having previously worked with Weiss at Stanford University from 2005 to 2008.

### J.   The Regents and the University also have been indifferent to harm to Plaintiffs and the class.

368.   The Regents are responsible and had a duty to ensure that the University runs with integrity and care for the students.

369.   It breached that duty by failing to supervise and monitor Weiss and as a result Plaintiffs and thousands of class members have had their privacy invaded and despite the Regents' actual prior notice including but not limited to the December 21–23, 2022 Reporting, after which Weiss continued to access, download, and sell Plaintiffs' PII and PHI.

79

60453048.2

370. The Regents are also responsible for overseeing the University's operations, finances, and policy, including approving budgets, tuition rates, and construction projects.

371. The Regents also failed in that duty by failing to consider, implement, or follow a policy to oversee how or whether the University conducted its operations in a manner that would have in any manner monitored, supervised, and ensured that retention and employment of Weiss would not result in a breach of the privacy Plaintiffs entrusted to the University.

372. The Regents also failed to take any action much less consider means by which to prevent the harm caused to Plaintiffs and class members as alleged in this Complaint.

373. The Regents were supposed, but failed, to establish University policy, including monitor personnel, including but not limited to Weiss, so that students on the campus were protected from their privacy being invaded.

374. The Regents were required, but failed, to ensure that the University offered services such as to have student athletes able to be treated by athletic professionals who do not invade their privacy.

375. The Regents recklessly failed to ensure information of and pertaining to student athletes, including but not limited to Plaintiffs, was safely secured since Plaintiffs and other similar to them entrusted the Regents to do so.

80

60453048.2

376.    The Regents were responsible for financial oversight of the University but failed to prudently exercise that duty because they placed avoiding cost of learning, having, and implementing security measures to protect the personal, private, and intimate images and information of the Plaintiffs and others similar to them, as more important than incurring the cost of establishing and paying for programs to so implement safety policies, and to monitor and ensure student safety.

377.    The Regents are supposed to regulate all three U-M campuses but failed to do so by failing to consider or implement any policies to review, discover, or prevent the willful invasions of privacy committed by Weiss because of the access the University provided to him.

378.    The University itself had all the same duties as the Regents.

379.    The University itself breached all the same duties and in the same and/or similar manners as the Regents.

380.    The Plaintiffs and others like them entrusted the University to safeguard their bodily images and personal information.

381.    The University breached the heightened duty it had and recklessly permitted Weiss to invade the Plaintiffs' privacy and likewise for their student athlete peers and expose them and their intimate images.

382.    The University employed Weiss.

383.    The University controlled Weiss.

81

60453048.2

384. The University assigned and directed job duties to and upon Weiss.

385. Those job duties and direction directly resulted in Weiss accessing private, personal, intimate images and information of Plaintiffs and others similar to them, all of which were private, and entrusted to be safeguarded by the University and its agents.

386. The University took no action to monitor Weiss despite providing him with the ability and means to invade Plaintiffs' privacy and the privacy of others, even after notice that he was doing so.

387. The University breached the confidences that Plaintiffs and others similar to Plaintiffs entrusted to the University and did so by providing Weiss with the electronic credentials and ability to track and spy on student athletes including Plaintiffs, and to use those credentials to invade Plaintiffs' private lives and obtain and use images of them and personal information relating to them.

388. With no University supervision, and during execution of his official duties as an employee of the University, Weiss invaded Plaintiffs' privacy and the privacy of others in similar postures, despite prior direct notice to all other Defendants through the December 21–23, 2022 Reporting, and despite notice to all other Defendants through receipt of ATS and University software reports detailing ATS and Google activity.

82

60453048.2

389.    Hundreds if not thousands of students still face harm because, despite notice from decades of athlete department complaints and abuse, and widely known social media stockpiles of information that beg for safekeeping, plus the ATS logs showing notice, the University's electronic ATS reports, the similar Google Workspace Reports, and the actual December 21–23, 2022 Reporting itself, Weiss continued to access, download, and sell Plaintiffs' PII and PHI through January 2022 while a University employee, and then continued to further sell Plaintiffs' PII and PHI that he had downloaded while a University employee after he was no longer a University employee, including up through the date he was indicated on or around March 20, 2025.

390.    Despite all of that, the Defendants have failed time and time again to disclose the harm Plaintiffs suffered and will continue to suffer, including by failing to disclose to Plaintiffs how or where their private and personal information that was taken has been disbursed, or is being stored, and maintained, and who can access such information, and from where.

391.    None of the Defendants has explained or justified why they failed to undertake any review of the conduct of Keffer or Weiss, or otherwise failed to investigate the access at issue, or monitor that access or establish safeguards for Plaintiffs and the class.

392. The harm extends to accounts of more than 2,000 targeted athletes and more than 1,300 additional students and/or alumni from universities and colleges from around the country, including but not limited to Plaintiffs.

393. Keffer conceded to the MDL panel that the number of victims as a result of the actions and inactions by the Defendants in this case is close to 300,000 individuals, as a result of vulnerabilities present in the ATS and subsequently exploited and unremediated.

394. Despite all such notice and prior instances of breach of trust, the Defendants failed to protect Plaintiffs' private information and images, or to undertake any reasonable method to protect the Plaintiffs' privacy and the privacy of others.

## CLASS ALLEGATIONS

395. Plaintiffs bring this lawsuit individually and as a class action on behalf of all others similarly situated pursuant to Rule 23.

396. This action satisfies the numerosity, commonality, predominance, typicality, and adequacy elements of the rule.

397. The Class is currently defined as:

**All persons whose personal information, images, data, social media, or videos were access by Weiss without authorization (the "<u>Class Members</u>").**

398. The Title IX "Deliberate Indifference" Subclass is currently defined as:

84

**All women who were University of Michigan students or student-athletes between March 2021 and January 2023 whose private information and/or intimate images were accessed via University of Michigan-controlled systems, facilities, or credentials, and who were subjected to sex-based harassment and University of Michigan's deliberate indifference after actual notice on or before December 23, 2022.**

399.   Section 1983 Fourth Amendment Subclass is currently defined as:

**All persons whose University of Michigan Google accounts or content were accessed without authorization using University of Michigan resources and credentials, including after University of Michigan's actual notice, resulting in unreasonable searches/seizures.**

400.   The CFAA/Computer-Access Subclass is currently defined as:

**All persons whose data were obtained from protected computers and electronic communication services (including University of Michigan Google Workspace and Keffer ATS) without authorization or by exceeding authorized access, with losses as alleged.**

401.   The NIL-Economic Harm Subclass is currently defined:

**All collegiate or former collegiate athletes whose NIL rights suffered measurable diminution in value due to nonconsensual access to and exploitation risk of intimate images obtained via cyber intrusion.**

402.   The Keffer Negligence Subclass is currently defined as:

**All persons whose PII/PHI/NIL were processed in Keffer's ATS and were accessed due to its allegedly open, unsecure configuration and failures to implement reasonable safeguards.**

403.   The Post-Notice Damages Subclass is currently defined as:

85

60453048.2

**All persons who suffered additional access or harm after Dec. 21–23, 2022 due to University of Michigan's failure to remove implicated devices, restrict access, or suspend Weiss, including during/after the Dec. 31, 2022 Fiesta Bowl.**

404. The Out-of-Institution Victims Subclass is currently defined as:

**All persons who were not University of Michigan students or student-athletes whose information/images were accessed via University of Michigan-controlled credentials/systems or Keffer ATS.**

405. The Injunctive-Relief Subclass is currently defined as:

**All class members seeking uniform disclosures regarding the breach and mandated security reforms at University of Michigan and Keffer.**

406. Numerosity: Although the exact number of Class Members is uncertain at this time and can only be ascertained through forthcoming appropriate discovery, the number is great enough such that joinder is impracticable and is estimated to exceed three hundred thousand members (300,000).

407. Law enforcement officials have disclosed the numbers of victims is a great many and numerosity is established.

408. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court, and preserve resources, avoid potentially inconsistent results, and be an equitable and efficient manner to adjudicate the claims.

409. The Class Members are readily identifiable from information and records in the possession of the federal and state authorities, the Regents, the University, and Keffer.

410. The electronic records possessed by the Parties which conducted their own investigations can confirm the identification of class membership, and/or any subclasses necessary or appropriate.

411. Commonality: The facts and liability proofs show how, where, who, when, and through what mediums the invasions of Plaintiffs' information occurred and are best and fairly determined in one stroke.

412. The actions, inactions, and recklessness of the Defendants are common as to all Plaintiffs and Class Members.

413. The access and invasions by Weiss through unsecure facilities is common to all Class Members and has caused injury to the Plaintiffs and Class Members in virtually identical manners.

414. The vast majority of the factual proofs and questions of law common to the Plaintiffs and to the Class Members predominate over individual questions.

415. Plaintiffs' claims are typical of the Class Members because they are highly similar, share the same essential characteristics, and are related in time, space, and origin.

60453048.2

416.   Plaintiffs have each been closely vetted and are more than adequate representatives of the class because they experienced the harms that the Class Members experienced, are familiar with the facts, are motivated to seek justice, and adequately represent the harms perpetrated upon the class as a whole.

417.   Maintaining this action as a class action is superior to other methods of adjudication, promoting the convenient administration of justice because:

a.   The pursuit of separate actions by individual Class Members would risk inconsistent or varying adjudications that would confront Defendants with potentially incompatible standards of conduct;

b.   Many victims will not come forward without a certified class.

c.   Final equitable relief will be appropriate with respect to the Class for any monitoring, protection, therapy and other equitable forms of relief that may be provided;

d.   This action is manageable as a class action and would be unmanageable any other way;

e.   Absent the class action, individual Class Members may not know if their rights have been violated, if their PII, PHI, or NIL was taken; where such data are currently being stored or are accessible by others; and their injuries are likely to go unaddressed and unremedied; and,

60453048.2

f. Individual Class Members may not have a significant interest in controlling the prosecution of separate actions.

## COUNT I – VIOLATION OF TITLE IX, 20 U.S.C. § 1681(a) *Et Seq.* SEXUAL HARASSMENT AND ASSAULT (AGAINST THE UNIVERSITY AND THE BOARD OF REGENTS)

418. Plaintiffs incorporate the allegations set forth above by reference with the same force and effect as if fully repeated.

419. Title IX enacted in 1972, provides in relevant part:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]

20 U.S.C. § 1681(a).

420. Plaintiffs and Class Members are each a "person" under the Title IX statutory language at 20 U.S.C. § 1681(a).

421. Since the passage of Title IX, the University of Michigan has received and continues to receive federal financial assistance for its education program and is therefore subject to the provisions of Title IX.

422. The United States Supreme Court has acknowledged the principle that the governing Board of an educational institution "is a recipient of federal education funding for Title IX purposes." *Davis v. Monroe County Bd. of Ed*., 526 U.S. 629, 639 (1999) (citing the lower court in that case, citation omitted). Thus, for purposes

89

60453048.2

of Title IX, the actions and/or inactions of the Board of Trustees are deemed the actions and/or inactions of the University.

423. The Civil Rights Restoration Act of 1987 made Congress' intent plain that "program or activity," as used in Title IX, applies to any program or activity so long as any part of the public institution receives federal financial assistance. 20 U.S.C. § 1687. Thus, the University is subject to Title IX even if none of the funding for either its men's or women's athletic programs, or any other specific program, comes specifically from federal sources.

424. In 1975, the Department of Health, Education, and Welfare (the predecessor of the United States Department of Education ("DOE")) adopted regulations interpreting Title IX. These regulations are codified at 34 C.F.R. Part 106 (the "Regulations").

425. Among the ten factors specified in 34 C.F.R. § 106.41(c) that are to be considered in the determination of equal athletic opportunity at an education institution is the "[p]rovision of medical and training facilities and services."

426. In 1979, the office of Civil Rights of the Department of Education ("OCR") issued a policy interpretation of Title IX and the Regulations. This policy interpretation is found at 44 Fed. Reg. 71413 (1979) (the "Policy Interpretation").

60453048.2

427. The Policy Interpretation provides that, to comply with Title IX and 34 C.F.R. § 106.41(c), educational institutions must provide equal athletic opportunities in three general areas, including "treatment and benefits." 44 Fed. Reg. at 71414.

428. Under both the Regulations and the Policy Interpretation, compliance in the area of equal treatment and benefits is assessed based on an overall comparison of the male and female athletic programs, including an analysis of the factors listed in 34 C.F.R. 106.41, and an analysis of whether the necessary funds are provided for teams of both sexes. *Id.*

429. The Regulations require that sponsors of interscholastic and other school-sponsored athletics (such as the University of Michigan) take such remedial actions as are necessary to overcome the effects of gender discrimination in violation of Title IX. *See* 34 C.F.R. § 106.3(c). Any remedial actions which the University has taken have been insufficient to satisfy the University's obligations under Title IX.

430. The Regulations further provide that, in order to comply with Title IX, "[a] recipient with actual knowledge of sexual harassment in an education program or activity of the recipient against a person in the United States, must respond promptly in a manner that is not deliberately indifferent." 34 C.F.R. § 106.44. "Sexual harassment means conduct on the basis of sex that satisfies one or more of the following:"

91

60453048.2

(1) An employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct;

(2) Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity; or

(3) "Sexual assault" as defined in 20 U.S.C. 1092(f)(6)(A)(v), "dating violence" as defined in 34 U.S.C. 12291(a)(10), "domestic violence" as defined in 34 U.S.C. 12291(a)(8), or "stalking" as defined in 34 U.S.C. 12291(a)(30).

34 C.F.R. § 106.30(a) (2020).

431.   20 U.S.C. 1092(f)(6)(A)(v) defines "sexual assault" as "an offense classified as a forcible or nonforcible sex offense under the uniform crime reporting system of the Federal Bureau of Investigation." Sexual assault under that definition is "[a]ny sexual act directed against another person, without the consent of the victim, including instances where the victim is incapable of giving consent," 34 C.F.R. Pt. 668, Subpt. D, App. A, and includes all "[o]ffenses against chastity, common decency, morals and the like" and also includes "[a]ttempts."[16]

432.   34 U.S.C. 12291(a)(36) defines "stalking" as:

engaging in a course of conduct directed at a specific person that would cause a reasonable person to—

(A) fear for his or her safety or the safety of others; or

(B) suffer substantial emotional distress.

---

[16] *FBI – Offense Definitions*, FBI.GOV, https://ucr.fbi.gov/crime-in-the-u.s/2010/crime-in-the-u.s.-2010/offense-definitions (last visited June 8, 2025).

433.   Stalking is a particular form of sexual harassment to which Plaintiffs and Class Members were subjected to by Weiss. Defendant Weiss wrongfully stalked his victims for years. The method by which he obtained Plaintiffs' and Class Members' information is objectionable to a reasonable person and speaks to the enormity of his stalking efforts. Weiss obtained Plaintiffs' and Class Members' information in the course of his employment with the University, both by gaining access to the databases of more than 100 colleges and universities that were maintained by Defendant Keffer, and also by accessing and downloading that information through the University Google Workspace Suite. Weiss then accessed personal information and medical data of more than 150,000 athletes and sold it to third parties. The information accessed and sold included social media, email, and cloud storage accounts of more than 2,000 athletes as well as more than 1,300 students or alumni from schools across the country. Weiss primarily targeted female college athletes. He researched and targeted these women based on their school affiliation, athletic history, and physical characteristics. Through his stalking, he obtained private photographs and videos never intended to be shared by their owners with anyone but their intimate partners.

434.   The damage caused by Weiss's stalking is, in a word, immense. His actions have caused his victims severe emotional distress in the form of humiliation,

93

60453048.2

embarrassment, loss of experience, loss of dignity and a profound sense of vulnerability that accompanies the exposure of deeply private matters.

435.   The Regulations further require that sponsors of athletics comply with the Regulations within three years of their effective date (which was July 21, 1975). Now, more than 49 years later, the University has still not fully complied with Title IX.

436.   As detailed above, the University had notice of the Title IX violations that are set out in this Count.

437.   All of the allegations made in Count I that are directed against the University are also directed against the Regents, and vice versa.

438.   Under Title IX, the University and the Regents are obligated to promptly investigate and respond to allegations of sexual harassment, including Weiss's misconduct, in a manner that is not deliberately indifferent. 34 C.F.R. § 106.44. Plaintiffs allege actual notice to appropriate University officials who had authority to institute corrective measures no later than December 21–23, 2022, including from and after the December 21–23 reporting, yet the University Defendants failed to take corrective actions and Weiss continued to operate on University-controlled systems and facilities, where he continued to access, download, and sell Plaintiffs' PII and PHI.

439. The harassment occurred in a context subject to the Regents' University's control—on University premises, via University-owned computers, using University credentials, and in Athletics spaces overseen by University officials—thus satisfying *Davis*/*Gebser* control prerequisites.

440. The Regents' and the University's failure to investigate and to respond promptly when Weiss's sexual harassment was reported to the University, constitutes deliberate indifference to discrimination on the basis of sex, in violation of Title IX.

441. The University and the Regents maintained a policy and/or practice of deliberate indifference to the protection of female student athletes, including Plaintiffs and Class Members.

442. The United States Supreme Court has equated deliberate indifference with intentionality, stating that "a recipient intentionally violates Title IX, and is subject to a private damages action, where the recipient is deliberately indifferent to known acts of teacher-student discrimination." *Davis*, 526 U.S. at 643.

443. The University's and the Regents' conduct was intentional, as it acted with deliberate indifference to Plaintiffs' rights, both before and after Weiss's harassment, by:

    a. Failing to protect Plaintiffs and Class Members in accordance with Title IX requirements;

    b. Failing to adequately institute safeguards and protective measures to prevent Weiss from harassing students and invading their privacy;

95

60453048.2

c. Failing to properly investigate the discriminatory sexual harassment perpetrated by Weiss;

d. Failing to notify Plaintiffs and Class Members, and/or address complaints regarding the deeply private information Plaintiffs and Class Members entrusted to them;

e. Failing, after actual notice, to secure or remove implicated Athletics desktop computers (including Weiss's office and the quarterback room computers) from service and to restrict Weiss's access credentials;

f. Failing to control or supervise access to the quarterback and tight end meeting rooms after notice, permitting continued attempts and activity;

g. Allowing Weiss to coach in the Fiesta Bowl after notice, prioritizing competitive interests over protective measures;

h. Failing to preserve and review surveillance contemporaneous with credential use indicating a second individual's presence in the quarterback room during the breach;

i. Failing to institute corrective measures to prevent Weiss from engaging in further sexual harassment of students; and

j. Failing to adequately investigate additional acts of deliberate indifference.

444. Weiss's targeting of female student-athletes and sexualized exploitation of their images and data constitutes sex-based harassment that was severe, pervasive, and objectively offensive, effectively denying equal access to University programs and benefits, including safe participation in athletics and medical/training services.

96

60453048.2

445. The University's and the Regents' deliberate indifference substantially increased the likelihood that Plaintiffs and Class Members would be sexually harassed.

446. The prior instances of conduct in violation of Title IX outlined above demonstrate that the University ignored a history of sexual harassment, sexual abuse, and sexual assault at the University. The University's and the Regents' long, sordid history of Title IX violations and sexual harassment constitute prior instances of "conduct demonstrating that [the defendant] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Marcilis v. Twp. of Redford*, 693 F.3d 589, 605 (6th Cir. 2012).

447. The United States Supreme Court has held that the failure to train oneself can amount to deliberate indifference. *City of Canton, Ohio v. Harris* 489 U.S. 378, 388 (1989). As explained by the *Davis* Court, "the theory in *Gebser* was that the recipient is *directly* liable for its deliberate indifference to discrimination." *Davis,* 526 U.S. at 645 (emphasis supplied).

448. The University and the Regents also demonstrated deliberate indifference, both before and after Weiss's sexual harassment, by failing and refusing to adequately train and supervise its employees, agents, and/or representatives, including Weiss, regarding the following duties:

a. Recognizing, reporting, and preventing unauthorized invasions of privacy on campus, despite prior notice including but not limited in response to the ATS logs, Google password reset reports, and the December 21–23, 2022 Reporting;

b. Providing diligent supervision of student athlete information, including athlete databases, student/alumni accounts, and student athletes' PII;

c. Providing diligent supervision of individuals, including but not limited to Weiss, with access to student athletes' personal information;

d. Investigating any and all privacy invasions committed by Weiss;

e. Safeguarding all students, faculty, staff, alumni, and visitors on the University's campus premises;

f. Maintaining a campus environment free from sexual harassment and invasions of privacy; and

g. Properly training faculty and staff to be aware of their individual responsibility for creating and maintaining a safe environment.

449. The University's and the Regents' failure and refusal to adequately train and/or supervise, and/or facilitating and/or enabling and/or ignoring Defendant Weiss's conduct, is a direct cause of Plaintiffs' and Class Members' injuries.

450. The University and the Regents knew of the long-standing culture of sexual harassment at the University, ignored that history of abuse, and was clearly on notice that its training and supervision in this area was deficient and likely to cause injury, including but not limited to as a result of the ATS logs, Google password reset reports, and the December 21–23, 2022 Reporting. *See Marcilis*, 693 F.3d at 605.

451. The University's and Regents' failure to promptly and appropriately protect, investigate, remedy, and respond to the sexual harassment of Plaintiffs and Class Members was clearly unreasonable given the known circumstances. This failure constitutes deliberate indifference.

452. Weiss's harassment, which on information and belief affected over 150,000 student-athletes and primarily targeted female college athletes, was sufficiently severe or pervasive such that it created a sexually hostile, intimidating, offensive and abusive environment at the University.

453. The University's and the Regents' failure to promptly and appropriately investigate, remedy, and respond to the discrimination of Plaintiffs and Class Members, and protect them and their PII, has effectively denied them equal educational opportunities at the University. 34 C.F.R. § 106.41(c).

454. The Regulations explain how sexual harassment can result in an effective denial of access to the University's education program: "[s]exual harassment means . . . [u]nwelcome[d] conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that **it effectively denies a person equal access to the recipient's education program or activity**. . ." 34 C.F.R. § 106.30(a) (2020) (emphasis added).

455. In the Sixth Circuit, pre-harassment deliberate indifference liability attaches where a school's policy/practice of deliberate indifference creates a known

or obvious heightened risk in a context subject to school control and results in actionable harassment; Plaintiffs plead these elements by alleging a longstanding policy/practice, actual notice, failure to act, and the ensuing exploitation. *See Doe on behalf of Doe #2 v. Metro. Gov't of Nashville & Davidson Cnty., Tennessee*, 35 F.4th 459 (6th Cir. 2022).

456.  The United States Supreme Court has adopted this approach, holding that a violation of Title IX is shown where a Plaintiff establishes "sexual harassment of students that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that victim-students are effectively denied equal access to an institution's resources and opportunities." *Davis*, 526 U.S. at 651.

457.  Such denied access need not be physical. "It is not necessary, however, to show physical exclusion to demonstrate that students have been deprived by the actions of another student or students of an educational opportunity on the basis of sex." *Davis,* 526 U.S. at 651 (1999).

458.  As a direct and foreseeable result of Weiss's cyber sexual harassment, sexual assault, and/or stalking, and the deliberate indifference shown by the University, Plaintiffs and Class Members have suffered a loss of educational benefits and opportunities, as well as deterioration and diminution in value of their NIL rights.

60453048.2

459. "The right of publicity is a creature of state common law and statute and originated as part of the common-law right of privacy." *Landham v. Lewis Galoob Toys, Inc.*, 227 F.3d 619, 622 (6th Cir. 2000).

460. As "Michigan has recognized a general right to publicity," NIL rights are a commercial asset protected under Michigan common law. *Romantics v. Activision Pub., Inc.*, 574 F. Supp. 2d 758, 764 (E.D. Mich. 2008).

461. Michigan has also recognized the inherent value of student-athletes' NIL rights, and to that end has passed an act "to prohibit postsecondary educational institutions in this state and certain athletic organizations from preventing a college athlete from receiving compensation for the use of his or her name, image, or likeness rights." MCL Ch. 390.1731 *et seq.*

462. Plaintiffs and Class Members generally, but particularly as high-level collegiate athletes, possess a legally recognized right to control and monetize their NIL rights, which rights are protected by Michigan NIL statutes and common law.

463. Weiss's sexualized exploitation of Plaintiffs' and Class Members' private images – obtained without consent through cyber intrusion – directly impaired those rights. Weiss's actions damaged the integrity, marketability, and future value of Plaintiffs' and Class Members' NIL assets. Any reputation damage, particularly when linked to nonconsensual exposure, directly diminishes a person's ability to control and profit from their NIL rights going forward.

101

60453048.2

464.    The concept of NIL rights is not new – it has been used by entertainers and celebrities for years to legally protect their "brand." It has been applied to athletes relatively recently, but recency bias aside, it is not restricted to athletes or for that matter, purely athletic endeavors. NIL embodies an individual's right to contract and profit from his or her name, image, and likeness in a commercial context. It also embodies the protection of a person's right to be left alone – to *not* have his or her name, image, and likeness released for public consumption and/or monetized or commercialized. In essence, NIL represents one's brand. That brand holds value not only throughout a person's life, but in fact in perpetuity. It not only survives graduation from any college, it literally and legally survives death.

465.    The nonconsensual access and/or exposure of Plaintiffs' and Class Members' sensitive and intimate photographs and information has irreparably tainted Plaintiffs' and Class Members' personal brands. In today's collegiate sports environment, NIL value is inextricably linked to an athlete's public image, marketability, and perceived integrity. The reputational harm caused by Weiss's conduct, combined with the University's deliberate indifference to cybersecurity risks, prior actual notice and other red flags and an institutional culture of systemic "sexual harassment" and "other improper conduct" (Schlissel firing letter, p.2.) as detailed above, has materially diminished Plaintiffs' and Class Members' ability to obtain endorsements, sign with sponsors, obtain and/or retain employment, or

102

60453048.2

otherwise commercially benefit from their NIL and athletic status, particularly because of Plaintiffs' and Class Members' gender.

466.   Moreover, the University's and the Regents' failure to act in a timely and protective manner—despite being on notice of Weiss's misconduct and the broader risks to female athletes' digital privacy—constitutes a knowing failure to prevent, and a deliberate indifference to, sex-based discrimination at the University. This failure enabled an environment in which female student-athletes were uniquely vulnerable to sexualized exploitation precisely because of their gender, athletic status, and online visibility. Plaintiffs and Class Members are entitled to damages for the long-term commercial harm to their NIL value—a measurable loss flowing directly from Defendants' discriminatory conduct, acts of commission and/or omission and/or deliberate indifference.

467.   Not only have Plaintiffs and Class Members suffered and continue to suffer ongoing damages to their NIL rights, but they have also incurred, and will continue to incur, attorneys' fees and costs of litigation that they would not have incurred absent Defendants' misconduct.

468.   At the time of Defendants' misconduct, wrongful actions, and wrongful inactions, Plaintiffs and Class Members were unaware, and/or with reasonable diligence could not have been aware, of the vast scope of the University's institutional failings with respect to their responsibilities under Title IX.

103

60453048.2

469. The University and the Regents were aware of the highly sensitive nature of Plaintiffs' and Class Members' private and personal information to which Weiss was able to gain access due to his position.

470. The University's and the Regents' policy and/or practice of deliberate indifference to the discrimination and sexual harassment of female athletes, including Plaintiffs and Class Members, created a heightened risk of sex-based discrimination, including cyber sexual harassment, sexual assault, privacy invasion and/or stalking. Because of the University's policy and/or practice of deliberate indifference, Plaintiffs had their privacy invaded and suffered cyber sexual harassment, sexual assault, stalking, and sex-based discrimination.

471. Despite having the ability, the University and the Regents failed to prevent the sex-based discrimination, sexual harassment, sexual assault, and/or stalking, suffered by Plaintiffs and Class Members.

472. The University's and the Regents' conduct violates the mandates, words, content and intent of Title IX, as well as the Regulations and the Policy Interpretation promulgated therefrom.

473. Plaintiffs and Class Members are entitled to injunctive relief, and as such specifically request it in the form of:

    a. Ordering the Regents and University to disclose to Plaintiffs the details of (a) how it was learned that their personal, private information was accessed, (b) who learned that information, (c) when that information

104

was learned, (d) what methods were used for that access, (e) what damage is believed to have occurred, (f) what damage it is believed will occur, and (g) why no other damages are likely in the eyes of the Defendants;

b. Disclosing details of (a) what security protocols are now being used, (b) why those protocols are now being used, (c) whether and how those protocols are consistent with industry standards, (d) what encryption protocols are being used, (e) regular audits, and (f) employee training, to prevent future data breaches that would impact Plaintiffs and Class Members; and

c. Ordering the University, the Regents, and Keffer, subject to a protective order, to immediately disclose the extent of their information gathered from their respective investigations into Weiss's actions so that Plaintiffs can determine what other protection or mitigating action they can take to reduce the harm.

474. As a direct and/or proximate result of the University's and the Regents' deliberate indifference and intentional misconduct, Plaintiffs have been damaged and continue to suffer damages, and have been so for years, including but not limited to from mundane events such as email, cloud storage account, and social media usage, to more severe publication of their most intimate and private information, images, and videos.

475. Plaintiffs and Class Members should be awarded all available forms of damages and injunctive relief for the University's violations of Title IX.

476. As a direct and foreseeable result of the University's and the Regents' deliberate indifference and intentional failure with regard to its obligations under

105

Title IX, Plaintiffs and Class Members have suffered losses, including, but not limited to:

    a. Loss of educational opportunities and/or benefits;

    b. Irreparable harm to their NIL rights, including but not limited to deterioration and diminution in value of their NIL rights;

    c. Irreparable harm to NIL rights proximately caused by Defendants' sex-based misconduct and deliberate indifference, including measurable diminution in marketability due to the dissemination risk of intimate images;

    d. Time and money spent on counseling;

    e. Tuition monies, which should have funded reasonable data privacy protections but due to Weiss' actions did not;

    f. Identity theft and/or increased risk of identity theft;

    g. Fraudulent credit checks, charges, and/or spam due to identity theft and/or risk of identity theft;

    h. Mitigation costs, including time and money spent to prevent and/or repair identity theft, such as on credit monitoring and software like DeleteMe; and

    i. Attorneys' fees and costs.

## COUNT II – VIOLATION OF TITLE IX, 20 U.S.C. § 1681(a) *ET SEQ.* TREATMENT AND BENEFITS (AGAINST THE UNIVERSITY AND THE BOARD OF REGENTS)

477. Plaintiffs incorporate the allegations set forth above by reference with the same force and effect as if fully repeated.

106

60453048.2

478.   All of the allegations in this Count and throughout the entirety of this complaint that are directed at the University are also directed at the Regents, and vice versa.

479.   By its conduct, the University and the Regents have, through the actions and/or inactions of its employees, agents, representatives, coaches, officials, and others, including named Individual University Employees and unnamed John Does, violated Title IX by knowingly, intentionally and deliberately discriminating against Plaintiffs and Class Members, by failing to provide them with treatment and benefits which are comparable overall to the treatment and benefits provided to male athletes.

480.   The University and the Regents knowingly failed to provide protective treatment and benefits—such as reasonable data security, prompt investigation, and interim measures—comparable to protections afforded to male athletes, who were instead provided the competitive benefit of Weiss's continued coaching post-notice.

481.   Defendant Weiss at the times relevant to this action was an employee of the University. Since Weiss targeted primarily women in his breach of highly sensitive PII, his misconduct constitutes discrimination against Plaintiffs and Class Members on the basis of sex.

482.   The University and the Regents had the ability to prevent the discrimination that harmed Plaintiffs and Class Members based on the repeated actual notice, but it failed and/or refused to do so.

60453048.2

483. The University and the Regents maintained a policy and/or practice of deliberate indifference to the protection of female student athletes, including Plaintiffs and Class Members, despite actual notice.

484. The sexualized exploitation of Plaintiffs' and Class Members' images and PII was the result of the University's and the Regents' deliberate indifference toward the rights of the Plaintiffs and the Class Members.

485. The University's and the Regents' failure to investigate and/or to respond promptly when Weiss' sexual harassment was reported to the University, and then conceal Weiss's conduct for years, and continuing to provide him unfettered access to access, download, and sell Plaintiffs' PII and PHI constitutes deliberate indifference to discrimination on the basis of sex, in violation of Title IX.

486. The University's and the Regents' conduct was intentional, as it acted with deliberate indifference to Plaintiffs' and Class Members' rights, both before and after Weiss's harassment, by:

    a. Failing to protect Plaintiffs and Class Members in accordance with Title IX requirements;

    b. Failing to adequately institute safeguards and protective measures to prevent Weiss from harassing students and invading their privacy;

    c. Failing to properly investigate the discriminatory sexual harassment perpetrated by Weiss;

60453048.2

d. Failing to notify Plaintiffs and Class Members, and/or address complaints regarding the deeply private information Plaintiffs and Class Members entrusted to them;

e. Failing to institute corrective measures to prevent Weiss from engaging in further sexual harassment of students;

f. Failing to secure implicated Athletics computers and to suspend Weiss's credentials promptly after notice, despite active exploitation from those systems;

g. Failing to restrict access to the quarterback and tight end rooms after notice, allowing continued attempted intrusions; and

h. Failing to adequately investigate additional acts of deliberate indifference.

487.   The University's and the Regents' failure to promptly and appropriately investigate, remedy, and respond to the discrimination of Plaintiffs and Class Members, and protect them and their PII, has effectively denied them equivalent educational opportunities at the University, specifically including medical and sports services, one of the Title IX treatment and benefit factors. 34 C.F.R. § 106.41(c).

488.   The Regulations explain how conduct such as that done by the University's employee and agent, Defendant Weiss, which was allowed by the University through action or inaction, can result in an effective denial of access to

109

the University's education program: "[s]exual harassment means . . . [u]nwelcome[d] conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity. . ." 34 C.F.R. § 106.30(a) (2020) (emphasis added).

489.   The United States Supreme Court has adopted this approach, holding that a violation of Title IX is shown where a Plaintiff establishes "sexual harassment of students that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that victim-students are effectively denied equal access to an institution's resources and opportunities." *Davis*, 526 U.S. at 651.

490.   Such denied access need not be physical. "It is not necessary, however, to show physical exclusion to demonstrate that students have been deprived by the actions of another student or students of an educational opportunity on the basis of sex." *Davis,* 526 U.S. at 651 (1999).

491.   Weiss's conduct here, in collecting Plaintiffs' and Class Members' personal information, including their private information and photographs, and videos, was most certainly unwelcome.

492.   Weiss's unwelcomed conduct, which on information and belief affected over 150,000 athletes, was so "severe, pervasive, and objectively offensive" (34

110

60453048.2

C.F.R. § 106.30(a) (2020)) that it effectively denied Plaintiffs and Class Members "equal access to the [University's] education program[s] or activit[ies]." *Id.* This includes medical and training services.

493. At the time the Plaintiffs received medical and training services from the University, they did not know, and could not with reasonable diligence have known, of the University's institutional failings with respect to Title IX, including in its hiring, training, and supervision of Weiss.

494. The University and the Regents demonstrated deliberate indifference, both before and after Weiss's sexual harassment, by failing and refusing to adequately train and supervise their employees, agents, and/or representatives, including Weiss, despite actual notice, regarding the following duties:

a. Recognizing, reporting, and preventing unauthorized invasions of privacy on campus;

b. Providing diligent supervision of student athlete information, including athlete databases, student/alumni accounts, and student athletes' PII;

c. Providing diligent supervision of individuals, including but not limited to Weiss, with access to student athletes' personal information;

d. Investigating any and all privacy invasions committed by Weiss;

e. Safeguarding all students, faculty, staff, alumni, and visitors on the University's campus premises;

111

60453048.2

f.  Maintaining a campus environment free from sexual harassment and invasions of privacy; and

g.  Properly training faculty and staff to be aware of their individual responsibility for creating and maintaining a safe environment.

495.   These deprivations foreseeably impaired female athletes' educational and athletic experiences and NIL value by exposing them to sexualized cyber harassment uniquely because of gendered targeting.

496.   The University's and the Regents' failure and refusal to adequately train and/or supervise, and/or facilitating and/or enabling and/or ignoring Defendant Weiss's conduct, is a direct cause of Plaintiffs' and Class Members' injuries.

497.   The actions and/or inactions of the University and the Regents by failing to adequately train and/or supervise, and/or by facilitating and/or enabling and/or ignoring Defendant Weiss's conduct, despite actual notice, led to the violations of Plaintiffs' and Class Members' rights.

498.   The sexualized exploitation of Plaintiffs' and Class Members' images and PII was the result of the University's deliberate indifference toward the rights of the Plaintiffs and Class Members.

499.   The United States Supreme Court has held that the failure to train itself can amount to deliberate indifference. *City of Canton, Ohio v. Harris* 489 U.S. 378, 388 (1989). As explained by the Davis Court, "the theory in *Gebser* was that the

112

recipient is *directly* liable for its deliberate indifference to discrimination." *Davis,* 526 U.S. at 645 (emphasis supplied).

500.   The University's and the Regents' conduct violates the mandates, words, content and intent of Title IX, as well as the Regulations and the Policy Interpretation promulgated therefrom.

501.   Plaintiffs also seek prospective injunctive and declaratory relief against Individual University Employees in their official capacities under *Ex parte Young,* including (a) mandatory implementation of device access controls, incident response protocols, and surveillance reviews; (b) credential governance and immediate suspension procedures upon notice; and (c) Title IX compliant protective measures for female student athletes' digital privacy.

502.   Plaintiffs and Class Members are entitled to injunctive relief, and as such specifically request it in the form of:

> a. Ordering the University and the Regents to disclose to Plaintiffs the details of (a) how it was learned that their personal, private information was accessed, (b) who learned that information, (c) when that information was learned, (d) what methods were used for that access, (e) what damage is believed to have occurred, (f) what damage it is believed will occur, and (g) why no other damages are likely in the eyes of the Defendants;
>
> b. Disclosing details of (a) what security protocols are now being used, (b) why those protocols are now being used, (c) whether and how those protocols are consistent with industry standards, (d) what encryption protocols are being used, (e) regular audits, and (f) employee training,

60453048.2

to prevent future data breaches that would impact Plaintiffs and Class Members; and

c. Ordering the University, the Regents, and Keffer, subject to a protective order, to immediately disclose the extent of their information gathered from their respective investigations into Weiss's actions so that Plaintiffs can determine what other protection or mitigating action they can take to reduce the harm.

503. As a direct and/or proximate result of the University's and the Regents' deliberate indifference and intentional misconduct, Plaintiffs have been damaged and continue to suffer damages.

504. Plaintiffs and Class Members should be awarded all available forms of damages and injunctive relief for the University's violations of Title IX.

505. As a direct and foreseeable result of the University's and the Regents' deliberate indifference and intentional failure with regard to its obligations under Title IX, Plaintiffs and Class Members have suffered losses, including but not limited to:

a. Loss of educational opportunities and/or benefits;

b. Irreparable harm to their name, image, and likeness ("NIL") rights, including but not limited to deterioration and diminution in value of their NIL rights;

c. Time and money spent on counseling;

60453048.2

d. Tuition monies, which should have included reasonable data privacy protections but due to Weiss' actions did not;

e. Identity theft and/or increased risk of identity theft;

f. Fraudulent credit checks, charges, and/or spam due to identity theft and/or risk of identity theft;

   Mitigation costs, including time and money spent to prevent and/or repair identity theft, such as on credit monitoring and software like DeleteMe; and

g. Attorneys' fees and costs.

### COUNT III – VIOLATION OF RIGHT TO PRIVACY AND APPROPRIATION UNDER MICHIGAN LAW(AGAINST THE INDIVIDUAL UNIVERSITY DEFENDANTS AND WEISS)

506. Plaintiffs incorporate the allegations set forth above by reference with the same force and effect as if fully repeated.

507. As "Michigan has recognized a general right to publicity," NIL rights are a commercial asset protected under Michigan common law. *Romantics v. Activision Pub, Inc.*, 574 F. Supp. 2d. 758, 764 (E.D. Mich., 2008).

508. Michigan has recognized the inherent value of student-athletes' NIL, and to that end has passed an act "to prohibit postsecondary educational institutions in this state and certain athletic organizations from preventing a college athlete from

115

60453048.2

receiving compensation for the use of his or her name, image, or likeness rights."
MCL § 390.1731 *et seq.*

509. In Michigan, the common-law right of privacy is said to protect against four types of invasions of privacy.

(1) Intrusion upon the plaintiff's seclusion or solitude, or into his private affairs.

(2) Public disclosure of embarrassing private facts about the plaintiff.

(3) Publicity which places the plaintiff in a false light in the public eye.

(4) Appropriation, for the defendant's advantage, of the plaintiff's name or likeness.

*Battaglieri v. Mackinac Ctr For Pub Policy*, 261 Mich. App. 296, 300 (2004).

510. Appropriation, also known as the "right of publicity," "differs from the first three types of the right to privacy; rather than the protection of a person's right 'to be left alone,' this right protects an individual's pecuniary interest in the commercial exploitation of his or her identity." *Id.* The Individual University Employees' actions violated Plaintiffs' and Class Members' right to privacy under invasion of privacy types 1, 2, and 4.

511. Weiss used Plaintiffs' and Class Members' personal information, including their PII and private photographs, for personal and/or commercial use.

60453048.2

Plaintiffs and Class Members were identifiable in the photographs as well as in their PII.

512.   Plaintiffs' and Class Members' information and private photographs were of a secret and private nature, which Plaintiffs and Class Members had a right to keep private. Weiss' use of this information and private photographs is highly offensive to the reasonable person.

513.   Plaintiffs and Class Members in no way consented to Weiss's use of their information, either for personal or commercial purposes.

514.   The private information of Plaintiffs and Class Members that Weiss collected, including PII and intimate photographs, is not a matter that is newsworthy or of legitimate public concern.

515.   Plaintiffs and Class Members, as high-level collegiate athletes, possess a legally recognized right to control and monetize their NIL rights, which are protected by Michigan NIL statutes and common law.

516.   Weiss's sexualized exploitation of Plaintiffs' and Class Members' private images—obtained without consent through cyber intrusion—directly impaired that right. Weiss's actions damaged the integrity, marketability, and future value of Plaintiffs' and Class Members' NIL assets. Any reputation damage, particularly when linked to nonconsensual exposure, directly reduces Plaintiffs' and Class Members' ability to control and profit from their NIL rights going forward.

117

60453048.2

517. Furthermore, the Individual University Employees' actions and/or inactions wrongfully appropriated Plaintiffs' and Class Members' NIL rights in that their ability to leverage their NIL rights on their own terms has been undermined. By subjecting Plaintiffs and Class Members to nonconsensual access and potential exposure of sensitive photographs, the Individual Defendants irreparably tainted the public perception of Plaintiffs' and Class Members' personal brands. In today's collegiate sports environment, NIL value is inextricably linked to an athlete's public image, marketability, and perceived integrity. The reputational harm caused by Weiss' conduct, combined with the Individual University Employees' deliberate indifference to cybersecurity risks and prior red flags, has materially diminished Plaintiffs' and Class Members' ability to obtain endorsements, sign with sponsors, obtain and/or retain employment or otherwise commercially benefit from their NIL rights and/or athletic status, particularly because of Plaintiffs' and Class Members' gender.

518. Not only have Plaintiffs and Class Members suffered and continue to suffer damages due to the ongoing misuse of and/or ill effect on their NIL rights, but they have also incurred, and will continue to incur, attorneys' fees and costs of litigation that they would not have incurred absent the Individual Defendants' misconduct.

118

60453048.2

519.    Plaintiffs and Class Members have also suffered and continue to suffer severe emotional distress, including humiliation, embarrassment, loss of dignity and the profound sense of vulnerability that accompanies the exposure of deeply private matters.

520.    Plaintiffs and Class Members should be awarded all available forms of damages in this case for the Individual Defendants' conduct, including but not limited to those outlined above, as well as injunctive relief, compensatory damages to include the deterioration and diminution in value of their NIL rights and severe emotional distress, including humiliation, embarrassment, loss of dignity, and the profound sense of vulnerability that accompanies the exposure of deeply private matters, punitive damages, and attorneys' fees and costs.

### COUNT IV -- FOURTEENTH AMENDMENT
### DUE PROCESS – INVASION OF PRIVACY
### (AGAINST THE INDIVIDUAL DEFENDANTS)

521.    Plaintiffs incorporate the allegations set forth above by reference as if fully repeated.

522.    Under the Fourteenth Amendment, no state actor may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Individual Defendants violated Plaintiffs' and Class Members' Due Process rights guaranteed by the Fourteenth Amendment to the United States Constitution.

119

60453048.2

523. Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, Moore, and Does 10-50, sued in their individual capacities, were state employees at all times relevant to this action, and acted under color of state law to deprive Plaintiffs and Class Members of their "rights, privileges or immunities secured by the Constitution and laws" of the United States (42 U.S.C. § 1983), specifically their Fourteenth Amendment right to Due Process. Defendant Weiss was a state employee acting under color of law at times relevant to this action, and at other times was not a state employee acting under color of law.

524. At the time of the conduct giving rise to this action, it was obvious, clearly established, and known or should have been known to the Individual Defendants that Plaintiffs and Class Members had an interest protected by the Due Process Clause of the Fourteenth Amendment, specifically their privacy, both personal and informational. The Individual Defendants knew or should have known that their actions and/or inactions violated that right.

525. The Individual Defendants invaded Plaintiffs' and Class Members' privacy in violation of the Due Process Clause, through Weiss' access and sexualized exploitation of Plaintiffs' and Class Members' private images and PII, which were obtained without consent through cyber intrusion, and including through Weiss's continued access to, and downloading and sale of, Plaintiffs' PII and PHI, from and after actual notice to the Individual University Employees.

120

60453048.2

526. Weiss's actions were malicious, intentionally harmful, and the Individual University Employees were deliberately indifferent when those actions were taken, and each of the Individual Defendants' actions were so outrageous as to shock the contemporary conscience.

527. There is absolutely no public interest served by Plaintiffs' and Class Members' private information and photographs, nor any public need for invading Plaintiffs' and Class Members' privacy.

528. The actions and/or inactions of Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, Moore, and Does 10-50, by failing to adequately train and/or supervise, and/or by facilitating and/or enabling and/or ignoring Defendant Weiss's invasion of Plaintiffs' and Class Members' privacy, led to the violations of Plaintiffs' and Class Members' Due Process rights.

529. Defendant Weiss of course had actual knowledge of his actions. Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, Moore, and Does 10-50 also had actual notice about Weiss' invasion of privacy, sexual harassment, sexual assaults and/or stalking, and failed to act sufficiently to prevent them.

530. The Individual University Employees' actions were insufficient to protect Plaintiffs' and Class Members' right to privacy.

60453048.2

531.   The sexualized exploitation of Plaintiffs' and Class Members' images and PII was the result of the Individual University Employees' deliberate indifference toward the privacy rights and well-being of student-athletes.

532.   Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, and Does 10-50 failed to adequately train and/or supervise their employees, agents, and/or representatives, including Weiss, regarding the following duties:

a.  Recognizing, reporting, and preventing unauthorized invasions of privacy on campus;

b.  Providing diligent supervision of student athlete information, including athlete databases, student/alumni accounts, and student athletes' PII;

c.  Providing diligent supervision of individuals, including but not limited to Weiss, with access to student athletes' personal information;

d.  Investigating any and all privacy invasions committed by Weiss;

e.  Safeguarding all students, faculty, staff, alumni, and visitors on the University's campus premises;

f.  Maintaining a campus environment free from sexual harassment and invasions of privacy; and

g.  Properly training faculty and staff to be aware of their individual responsibility for creating and maintaining a safe environment.

122

60453048.2

533. Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, Moore, and Does 10-50's failing to adequately train and/or supervise, and/or facilitating and/or enabling and/or ignoring Defendant Weiss' conduct, is a direct cause of Plaintiffs' and Class Members' injuries.

534. As a result, the Individual University Employees deprived Plaintiffs and Class Members of the clearly established constitutional right to privacy secured by the Fourteenth Amendment to the United States Constitution.

535. The Individual Defendants are not entitled to qualified immunity.

536. Section 1983 of Title 42 of the United States Code provides, in part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . .

42 U.S.C. § 1983.

537. When the Individual Defendants engaged in the improper actions described above, they were acting under color of law for purposes of the Due Process Clause of the United States Constitution and 42 U.S.C. § 1983. Under this section, the Individual Defendants are liable for their violations of the Plaintiffs' and Class Members' constitutional rights under the Fourteenth Amendment.

123

60453048.2

538.   The Individual Defendants' deprivation of Plaintiffs' and Class Members' right to privacy caused them to have suffered, and to continue to suffer, harm and damages as described above and further including but not limited to humiliation, distress, and embarrassment.

539.   Plaintiffs and Class Members should be awarded all available forms of damages in this case for the Individual Defendants' conduct, including but not limited to those outlined above, as well as injunctive relief, compensatory damages to include the deterioration and diminution in value of their NIL rights and severe emotional distress, including humiliation, embarrassment, loss of dignity, and the profound sense of vulnerability that accompanies the exposure of deeply private matters, punitive damages, and attorneys' fees and costs.

### COUNT V -- FOURTEENTH AMENDMENT DUE PROCESS – DEPRIVATION OF PROPERTY (AGAINST THE INDIVIDUAL DEFENDANTS)

540.   Plaintiffs incorporate the allegations set forth above by reference with the same force and effect as if fully repeated.

541.   Under the Fourteenth Amendment, no state actor may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

542.   The Individual Defendants violated Plaintiffs' and Class Members' Due Process rights guaranteed by the Fourteenth Amendment to the United States Constitution.

543.   Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, Moore, and Does 10-50, sued in their individual capacities, were state employees at all times relevant to this action, and acted under color of state law to deprive Plaintiffs and Class Members of their "rights, privileges or immunities secured by the Constitution and laws" of the United States (42 U.S.C. § 1983), specifically their Fourteenth Amendment right to Due Process. Defendant Weiss was a state employee acting under color of law at some times relevant to this action, and at other times was not a state employee acting under color of law.

544.   At the time of the actions giving rise to this action, it was obvious, clearly established, and known or should have been known to the Individual Defendants that that Plaintiffs and Class Members had an interest protected by the Due Process Clause of the Fourteenth Amendment, specifically the right not to be deprived of one's property. The Individual Defendants knew or should have known that their actions and/or inactions violated that right.

545.   The Individual Defendants engaged in actions which violated Plaintiffs' and Class Members' right to not be deprived of their property in violation of the Due Process Clause, through Weiss's access and sexualized exploitation of Plaintiffs' and

125

60453048.2

Class Members' private images and PII, which were obtained without consent through cyber intrusion.

546.   Plaintiffs and Class Members had a protected property interest in their personal, private, intimate, and confidential information and photographs. This protected property interest was violated when Weiss took possession of Plaintiffs' and Class Members' PII and photographs, particularly after the actual notice to the Individual University Employees.

547.   Plaintiffs and Class Members additionally had a protected property interest in their NIL rights. This protected property interest was violated when Weiss wrongfully appropriated Plaintiffs' and Class Members' NIL rights as described above, and each of the Individual University Defendants approved of him doing so by failing to act despite actual notice of Weiss's actions.

548.   The actions and/or inactions of Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, Moore, and Does 10-50, by failing to adequately train and/or supervise, and/or by facilitating and/or enabling and/or ignoring Defendant Weiss's deprivation of Plaintiffs' and Class Members' property, led to the violations of Plaintiffs' and Class Members' Due Process rights.

549.   Defendant Weiss of course had actual knowledge of his actions. Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, Moore, and Does 10-50 knew about Weiss' deprivation of property, sexual

126

60453048.2

harassment, sexual assaults and/or stalking, and failed to act sufficiently to prevent them.

550. The Individual Defendants' actions were insufficient to protect Plaintiffs' and Class Members' property rights.

551. Weiss's actions were malicious, intentionally harmful, and the actions and inaction of the Individual University Defendants were taken with deliberate indifference, and they were so outrageous as to shock the contemporary conscience.

552. The sexualized exploitation of Plaintiffs' and Class Members' images and PII was the result of the Individual University Employees' deliberate indifference toward the property rights and well-being of student-athletes.

553. Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, and Does 10-50 failed to adequately train and supervise their employees, agents, and/or representatives, including Weiss, regarding the following duties:

    a. Recognizing, reporting, and preventing unauthorized invasions of privacy on campus;

    b. Providing diligent supervision of student athlete information, including athlete databases, student/alumni accounts, and student athletes' PII;

127

60453048.2

c.  Providing diligent supervision of individuals, including but not limited to Weiss, with access to student athletes' personal information;

d.  Investigating any and all privacy invasions committed by Weiss;

e.  Safeguarding all students, faculty, staff, alumni, and visitors on the University's campus premises;

f.  Maintaining a campus environment free from sexual harassment and invasions of privacy; and

g.  Properly training faculty and staff to be aware of their individual responsibility for creating and maintaining a safe environment.

554.  No adequate post-deprivation remedy exists given the intimate nature of the digital images/data, the difficulty of clawback, and the ongoing exposure risks.

555.  Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, Moore, and Does 10-50's failing to adequately train and/or supervise, and/or facilitating and/or enabling and/or ignoring Defendant Weiss' conduct, is a direct cause of Plaintiffs' and Class Members' injuries.

556.  Due to the highly personal nature of the Plaintiffs' and Class Members' information and photographs, along with the reputational and emotional harms they suffered and/or will suffer due to the Individual Defendants' actions and/or inactions, no adequate post-deprivation remedy exists.

128

60453048.2

557.   As a result, the Individual Defendants deprived Plaintiffs and Class Members of their clearly established constitutional property rights secured by the Fourteenth Amendment to the United States Constitution.

558.   The Individual Defendants are not entitled to qualified immunity.

559.   Section 1983 of Title 42 of the United States Code provides, in part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . .

42 U.S.C. § 1983.

560.   When the Individual Defendants engaged in the improper actions described above, they were acting under color of law for purposes of the Due Process Clause of the United States Constitution and 42 U.S.C. § 1983. Under this section, the Individual Defendants are liable for their violations of the Plaintiffs' and Class Members' constitutional rights under the Fourteenth Amendment.

561.   The Individual Defendants' deprivation of Plaintiffs' and Class Members' property rights caused them to have suffered, and to continue to suffer, harm and damages as described above and further including but not limited to humiliation, distress, and embarrassment.

60453048.2

562.   Plaintiffs and Class Members should be awarded all available forms of damages in this case for the Individual Defendants' conduct, including but not limited to those outlined above, as well as injunctive relief, compensatory damages to include the deterioration and diminution in value of their NIL rights and severe emotional distress, including humiliation, embarrassment, loss of dignity, and the profound sense of vulnerability that accompanies the exposure of deeply private matters, punitive damages, and attorneys' fees and costs.

### COUNT VI -- FOURTEENTH AMENDMENT -- DUE PROCESS – DEPRIVATION OF BODILY INTEGRITY (AGAINST THE INDIVIDUAL DEFENDANTS)

563.   Plaintiffs incorporate the allegations set forth above by reference with the same force and effect as if fully repeated.

564.   Under the Fourteenth Amendment, no state actor may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

565.   The Individual Defendants violated Plaintiffs' and Class Members' Due Process rights guaranteed by the Fourteenth Amendment to the United States Constitution.

566.   Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, Moore, and Does 10-50, sued in their individual capacities, were state employees at all times relevant to this action, and acted under color of state law

130

60453048.2

to deprive Plaintiffs and Class Members of their "rights, privileges or immunities secured by the Constitution and laws" of the United States (42 U.S.C. § 1983), specifically their Fourteenth Amendment right to Due Process. Defendant Weiss was a state employee acting under color of law at times relevant to this action, and at other times was not a state employee acting under color of law.

567.   Among the historic liberties long cherished at common law is "a right to be free from and to obtain judicial relief, for unjustified intrusions on personal security." *Ingraham v. Wright*, 430 U.S. 651, 673 (1977). This right, the "right to bodily integrity" is "a fundamental interest protected by the Due Process Clause of the Fourteenth Amendment." *In re Flint Water Cases*, 384 F. Supp. 3d 802, 839 (E.D. Mich. 2019), *aff'd and remanded*, 960 F.3d 303 (6th Cir. 2020).

568.   At the time of the actions giving rise to this action, it was obvious, clearly established, and known or should have been known to the Individual Defendants that Plaintiffs and Class Members had an interest protected by the Due Process Clause of the Fourteenth Amendment, specifically their right to bodily integrity. The Individual Defendants knew or should have known that their actions and/or inactions violated that right.

569.   The Individual Defendants engaged in actions which violated Plaintiffs' and Class Members' right to bodily integrity, in violation of the Due Process Clause, through Weiss' access and sexualized exploitation of Plaintiffs' and Class Members'

131

private images and PII, which were obtained without consent through cyber intrusion.

570. Weiss's actions were malicious, intentionally harmful, and the Individual University Defendants' actions were taken with deliberate indifference, and they were so outrageous as to shock the contemporary conscience.

571. The actions and/or inactions of Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, Moore, and Does 10-50, by failing to adequately train and/or supervise, and/or by facilitating and/or enabling and/or ignoring Defendant Weiss's deprivation of Plaintiffs' and Class Members' right to bodily integrity, led to the violations of Plaintiffs' and Class Members' Due Process rights.

572. Defendant Weiss of course had actual knowledge of his actions. Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, Moore, and Does 10-50 either encouraged the specific misconduct, directly participated, or at minimum knowingly acquiesced in the unconstitutional conduct by failing to act despite actual notice of ongoing violations and control over the physical premises, devices, and Weiss's access. Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, and Moore knew about Weiss' deprivation of bodily integrity, sexual harassment, sexual assaults and/or stalking and failed to act sufficiently to prevent them.

132

60453048.2

573.  The Individual Defendants' actions were insufficient to protect Plaintiffs' and Class Members' right to bodily integrity.

574.  The sexualized exploitation of Plaintiffs' and Class Members' images and PII was the result of the Individual Defendants' deliberate indifference toward the right to bodily integrity and well-being of student-athletes and increased the likelihood of future sexual assaults.

575.  Defendants Grasso, Ono, Schlissel, Manual, Gnodtke, Harbaugh, Pendse, Brennan and Does 10-50 failed to adequately train and supervise their employees, agents, and/or representatives, including Weiss, regarding the following duties:

    a.  Recognizing, reporting, and preventing unauthorized invasions of privacy on campus;

    b.  Providing diligent supervision of student athlete information, including athlete databases, student/alumni accounts, and student athletes' PII;

    c.  Providing diligent supervision of individuals, including but not limited to Weiss, with access to student athletes' personal information;

    d.  Investigating any and all privacy invasions committed by Weiss;

133

60453048.2

e.  Safeguarding all students, faculty, staff, alumni, and visitors on the University's campus premises;

f.  Maintaining a campus environment free from sexual harassment and invasions of privacy; and

g.  Properly training faculty and staff to be aware of their individual responsibility for creating and maintaining a safe environment.

576.  The conduct shocks the conscience in light of the known, foreseeable risk of sexualized exploitation of female students and student-athletes and Defendants' decision to prioritize Athletics interests (including permitting Weiss to coach the Fiesta Bowl) over immediate protective measures.

577.  Defendants Grasso, Ono, Schlissel, Manual, Gnodtke, Harbaugh, Pendse, Brennan, Moore, and Does 10-50's failing to adequately train and/or supervise, and/or facilitating and/or enabling and/or ignoring Defendant Weiss's conduct, is a direct cause of Plaintiffs' and Class Members' injuries.

578.  Accomplice indicia—including the second individual entering the quarterback room at 3:42 PM and exiting with a box during ongoing compromises—underscore the need for immediate supervisory intervention that Defendants failed to provide.

134

60453048.2

579. As a result, the Individual Defendants deprived Plaintiffs and Class Members of their clearly established constitutional right to bodily integrity secured by the Fourteenth Amendment to the United States Constitution.

580. The Individual Defendants are not entitled to qualified immunity.

581. Section 1983 of Title 42 of the United States Code provides, in part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . .

42 U.S.C. § 1983.

582. When the Individual Defendants engaged in the improper actions described above, they were acting under color of law for purposes of the Due Process Clause of the United States Constitution and 42 U.S.C. § 1983. Under this section, the Individual Defendants are liable for their violations of the Plaintiffs' and Class Members' constitutional rights under the Fourteenth Amendment.

583. The Individual Defendants' deprivation of Plaintiffs' and Class Members' right to bodily integrity caused them to have suffered, and to continue to suffer, harm and damages as described above and further including, but not limited to, humiliation, distress, and embarrassment.

135

60453048.2

584.    Plaintiffs and Class Members should be awarded all available forms of damages in this case for the Individual Defendants' conduct, including but not limited to those outlined above, injunctive relief, compensatory damages to include the deterioration and diminution in value of their NIL rights and severe emotional distress, including humiliation, embarrassment, loss of dignity, and the profound sense of vulnerability that accompanies the exposure of deeply private matters, punitive damages, and attorneys' fees and costs.

## COUNT VII -- FOURTEENTH AMENDMENT
## EQUAL PROTECTION
## (AGAINST THE INDIVIDUAL DEFENDANTS)

585.    Plaintiffs incorporate the allegations set forth above by reference with the same force and effect as if fully repeated.

586.    The Fourteenth Amendment to the United States Constitution requires that a state shall not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1.

587.    The Individual Defendants violated Plaintiffs' and Class Members' Equal Protection rights guaranteed by the Fourteenth Amendment to the United States Constitution.

588.    Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, Moore, and Does 10-50, sued in their individual capacities, were state employees at all times relevant to this action, and acted under color of state law

136

to deprive Plaintiffs and Class Members of their "rights, privileges or immunities secured by the Constitution and laws" of the United States (42 U.S.C. § 1983), specifically their Fourteenth Amendment right to Equal Protection. Defendant Weiss was a state employee acting under color of law at times relevant to this action, and at other times was not a state employee acting under color of law.

589.  At the time of the actions giving rise to this action, it was obvious, clearly established, and known or should have been known to the Individual Defendants that Plaintiffs and Class Members had a right protected by the Equal Protection Clause of the Fourteenth Amendment, specifically the right to be free from gender discrimination, including sexual harassment and abuse at the hands of a state employee. The Individual Defendants knew or should have known that their actions and/or inactions violated that right.

590.  The Individual Defendants violated Plaintiffs' and Class Members' right to Equal Protection, through Weiss's access and sexualized exploitation of Plaintiffs' and Class Members' private images and PII, which were obtained without consent through cyber intrusion. This conduct constitutes sexual harassment, sexual assault and/or stalking, as defined in the Regulations. Weiss's selective targeting of female student-athletes for sexualized exploitation of images and data evidences discriminatory intent; University officials' deliberate indifference after actual notice,

137

in a context they controlled, constitutes purposeful discrimination under the Equal Protection Clause.

591. Plaintiffs and Class Members belong to a protected class, specifically based on gender as women. The violations of sexual harassment, sexual assaults and/or stalking in this action are based on Plaintiffs' and Class Members' protected status.

592. The sexual harassment, sexual assaults and/or stalking were sufficiently severe and/or pervasive as to alter the conditions of Plaintiffs' and Class Members' education and create an abusive environment, such that it effectively denied Plaintiffs and Class Members equivalent access to the University's education programs and/or activities.

593. Defendant Wiess of course had actual knowledge of his actions. Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, Moore, and Does 10-50 knew about Weiss's Equal Protection violations, sexual harassment, sexual assaults and/or stalking and failed to act sufficiently to prevent them.

594. Plaintiffs and Class Members were treated differently from similarly situated individuals who were not members of the protected class, in that Weiss primarily targeted female athletes. Similarly situated male athletes were not subjected to the same sexual harassment, sexual assaults and/or stalking, as their

138

60453048.2

female peers. Any male comparators—male student-athletes similarly situated regarding University-maintained accounts—were not subjected to comparable sexualized exploitation, while male athletes simultaneously received the competitive benefit of Weiss's coaching post-notice.

595.   Weiss's actions were malicious, intentionally harmful, and the actions of the Individual University Employees were taken with deliberate indifference, and were so outrageous as to shock the contemporary conscience.

596.   The actions and/or inactions of Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, Moore, and Does 10-50 actions, by failing to adequately train and/or supervise, and/or by facilitating and/or enabling and/or ignoring Defendant Weiss's illegal and discriminatory conduct as detailed above, led to the violations of Plaintiffs' and Class Members' Equal Protection rights.

597.   The Individual Defendants' actions were insufficient to protect Plaintiffs' and Class Members' rights to Equal Protection.

598.   The sexualized exploitation of Plaintiffs' and Class Members' images and PII was the result of the Individual Defendants' deliberate indifference toward the rights and well-being of student-athletes.

599.   Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, and Does 10-50 failed to adequately train and supervise their

60453048.2

employees, agents, and/or representatives, including Weiss, regarding the following duties:

a. Recognizing, reporting, and preventing unauthorized invasions of privacy on campus;

b. Providing diligent supervision of student athlete information, including athlete databases, student/alumni accounts, and student athletes' PII;

c. Providing diligent supervision of individuals, including but not limited to Weiss, with access to student athletes' personal information;

d. Investigating any and all privacy invasions committed by Weiss;

e. Safeguarding all students, faculty, staff, alumni, and visitors on the University's campus premises;

f. Maintaining a campus environment free from sexual harassment and invasions of privacy; and

g. Properly training faculty and staff to be aware of their individual responsibility for creating and maintaining a safe environment.

600. Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, Moore, and Does 10-50's failing to adequately train and/or

140

60453048.2

supervise, and/or facilitating and/or enabling and/or ignoring Defendant Weiss'

conduct, is a direct cause of Plaintiffs' and Class Members' injuries.

601. As a result, the Individual Defendants deprived Plaintiffs and Class

Members of their clearly established constitutional right to be free from

discrimination, secured by the Fourteenth Amendment to the United States

Constitution.

602. The Individual Defendants are not entitled to qualified immunity.

603. Section 1983 of Title 42 of the United States Code provides, in part:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or
> other person within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress. . .

42 U.S.C. § 1983.

604. When the Individual Defendants engaged in the improper actions

described above, they were acting under color of law for purposes of the Equal

Protection Clause of the United States Constitution and 42 U.S.C. § 1983. Under

this section, the Individual Defendants are liable for their violations of the Plaintiffs'

and Class Members' constitutional rights under the Fourteenth Amendment.

605. The Individual Defendants' deprivation of Plaintiffs' and Class

Members' right to Equal Protection caused them to have suffered, and to continue to

141

60453048.2

suffer, harm and damages as described above and further including but not limited to humiliation, distress, and embarrassment.

606. Plaintiffs and Class Members should be awarded all available forms of damages in this case for the Individual Defendants' conduct, including but not limited to those outlined above, as well as injunctive relief, compensatory damages to include the deterioration and diminution in value of their NIL rights and severe emotional distress, including humiliation, embarrassment, loss of dignity, and the profound sense of vulnerability that accompanies the exposure of deeply private matters, punitive damages, and attorneys' fees and costs.

## COUNT VIII -- FOURTH AMENDMENT -- UNREASONABLE SEARCH AND SEIZURE (AGAINST THE INDIVIDUAL DEFENDANTS)

607. Plaintiffs incorporate the allegations set forth above by reference with the same force and effect as if fully repeated.

608. The Fourth Amendment, made applicable to the States by the Fourteenth Amendment, provides in pertinent part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. Const. amend. IV. "This right applies with equal force in both the civil and criminal contexts." *Thomas v. Cohen*, 304 F.3d 563, 569 (6th Cir. 2002).

60453048.2

609. The Individual Defendants violated Plaintiffs' and Class Members' rights guaranteed by the Fourth Amendment to the United States Constitution.

610. Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, Moore, and Does 10-50, sued in their individual capacities, were state employees at all times relevant to this action, and acted under color of state law to deprive Plaintiffs and Class Members of their "rights, privileges or immunities secured by the Constitution and laws" of the United States (42 U.S.C. § 1983), specifically their Fourth Amendment right to be free of warrantless and unreasonable searches and seizures. The violation of this right is also, of course, an invasion of privacy. Defendant Weiss was a state employee acting under color of law at times relevant to this action, and at other times was not a state employee acting under color of law.

611. At the time of the actions giving rise to this action, it was obvious, clearly established, and known or should have been known to the Individual Defendants that Plaintiffs and Class Members had an interest protected by the Fourth Amendment, specifically their Fourth Amendment right to be free of warrantless and unreasonable searches and seizures.

612. The Individual Defendants violated Plaintiffs' and Class Members' right to be free of warrantless and unreasonable searches and seizures in violation of the Fourth Amendment through Weiss' access and sexualized exploitation of

143

60453048.2

Plaintiffs' and Class Members' private images and PII, which were obtained without consent through cyber intrusion. The Individual University Employees knew that their actions and/or inactions violated that right.

613. Weiss intentionally searched and seized Plaintiffs' private information without their consent, without a warrant, without probable cause or reasonable suspicion, and without any lawful basis or justification, in violation of Plaintiffs' and Class Members' clearly established rights under the Fourth Amendment. Defendant Weiss's search and seizure of Plaintiffs' and Class Members' personal information was per se unreasonable under the Fourth Amendment.

614. Plaintiffs and Class Members had a reasonable and legitimate expectation of privacy in their private, personal, and intimate information and images.

615. The search and/or seizure of Plaintiffs' and Class Members' information and photographs and videos was entirely unreasonable and caused meaningful interference with their possessory interests in their property. For example, Plaintiffs and Class Members have possessory interests in their NIL rights. The Individual Defendants' actions caused irreparable damage to their NIL rights, thereby damaging their possessory interests.

144

60453048.2

616. Weiss's actions were malicious, intentionally harmful, and the actions and inactions of the other Individual Defendants were taken with deliberate indifference, and they were so outrageous as to shock the contemporary conscience.

617. The actions and/or inactions of Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, Moore, and Does 10-50 actions, by failing to adequately train and/or supervise, and/or by facilitating and/or enabling and/or ignoring Defendant Weiss's illegal search and seizure, led to the violations of Plaintiffs' and Class Members' Fourth Amendment rights.

618. The Individual Defendants' actions were insufficient to protect Plaintiffs' and Class Members' rights to be free of warrantless and unreasonable searches and seizures.

619. The sexualized exploitation of Plaintiffs' and Class Members' images and PII was the result of the Individual Defendants' deliberate indifference toward the rights and well-being of student-athletes.

620. Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, and Does 10-50 failed to adequately train and supervise their employees, agents, and/or representatives, including Weiss, regarding the following duties:

    a. Recognizing, reporting, and preventing unauthorized invasions of privacy on campus;

b. Providing diligent supervision of student athlete information, including athlete databases, student/alumni accounts, and student athletes' PII;

c. Providing diligent supervision of individuals, including but not limited to Weiss, with access to student athletes' personal information;

d. Investigating any and all privacy invasions committed by Weiss;

e. Safeguarding all students, faculty, staff, alumni, and visitors on the University's campus premises;

f. Maintaining a campus environment free from sexual harassment and invasions of privacy; and

g. Properly training faculty and staff to be aware of their individual responsibility for creating and maintaining a safe environment.

621. Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, Moore, and Does 10-50's failing to adequately train and/or supervise, and/or facilitating and/or enabling and/or ignoring Defendant Weiss's conduct, is a direct cause of Plaintiffs' and Class Members' injuries.

622. As a result, the Individual Defendants deprived Plaintiffs and Class Members of their clearly established constitutional rights secured by the Fourth Amendment to the United States Constitution. Plaintiffs and Class Members had a

146

60453048.2

reasonable expectation of privacy in the content and settings of their Google accounts (including email, Drive, and Photos) and associated multi-factor recovery; Weiss's warrantless intrusions using state resources were per se unreasonable.

623. Defendant Wiess of course had actual knowledge of his actions. Defendants Grasso, Ono, Schlissel, Manuel, Gnodtke, Harbaugh, Pendse, Bermann, Moore, and Does 10-50 knew about Weiss' Fourth Amendment violations, sexual harassment, sexual assaults and/or stalking and failed to act sufficiently to prevent it.

624. The Individual Defendants' deliberate indifference after actual notice, including failure to disable implicated devices and restrict access to credentialed systems and rooms, caused continued unconstitutional searches and seizures.

625. The Individual Defendants are not entitled to qualified immunity.

626. Section 1983 of Title 42 of the United States Code provides, in part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . .

42 U.S.C. § 1983.

627. When the Individual Defendants engaged in the improper actions described above, they were acting under color of law for purposes of the Fourth

147

60453048.2

Amendment to the United States Constitution and 42 U.S.C. § 1983. Under this section, the Individual Defendants are liable for their violations of the Plaintiffs' and Class Members' constitutional rights under the Fourth Amendment.

628. The Individual Defendants' deprivation of Plaintiffs' and Class Members' Fourth Amendment rights caused them to have suffered, and to continue to suffer, harm and damages as described above and further including but not limited to humiliation, distress, and embarrassment.

629. Plaintiffs and Class Members should be awarded all available forms of damages in this case for the Individual Defendants' conduct, including but not limited to those outlined above, as well as injunctive relief, compensatory damages to include the deterioration and diminution in value of their NIL rights and severe emotional distress, including humiliation, embarrassment, loss of dignity, and the profound sense of vulnerability that accompanies the exposure of deeply private matters, punitive damages, and attorneys' fees and costs.

## COUNT IX – VIOLATION OF MICHIGAN CIVIL RIGHTS
## MICHIGAN CONSITUTION ARTICLE I -- § 26
## (AGAINST THE INDIVIDUAL DEFENDANTS)

630. Plaintiffs adopt and re-allege all paragraphs as if fully set forth herein, with particular emphasis on the allegations made in the Title IX and § 1983 claims.

631. Article I, Section 26 of the Michigan Constitution of 1963, in part, states: "The University of Michigan . . . shall not discriminate against, or grant

148

60453048.2

preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education or public contracting."

632. Plaintiffs are members of a protected class, specifically their gender as women.

633. Defendant Weiss, while employed by the University and acting under color of state law, accessed, viewed, and/or retained private and sensitive images and digital data of Plaintiffs and Class Members, based solely on their sex.

634. The Individual Defendants, who held supervisory and administrative roles within the University, had actual or constructive knowledge of Weiss's sex-based misconduct and failed to take appropriate remedial or preventative action.

635. The actions and/or inactions of the Individual University Employees, by failing to adequately train and/or supervise, and/or by facilitating and/or enabling and/or ignoring Defendant Weiss's invasion of Plaintiffs' and Class Members' privacy, led to the violations of Plaintiffs' and Class Members' Michigan Constitutional rights.

636. Individual Defendants' actions and/or inactions subjected Plaintiffs to discrimination on the basis of sex. Plaintiffs faced both intentional discrimination and disparate treatment.

60453048.2

637. Through the Individual Defendants' actions or inactions, Plaintiffs faced intentional discrimination. As Weiss targeted primarily women, this is discrimination motivated by Plaintiffs' sex as women.

638. Through the Individual Defendants' actions or inactions, Plaintiffs also faced disparate treatment, as they were treated differently from similarly situated individuals of the opposite sex. Specifically, similarly situated men were not subjected to Weiss' actions nor the Individual University Employees' actions and/or inactions. Furthermore, as noted above the Individual University Employees provided similarly situated men on the football team the benefit of Weiss's football prowess as an elite offensive coordinator at their playoff game, 10 days after his victimization of women was reported to the University. In contrast, the women continue to this day to be victimized.

639. As a direct and proximate cause and consequence of the unconstitutional policies, procedures, customs, acts, inactions, and/or practices described above, Plaintiff has suffered and continues to suffer injuries, damages and losses as set forth herein.

## COUNT X – VIOLATION OF ELLIOTT-LARSEN CIVIL RIGHTS ACT ("ELCRA") MCL 37.2101 *ET SEQ.* SEXUAL HARASSMENT AND ASSAULT (AGAINST THE INDIVIDUAL DEFENDANTS)

150

60453048.2

640. Plaintiffs adopt and re-allege all paragraphs as if fully set forth herein, with particular emphasis on the allegations made in the Title IX and § 1983 claims.

641. The ELCRA provides Michigan citizens with:

> The opportunity to obtain . . . the full and equal utilization of public accommodations, public service, and educational facilities without discrimination because of religion, race, color, national origin, age, sex, sexual orientation, gender identity or expression, height, weight, familial status, or marital status as prohibited by this act, is recognized and declared to be a civil right.

MCL 37.2102.

642. At all material times, the University offered educational facilities, and/or is a political subdivision, covered by and within the meaning of the Michigan ELCRA, MCL 37.2101, *et seq*.

643. The Individual Defendants are persons as that term is defined in ELCRA, MCL 37.2103.

644. Plaintiffs are persons and students, or former students, at the University who faced discrimination on the basis of sex.

645. Plaintiffs were and are members of a protected class by virtue of their sex as women.

646. Under the ELCRA, "[d]iscrimination because of sex includes sexual harassment." MCL 37.2103(k). "Sexual harassment means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or

communication of a sexual nature under the following conditions. . . . (iii) The conduct or communication has the purpose or effect of substantially interfering with an individual's employment, public accommodations or public services, education, or housing, or creating an intimidating, hostile, or offensive employment, public accommodations, public services, educational, or housing environment." *Id.*

647. Due to Defendants' actions and/or inactions, Plaintiffs faced sexual harassment.

648. The University's Standard Practice Guide 201.35 sets forth its policy on discrimination:

649. The University of Michigan. . . complies with all applicable federal and state laws regarding nondiscrimination. The University of Michigan is committed to a policy of equal opportunity for all persons and does not discriminate on the basis of race, color, national origin, age, marital status, sex, sexual orientation, gender identity, gender expression, disability, religion, height, weight, or veteran status in employment, educational programs and activities, and admissions.

650. Defendant Weiss, while employed by the University and acting under color of state law, accessed, viewed, and/or retained private and sensitive images and digital data of Plaintiffs and Class Members, based solely on their sex.

651. The Individual University Employees, who held supervisory and administrative roles within the University, had actual or constructive knowledge of

152

60453048.2

Weiss's sex-based misconduct and failed to take appropriate remedial or preventative action.

652. The actions and/or inactions of the Individual University Employees, by failing to adequately train and/or supervise, and/or by facilitating and/or enabling and/or ignoring Defendant Weiss's invasion of Plaintiffs' and Class Members' privacy, led to the violations of Plaintiffs' and Class Members' Michigan Constitutional rights and in violation of the University's own policies.

653. As Weiss targeted primarily women, Plaintiffs' sex and/or gender was at least one factor that made a difference in the Individual University Employees' treatment of Plaintiffs and subjected them to a hostile environment.

654. The Individual Defendants, through their agents, representatives, and employees, unlawfully discriminated against and harassed Plaintiffs based on their gender and/or sex and acted in accordance with that predisposition. The Individual Defendants treated Plaintiffs differently from similarly situated patrons in the administration of care based on their gender and/or sex, and allowed Plaintiffs to be subject to unlawful discrimination, including sexual harassment, sexual assault, privacy invasion, and/or stalking, based on their gender and/or sex.

655. The Individual University Employees failed to provide adequate oversight, safeguards, or response procedures to prevent such sex-based

153

60453048.2

discrimination and failed to take prompt and effective remedial action once the conduct came to light.

656. As a result, Plaintiffs were subjected to a hostile educational environment, discrimination based on sex, and a denial of equal access to educational benefits in violation of ELCRA.

657. In addition, to the extent that Plaintiffs faced retaliation for raising concerns or participating in any investigation, such conduct independently violated ELCRA's prohibition on retaliatory discrimination. MCL 37.2701.

658. The Individual Defendants' actions were intentional in disregard for Plaintiffs' rights and sensibilities.

659. As a direct and proximate cause and consequence of the unconstitutional policies, procedures, customs, acts, inactions, and/or practices described above, Plaintiffs have suffered and continue to suffer injuries, damages and losses as set forth herein.

## COUNT XI – VIOLATION OF MICHIGAN CONSTITUTION ARTICLE 1, § 2 FOR EQUAL PROTECTION (AGAINST THE INDIVIDUAL DEFENDANTS)

660. Plaintiffs adopt and re-allege all paragraphs as if fully set forth herein, with particular emphasis on the allegations made in the Title IX and § 1983 claims.

154

60453048.2

661. The Michigan Constitution states: "[n]o person shall be denied the equal protection of the laws…". MI Const. Art. 1, § 2. The Michigan Constitution, Article 1, § 2 guarantees equal protection and protection against discrimination.

662. "The Michigan Constitution secures the same right of equal protection (Const.1963, art. 1, § 2) and due process (Const.1963, art. 1, § 17) as does the United States Constitution." *Roy v. Rau Tavern, Inc*, 167 Mich. App. 664, 667 (1988).

663. Defendants were acting under color of state law at all times relevant to this action.

664. Plaintiffs, persons and students, or former students, at the University, and entitled to the equal protection of the law in connection with her education and access to institutional resources.

665. Defendant Weiss, while acting under color of law and within the scope of his employment at the University, targeted Plaintiffs and other female student-athletes by accessing and misappropriating their private digital materials solely because of their sex.

666. The Individual University Employees, acting in their official roles within the University, knew of this sex-based conduct and either enabled it, failed to prevent it, or deliberately disregarded it.

667. The Individual University Employees failed to provide a nondiscriminatory educational environment and took no prompt or effective

155

60453048.2

remedial action despite knowledge of discriminatory conduct, thereby violating Plaintiffs' right to equal protection under Michigan law.

668.   The conduct of all Individual Defendants, individually and collectively, resulted in Plaintiffs being treated unequally on the basis of sex by a state actor, in violation of their rights under Article I, § 2 of the Michigan Constitution.

669.   Plaintiffs and Class Members are entitled to monetary damages, as no adequate alternative remedy exists.

670.   There was no rational basis for the disparate treatment.

671.   Governmental immunity does not shield officials from liability when they violate clearly established constitutional rights of which a reasonable person would have known. The Individual Defendants' actions violated Plaintiffs' rights to equal protection, which is a right clearly established under the Michigan constitution and which a reasonable person would have known.

672.   The above-described acts of abuse and inferior treatment is not substantially related to an important and legitimate government interest and violates Plaintiff's rights to equal protection under the Michigan Constitution.

673.   The Individual Defendants' actions were intentional in disregard for Plaintiff's rights and sensibilities.

674.   As a direct and proximate cause and consequence of the unconstitutional policies, procedures, customs, acts, inactions, and/or practices

156

60453048.2

described above, Plaintiffs have suffered and continues to suffer injuries, damages and losses as set forth herein.

675. All of the Individual Defendants' collective and singular conduct was willful, malicious, knowingly, intentionally and/or with reckless disregard of the consequences of their actions. Accordingly, Plaintiffs are entitled to an award of punitive damages.

## COUNT XII – VIOLATION OF THE RIGHT TO SUBSTANTIVE DUE PROCESS UNDER THE MICHIGAN CONSTITUTION (AGAINST THE INDIVIDUAL DEFENDANTS)

676. Plaintiffs reallege the preceding paragraphs as if fully repeated.

677. Article 1, § 17 of the Michigan Constitution provides, in pertinent part, that "[n]o person shall be…deprived of life, liberty or property, without due process of law."

678. The Due Process Clause of the Michigan Constitution protects citizens from the deprivation of certain fundamental rights, regardless of the process afforded.

679. The right to privacy and the right to bodily integrity are fundamental rights protected under the Due Process Clause of the Michigan Constitution.

680. The due process guarantee of the Michigan Constitution is coextensive with its federal counterpart. The doctrine of substantive due process protects enumerated fundamental rights and liberties under the Due Process Clause of the

157

Fourteenth Amendment of the United States Constitution and under CONST. 1963, ART. 1 § 17.

681.  Plaintiffs, along with all members of the Class, were protected by the right to not be deprived of life, liberty or property without due process of law under the Due Process Clause of the Michigan Constitution.

682.  The right to privacy and bodily integrity has long been recognized by the Michigan Supreme Court to be protected by the Due Process Clause of the Michigan Constitution, CONST. 1963, ART. 1, § 17. *Mays et al. v Governor of Michigan et al.*, 506 Mich. 157, 186-187 (2020).

683.  Weiss, as a University employee at all times relevant and acting within the scope of his employment, violated the rights of Plaintiffs and Class Members by improperly accessing their PII and PHI and using that information to gain unauthorized access to other computer systems, which Weiss used to access private and intimate information belonging to Plaintiffs and Class Members, causing substantial damages to Plaintiffs and Class Members.

684.  The arbitrary and capricious conduct of Defendants, including Weiss, which deprived Plaintiffs and other Class Members of their privacy and bodily integrity was so egregious as to "shock the conscience" of any fair-minded person. *Mays*, at 192 (citing *Mettler Walloon, L.L.C. v. Melrose Twp.*, 281 Mich. App. 184, 198, 761 N.W.2d 293 (2008) (explaining that in the context of individual

158

60453048.2

governmental actions or actors, to establish a substantive due-process violation, "the governmental conduct must be so arbitrary and capricious as to shock the conscience")).

685. At all relevant times, Weiss was acting as an employee of the University, a public university funded by the State of Michigan, including, but not limited to, being responsible for the health, safety, and well-being of its students.

686. The Individual University Employees actually knew of Weiss's actions and failed to take any action to stop him despite actual notice from the ATS logs, the Google Workspace Reports, and the December 21–23, 2022 Reporting, and after each such notice, Weiss further accessed, downloaded, and sold Plaintiffs' PII and PHI, including through the date of his termination and continuing to the date of his Indictment.

687. The University also violated the rights of Plaintiffs and Class Members by depriving them of their right to privacy and bodily integrity without due process by improperly disclosing PII and PHI belonging to Plaintiffs and Class Members to Weiss, causing substantial damages to Plaintiffs and Class Members.

688. Weiss's conduct in improperly accessing PII and PHI belonging to Plaintiffs and Class Members and using that information to access private information and photographs belonging to Plaintiffs and Class Members, and the Individual University Defendants' permitting him to do so and providing computer

159

60453048.2

access to do so, despite actual notice, was arbitrary and capricious and so egregious as to shock the conscience.

689. The conduct of the University, in continuously recklessly permitting unauthorized access to the PII and PHI of Plaintiffs and Class Members, thereby permitting their most personal and intimate information to be stolen by a University employee, was arbitrary and capricious and so egregious as to shock the conscience.

## COUNT XIII – VIOLATION OF THE RIGHT TO PROCEDURAL DUE PROCESS UNDER THE MICHIGAN CONSTITUTION (AGAINST THE INDIVIDUAL DEFENDANTS)

690. Plaintiffs reallege the preceding paragraphs as if fully set forth herein.

691. Article 1, § 17 of the Michigan Constitution provides, in pertinent part, that "[n]o person shall be…deprived of life, liberty or property, without due process of law."

692. Plaintiffs and Class Members were protected by the right to not be deprived of life, liberty or property without due process under the Due Process Clause of the Michigan Constitution.

693. The right to privacy and the right to bodily integrity are protected under the Due Process Clause of the Michigan Constitution.

694. Weiss, as a University employee at all times relevant and acting within the scope of his employment, violated the rights of Plaintiffs and Class Members by improperly accessing their PII and PHI without due process and using that

160

60453048.2

information to gain unauthorized access to other computer systems, which Weiss used to access private information and photographs belonging to Plaintiffs and Class Members, causing substantial damages to Plaintiffs and Class Members.

695.   The Individual University Defendants as noted throughout this Complaint had actual notice of Weiss's actions and failed to terminate his computer credentials and after such notice Weiss continued to access, download, and sell Plaintiffs' PII and PHI.

696.   The Individual University Employees thus violated the rights of Plaintiffs and Class Members by depriving them of their right to privacy and bodily integrity without due process by knowingly approving the improper disclosing of the PII and PHI belonging to Plaintiffs and Class Members, causing substantial damages to Plaintiffs and Class Members.

## COUNT XIV – UNLAWFUL SEARCH AND SEIZURE UNDER THE MICHIGAN CONSTUTION (AGAINST THE INDIVIDUAL DEFENDANTS)

697.   Plaintiffs reallege the preceding paragraphs as if fully repeated.

698.   Article 1, § 11 of the Michigan Constitution provides in pertinent part, that "The person, houses, papers, possessions, electronic data, and electronic communications of every person shall be secure from unreasonable searches and seizures."

60453048.2

699.  Weiss, as a University employee at all times relevant and acting within the scope of his employment, violated the rights of Plaintiffs and Class Members by improperly accessing their PII and PHI and using that information to gain unauthorized access to other computer systems, which Weiss used to access private and intimate information belonging to Plaintiffs and Class Members.

700.  The Individual Defendants had actual knowledge of Weiss's conduct and failed to take any action to terminate Weiss's ongoing unlimited computer credentials and equipment, including from and after receiving the ATS logs, Google Workspace Reports, and the December 21–23, 02022 Reporting, after which Weiss continued to access, download, and sell Plaintiffs' PII and PHI.

701.  Weiss's actions constituted a search and seizure of electronic data and electronic communications belonging to Plaintiffs and Class Members.

702.  Weiss did not seek or obtain a warrant, and he did not have any other lawful authorization or justification that would have permitted him to search or seize electronic data and electronic communications belonging to Plaintiffs and Class Members.

703.  Plaintiffs and Class Members have a reasonable expectation of privacy in their personal electronic data and electronic communications.

60453048.2

704.   Weiss's search and seizure of electronic data and electronic communications belonging to Plaintiffs and Class Members was therefore per se unreasonable.

705.   Weiss's search and seizure of electronic data and electronic communications belonging to Plaintiffs and Class Members caused substantial damages to Plaintiffs and Class Members.

706.   The Individual University Defendants are also liable for Weiss's conduct since they had actual knowledge of it, could have terminated Weiss's computer access, and failed to do so, resulting in further harm to Plaintiffs and the Class Members.

## COUNT XV – STATE-CREATED DANGER UNDER THE MICHIGAN CONSTITUTION (AGAINST THE INDIVIDUAL UNIVERSITY EMPLOYEES)

707.   Plaintiffs reallege the preceding paragraphs as if fully repeated.

708.   Article 1, § 17 of the Michigan Constitution provides, in pertinent part, that "[n]o person shall be…deprived of life, liberty or property, without due process of law."

709.   Given their actual prior notice, the Individual University Employees recklessly exposed Plaintiffs and Class Members to a dangerous predator, Weiss, knowing he could cause serious damage by sexually harassing female students, and also by violating their rights to privacy.

163

60453048.2

710.   Plaintiffs, as female student athletes, were foreseeable victims.

711.   The invasion of Plaintiffs' and Class Members' privacy by Weiss was foreseeable.

712.   The decisions and actions to expose Plaintiffs PII and PHI to Weiss constituted affirmative acts that caused and/or increased the risk of harm, as well as physical and emotional injury, to Plaintiffs and Class Members.

713.   The risk that the Individual University Employees created regarding Plaintiffs and Class Members was different from a risk that affects the public, because Plaintiffs, as University athletes, were required to entrust the Individual University Employees with their PII and PHI.

714.   The Individual University Employees knew what Weiss was doing and that he would continue his collection of PII and PHI and exposure to Weiss endangered Plaintiffs and Class Members.

715.   Plaintiffs should be awarded all such forms of damages in this case for the Individual University Employees' conduct that caused great damage, humiliation, and embarrassment to Plaintiffs and the Class.

## COUNT XVI -- VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT – 18 U.S.C. § 1030 (AGAINST THE INDIVIDUAL DEFENDANTS AND KEFFER)

716.   Plaintiffs incorporate all other paragraphs of this Complaint by reference as if fully repeated.

164

60453048.2

717.   A person violates the Computer Fraud and Abuse Act ("CFAA") if he or she intentionally accesses a protected computer, lacked authority to access the computer or exceeded granted authority to access the computer, and thereby obtain information from any protected computer. *See* 18 U.S.C. § 1030(a)(2)(C). A "protected computer" includes one that is used in or affecting interstate or foreign commerce. 18 U.S.C.§ 1030(e)(2).

718.   Further, a person violates the Act by knowingly accessing or causing the transmission of a program, information, code, or command, and as a result of such conduct, intentionally or recklessly causes damage without authorization to a protected computer. *See* 18 U.S.C. § 1030(a)(5)(A), (B).

719.   Employers, supervisors, and others in a position of power or control are liable for violations of the Act under common-law tort doctrines, including agency and *respondeat superior*.

720.   Weiss used his University-granted access to Keffer's systems to intentionally obtain sensitive data about class members from Keffer's ATS without authorization. Weiss's obtained access to Keffer's system as part of and by virtue of his employment as a football coach at the University.

721.   Keffer was aware of Weiss's elevated level of access to its systems and that he was accessing and taking extraordinarily sensitive data but failed to terminate Weiss's access or otherwise stop him from exfiltrating data without authorization.

722.   Weiss gained access to class members' University's Google Workplace system, including Google Drive, without authorization in furtherance of his duties as a senior coach employed in the University's Athletic Department.

723.   Weiss had, guessed, and/or changed class members' passwords using the data he had gained by virtue of his employment by the University. Weiss used that access to view and/or download explicit and/or intimate videos and photos of class members without their authorization.

724.   Keffer's ATS and the University's Google Workplace systems, and the servers and computers that support them, are "protected computers" under the Act.

725.   Class Members' computers, which Weiss accessed, are likewise "protected computers" under the Act.

726.   Weiss intentionally accessed protected computers, lacked authority to access the computers or exceeded granted authority to access the computers, and thereby obtained information from any protected computer.

727.   The Individual University Defendants had actual notice of Weiss's activities, could have terminated his computer credentials, and failed to do so, thereby ensuring and causing more direct harm to Plaintiffs, and the Individual University Defendants are therefore liable for Weiss's intentional acts.

728.   Keffer knowingly and recklessly allowed Weiss to exfiltrate data from its ATS servers.

166

60453048.2

729. Keffer aided and facilitated Weiss's violation of the Act and is therefore vicariously liable for Weiss's violation of the Act.

730. Under 18 U.S.C. § 1030(g), the class may recover damages in this civil action from each of the Defendants, as well as injunctive relief.

731. Under 18 U.S.C. § 1030(e)(11), Plaintiffs and Class Members may recover any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense.

732. As a direct result of the Individual Defendants and Keffer's actions and inactions, Plaintiffs and Class Members suffered losses, including but not limited to, mitigation costs, including time and money spent to prevent identity theft, such as on credit monitoring and software like DeleteMe. These losses in the aggregate are over $5,000 in value over a one-year period.

733. As part of Plaintiffs' damages claim, Plaintiffs will incur expenses to investigate what has happened to their sensitive information, where it was stored, whether it was distributed to third parties and to ensure it is never distributed without their consent. Those expenses will be distinct from any expense incurred to litigate this case.

### COUNT XVII -- VIOLATION OF THE STORED COMMUNICATIONS ACT – 18 U.S.C. § 2701 *ET SEQ.* (AGAINST THE REGENTS, THE UNIVERSITY, AND THE INDIVIDUAL DEFENDANTS)

167

60453048.2

734. Plaintiffs incorporate all other paragraphs of this Complaint by reference with the same force and effect as if fully repeated.

735. A person violates the Stored Communications Act when he intentionally accesses without authorization a facility through which an electronic communication service is provided or intentionally exceeds an authorization to access that facility and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system. *See* 18 U.S.C. § 2701(a).

736. Electronic storage includes any temporary, immediate storage of a wire or electronic communication incidental to electronic transmission and any storage of an electronic communication by an electronic communication service. *See* 18 U.S.C. § 2510(17). An electronic communication includes, with few exceptions, any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature by a wire or radio that affects interstate or foreign commerce. *Id*. § 2510(12).

737. Employers, supervisors, and others in a position of power or control are liable for violations of the Act under common-law tort doctrines, including agency and *respondeat superior*.

738. The Act imposes strict liability on defendants.

739. Weiss used his University-granted access to Keffer's systems to intentionally obtain sensitive data about class members from Keffer's ATS without

authorization. Weiss obtained access to Keffer's system as part of and by virtue of his employment as a football coach at the University. Absent that employer-granted access, Weiss would have been unable to violate the Act.

740. Weiss gained access to class members' University's Google Workplace system, including Google Drive, without authorization in furtherance of his duties as a senior coach employed in the University's Athletic Department.

741. Weiss had, guessed, and/or changed class members' passwords using the data he had gained by virtue of his employment by the University. Weiss used that access to view and/or download explicit and/or intimate messages, mails, videos, and photos of class members without their authorization.

742. Keffer's ATS and the University's Google Workplace systems, and the servers and computers that support them, are facilities through which an electronic communication services are provided.

743. Weiss intentionally accessed ATS and the University's Google Workplace systems, lacked authority to access these systems or exceeded granted authority to access these systems, and thereby obtained unauthorized access to class members' electronic wires and/or communications.

744. Weiss accessed high volumes of messages, mails, videos, and photos, including those which were unopened.

169

60453048.2

745.   The Regents and the Individual University Defendants were on notice of Weiss's actions and approved of that action by failing to terminate Weiss's computer access after which Weiss continued to access, download, and sell Plaintiffs' PII and PHI.

746.   The University, through the Regents, Keffer, and Individual University Defendants, is liable for Weiss's intentional acts.

747.   The class may bring a civil action for violation of the Act, and they may obtain appropriate relief including equitable and declaratory relief, actual damages or damages not less than $1,000, punitive damages, and reasonable attorneys' fees and costs. *See* 18 U.S.C. § 2707(b)-(c).

### COUNT XVIII – VIOLATION OF THE STORED COMMUNICATIONS ACT – 18 U.S.C. § 2702 *ET SEQ.* (AGAINST KEFFER)

748.   Plaintiffs incorporate the allegations set forth above by reference with the same force and effect as if fully repeated.

749.   Under 18 U.S.C. § 2702, it is unlawful for a person or entity providing an electronic communication service or remote computing service to the public to knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service or to divulge to any person or entity the contents of any communication which is carried or maintained on that service on behalf of a subscriber or customer of such service, solely for the purpose of providing storage

or computer processing services to such subscriber or customer, if the provider is not authorized to access the contents of any such communications for purposes of providing any services other than storage or computer processing.

750. Because ATS facilitates communication between staff, student athletes, and others and provides computer storage and processing services to members of the public who are users of ATS, Keffer provides an electronic communication service and remote computing service.

751. Defendant Weiss was not authorized to access or divulge the content of Plaintiffs' private communications by for any purpose.

752. Weiss accessed without authorization and knowingly divulged that content.

753. By being willfully blind to Defendant Weiss's unlawful access to and exfiltration of Plaintiffs' private communications and other highly sensitive information, Keffer in effect knowingly divulged that information as well.

754. Keffer's divulging of Plaintiffs' private, personal, and intimate information, messages, files, and media constituted a violation of 18 U.S.C. § 2702.

755. As a result of these violations, Plaintiffs have incurred significant monetary and nonmonetary damages as a result of these violations of the Stored Communications Act, and Plaintiffs seek appropriate compensation for their damages.

60453048.2

## COUNT XIX – GROSS NEGLIGENCE (AGAINST KEFFER AND THE INDIVIDUAL DEFENDANTS)

756. Plaintiffs incorporate the allegations set forth above by reference as if fully repeated.

757. Plaintiffs entrusted Keffer with their private information, social media, images, and videos.

758. Plaintiffs were reasonable with that entrustment under the circumstances because the Regents, the University, and Keffer are in positions of control over Plaintiffs' PII, PHI, and NIL in the undergraduate student athlete context.

759. Plaintiffs' entrustment to Keffer extended to the safeguarding of their private information, social media, images, and videos.

760. Keffer is liable at law to Plaintiffs and the Class for permitting the handling and use of Plaintiffs' private personal information and the private and personal information of the Class in a manner that caused harm to the Plaintiffs, the Class Members, and others.

761. Keffer knew of the sensitivity of the information it was handling, and Plaintiffs relied heavily on the Keffer for the safe handling and using of the information entrusted to it.

172

60453048.2

762.   Keffer acted grossly negligent by not taking even the most basic steps to handle and care for the personal and private information of the Plaintiffs and the Class, by, among other conduct as identified in this Complaint, failing to use MFA, permitting actors like Weiss to access personal information without background checks, and failing to terminate access following the actual notice Keffer received of the quantities of information and extent of access by Weiss.

763.   As further illustration, Keffer, presumably jokingly, included until recently a picture of its pet dog on its website as its public indication of who is in charge of "security" as it relates to Keffer's team:

## Meet the Team



**Ashley, ATC**
Sales & Support



**Joe, ATC**
Sales & Support



**Gail**
Research & Sales



**Dana**
Office Manager



**Rhett**
Founder/CEO



**Maggie**
Office Security

173

60453048.2

764. But Plaintiffs' and the Class Members' PII, PHI, NIL, and other sensitive and private information is not a joking matter.

765. But for the lax below-standard security measures and failures by Keffer, Plaintiffs' and the Class Members' PII, PHI, NIL, and other private information, social media, images, and email accounts would not have been accessed by Weiss, and likely others.

766. Keffer failed in its duty, even after Weiss's activities were reported in December 2022.

767. The Individual Defendants also acted recklessly by failing to review or even consider how to safeguard Plaintiffs' and the Class Members' PII, PHI, NIL, and other personal information, social media, images, and email accounts, despite actual notice that it was being taken and sold by Weiss.

768. The Individual Defendants failed to undertake any action whatsoever to review or consider the maintenance, protection, monitoring, and supervision of Plaintiffs' personal and private information entrusted to Keffer and to the University to ensure it was kept confidential and safe.

769. But for the Individual Defendants' gross negligence and recklessness in this respect, Plaintiffs and the Class members would not have been damaged.

174

770. Plaintiffs have incurred significant monetary and nonmonetary damages as a result of Keffer's and the Individual Defendants' actions and request the appropriate damages.

## COUNT XX – TRESPASS TO CHATTELS
### (AGAINST WEISS)

771. Plaintiffs incorporate the allegations set forth above by reference with the same force and effect as if fully repeated.

772. By accessing Plaintiffs' personal and private information without authorization, Weiss intentionally and harmfully interfered with, and wrongfully exercised dominion or control over, Plaintiffs' private and personal information, images, videos, and social media.

773. The aforementioned accessing, dominion, and control was willful and malicious.

774. Plaintiffs and the Class Members have incurred significant monetary and nonmonetary damages as a result of Weiss's intentional and harmful interference with, and wrongful exercise of dominion or control over, Plaintiffs' private and personal information.

775. Plaintiffs are entitled to exemplary damages as a result of these intentional and harmful act and interference with, and wrongful exercise of control over, their property.

175

60453048.2

## COUNT XXI – COMMON LAW CONVERSION
## (AGAINST WEISS)

776. Plaintiffs incorporate the allegations set forth above by reference as if fully repeated.

777. By accessing Plaintiffs' personal and private information, Weiss wrongfully exercised dominion or control over Plaintiffs' property, social media, images, videos, and related media, and that access was in denial of, or inconsistent with, Plaintiffs' rights therein.

778. The aforementioned exercise of dominion or control was willful and malicious.

779. Plaintiffs have incurred significant monetary and nonmonetary damages as a result of Weiss wrongfully exercising dominion or control over Plaintiffs' personal and private information all of which was in denial of, or inconsistent with, Plaintiffs' rights therein.

780. Plaintiffs are entitled to exemplary damages as a result of Weiss wrongfully exercising dominion or control over Plaintiffs' property, in denial of, or inconsistent with, Plaintiffs' rights therein.

## COUNT XXII – VIOLATIONS OF MCL § 600.2919a
## (AGAINST THE WEISS)

781. Plaintiffs incorporate the allegations set forth above by reference as if fully repeated.

176

60453048.2

782. MCL § 600.2919a provides:

(1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:

(a) Another person's stealing or embezzling property or converting property to the other person's own use.

(b) Another person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted.

(2) The remedy provided by this section is in addition to any other right or remedy the person may have at law or otherwise.

783. Plaintiffs were damaged as a result of Weiss possessing, concealing, aiding the concealment of, stealing, and/or embezzling Plaintiffs' private and personal information and converting that information, those videos, and those images to his own use by using that information for his own purposes, and selling it.

784. Under MCL § 600.2919a, Plaintiffs are entitled to 3 times actual damages, plus costs and reasonable attorney fees.

## XXIII – NEGLIGENCE AS TO KEFFER

177

60453048.2

785.  Plaintiffs incorporate the allegations set forth above by reference as if fully repeated.

786.  Keffer owed Plaintiffs and the Class a duty to reasonably protect and safeguard their PII, PHI, NIL, and to limit access to private information, social media, images, and videos.

787.  Keffer acted unreasonably by use and maintenance of its dated, open, and unsecure ATS system.

788.  As a result, Weiss was able to access Plaintiffs' and the Class's PII, PHI, NIL, and other private information, social media, images, and videos.

789.  It was a breach of a reasonable standard for Keffer to not more carefully handle and use the personal and private information of the Plaintiffs, including with greater attention, and sensitivity so as to safeguard and protect from instruction by Weiss.

790.  Keffer failed in that duty.

791.  Plaintiffs' information was accessed by Weiss as a result, and his accessing, downloading, and sales were foreseeable as a result of Keffer's open access configuration, easily exportable data accumulation, and lack of monitoring, training, or review characteristics for protection of the students' PII and PHI within the Keffer computer network.

178

60453048.2

792.    Plaintiffs have incurred significant monetary and nonmonetary damages as a result of Defendants' actions and request the appropriate damages.

WHEREFORE, Plaintiffs request that the Court enter a judgment encompassing the relief requested above, plus significant compensatory damages exceeding $500,000,000.00 together with all other forms of relief, costs, interest and attorney fees, against Defendants, jointly and severally, and such other relief to which Plaintiffs and the Class Members are entitled.

Date: March 2, 2026                              Respectfully Submitted,

By:/s/*Parker Stinar*
Parker Stinar
parker@stinarlannenlaw.com

By:/s/*Patrick Lannen*
Patrick Lannen
**STINAR LANNEN, PLLC**
280 W. Maple Rd., Suite 230
Birmingham, Michigan 48009
patrick@stinarlannenlaw.com
(269) 370-1746

By:/s/ *Brian Glasser*
Brian A. Glasser
**BAILEY & GLASSER LLP**
1055 Thomas Jefferson Street,
NW, Suite 540
Washington, DC 20007
Phone: (202) 463-2101
bglasser@baileyglasser.com

By: /s/ *Bart Cohen*
Bart D. Cohen

179

60453048.2

**BAILEY & GLASSER LLP**
1622 Locust Street
Philadelphia, PA 19103
Phone: (267) 973-4855
bcohen@baileyglasser.com

By: */s/ David Selby, II*
David L. Selby, II
**BAILEY & GLASSER LLP**
3000 Riverchase Galleria, Suite 905
Birmingham AL 35244
Phone: (205) 628-7575
dselby@baileyglasser.com

By: */s/ John W. Barrett*
John W. Barrett
Katherine E. Charonko
**BAILEY & GLASSER LLP**
209 Capitol Street
Charleston, WV 25301
Phone: (304) 345-6555
jbarrett@baileyglasser.com
kcharonko@baileyglasser.com

By: /s/ *Aimee H. Wagstaff*
Aimee H. Wagstaff
Benjamin Gillig
**WAGSTAFF LAW FIRM**
940 N. Lincoln Street
Denver, CO 80203
Tel: 303-376-6360
awagstaff@wagstafflawfirm.com
bgillig@wagstafflawfirm.com

By: */s/ Nathan Fink*
Nathan J. Fink
**FINK BRESSACK PLLC**
38500 Woodward Avenue, Ste 350
Bloomfield Hills, MI 48304

180

60453048.2

248-971-2500
nfink@finkbressack.com

By: */s/ Samuel J. Schiller*
SAMUEL J. SCHILLER
**SCHILLER LAW FIRM**
Tennessee Attorney Registration #021810
Oklahoma Bar Association #016067
Suite 200, 4113 Cumby Road
Cookeville, TN 38501
Telephone: (931) 528-5050
Email: sjs@schillerlawfirm.com

By: */s/ J. Gerard Stranch, IV*
J. Gerard Stranch, IV
Emily Schiller
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
gstranch@stranchlaw.com
eschiller@stranchlaw.com

By: */s/ Raina Borrelli*
Raina Borrelli
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
raina@straussborrelli.com

By: */s/  Gary M. Klinger*
Gary M. Klinger
**MILBERG**
221 W. Monroe Street, Suite 2100
Chicago, IL 60606
gklinger@milberg.com

By: */s/  James J. Pizzirusso*

181

60453048.2

James J. Pizzirusso
**HAUSFELD LLP**
1200 17th St NW Suite 600,
Washington, DC 20036
T: 202.540.7200
jpizzirusso@hausfeld.com

*Counsel for Plaintiffs and the Proposed Class*

60453048.2

**CERTIFICATE OF SERVICE**

I hereby certify that on March 30, 2026, I electronically filed the foregoing document(s) using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

Date: March 30, 2026

Respectfully Submitted,

By:/s/*Patrick Lannen*
Patrick Lannen
Parker Stinar
**STINAR LANNEN, PLLC**
280 West Maple, Suite 230
Birmingham, Michigan 48009
patrick@stinarlannenlaw.com
parker@stinarlannenlaw.com